1  Christopher P. Ridout (SBN 143931)
2  ZIMMERMAN REED LLP
   2381 Rosecrans Avenue, Suite 328
3  Manhattan Beach, CA 90245
4  Telephone: (877) 500-8780
   Christopher.Ridout@zimmreed.com
5

6  *Counsel for Relator*

SEALED

7

8         **IN THE UNITED STATES DISTRICT COURT**
9         **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10  THE UNITED STATES OF AMERICA )    **Case No.** '20 CV1625 WQHAHG
    ex rel. ROGER S. CRAIG,          )
11                                    )
                                      )    **COMPLAINT**
12              Plaintiffs,           )
                                      )
13                                    )    **FILED IN CAMERA AND**
    v.                                )    **UNDER SEAL PURSUANT TO**
14                                    )    **31 U.S.C. § 3730(b)(2)**
    HAWTHORNE MACHINERY CO. and       )
15  COMERICA BANK,                    )    **JURY TRIAL DEMANDED**
16                                    )
                                      )
                Defendants.           )
17                                    )
                                      )
18

19

20

21

22

23

24

25

26

27

28

————————————————————————————————————————
2

1. Plaintiff-Relator Roger S. Craig ("Relator") brings this action on behalf of the United States of America against Hawthorne Machinery Co. ("Hawthorne") and Comerica Bank ("Comerica" and together with Hawthorne, the "Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") to recover all damages, civil penalties, and other remedies provided for under that statute.

## I.    INTRODUCTION

2. This action concerns Hawthorne's false and fraudulent application for a $5 to $10 million loan under the government's Payroll Protection Program ("PPP") and Comerica's approval and issuance of that loan despite being on notice that Hawthorne was ineligible under applicable federal law and PPP requirements.

3. The PPP is one of our nation's most aggressive economic responses to the current Coronavirus pandemic. It represents over $500 billion of government support for loans to certain specified entities for the purpose of allowing those entities to continue to employ their workers during this time of severe economic disruption. PPP loans are below-market rate loans issued by private lenders but guaranteed by the federal government. If borrowers use the proceeds of PPP loans for qualifying purposes such as payroll or rent, the federal government will forgive the repayment of all money so used. A critical aspect of the PPP is its limitation on the types of entities that are eligible for these government-backed loans.

4. Businesses that are not otherwise qualified as "small business concerns" under the laws and regulations administered by the Small Business Administration

("SBA") are only eligible to receive PPP loans if they have averaged 500 or fewer employees over the prior year, as calculated under relevant law, or if they meet certain other industry-specific criteria, if applicable.

5. Hawthorne Machinery Co. is a California company that has over $200 million in annual revenue and does not qualify as a "small business concern" or otherwise meet the SBA's industry-specific size requirements for small businesses. It had more than 500 employees for the year preceding its submission of a PPP loan application to its commercial bank, Comerica Bank. Accordingly, Hawthorne was ineligible to receive a PPP loan.

6. In a cynical attempt to obtain a PPP loan to which it was not entitled, Hawthorne undermined the entire purpose of the PPP by terminating over 20 employees effective the same day that it submitted its PPP loan application. Hawthorne then falsely represented on its PPP loan application that it had only 489 employees, when the correct calculation of its employee size under applicable laws would have been over 500.

7. Hawthorne's deceitful actions were plainly contrary to the goal of the PPP, which was to allow qualifying business to *retain* employees using the proceeds of government-backed, below-market loans. It would obviously contradict this clear purpose if companies were allowed and incentivized to fire a sufficient number of employees on the day of a PPP loan application to bring their headcount down to 500 or below. This is why the SBA and the laws and regulations applicable to its lending programs have specific rules for calculating employee counts that do not look to a

4

specific point in time but instead average an employer's headcount over a period generally equal to one year.

8.     Comerica approved Hawthorne's PPP loan in an amount between $5 and $10 million on April 6, 2020. Comerica approved this application despite the fact that it had a pre-existing commercial banking relationship with Hawthorne and otherwise had information regarding its payroll for the prior year, which information would indicate that Hawthorne had more than 500 employees during the prior year and was therefore ineligible for a PPP loan. Comerica earned $50,000 to $100,000 in fees from the SBA for issuing this loan.

9.     Two days prior to Comerica's approval of Hawthorne's false and fraudulent PPP loan application, the SBA issued a statement that explicitly addressed the calculation of employees for purposes of PPP eligibility. This SBA statement made unmistakably clear that the calculation of an employer's headcount for purposes of the PPP 500-employee limit was based on the average of that employer's headcount for the prior year. This is the same employee calculation methodology that applied across the SBA's operations, and with which Comerica was familiar since it was an approved SBA lender. Notwithstanding this clear instruction, Comerica approved Hawthorne's application and issued it a multi-million dollar government-backed PPP loan.

10.     The actions of Defendants have undermined the government's response to the Coronavirus pandemic and have defrauded the United States into guaranteeing a $5 to $10 million loan to which Hawthorne was not entitled. If any portion of this loan is

forgiven by the government, it will suffer separate and additional economic harm in an amount of the forgiven balance.

## II.    JURISDICTION & VENUE

11.    Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3729 *et seq.*, specifically 31 U.S.C. §§ 3732(a) & (b) and 28 U.S.C. §§ 1331 and 1345.

12.    The Court may exercise personal jurisdiction over the Defendants because they transact business in this District, engaged in the alleged illegal activities and practices in this District, and are located in this District.

13.    Venue in this District is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

## III.    PARTIES

14.    The United States is a real party in interest to the claims in this action. Through the Small Business Administration and the Department of the Treasury, the United States administers the Paycheck Protection Program.

15.    Relator Roger S. Craig is an individual who resides in Fallbrook, California. Relator worked at Hawthorne as a Finance Manager from October 14, 2019 until he was terminated effective on April 3, 2020.

16.    Defendant Hawthorne is a California corporation with its principal executive office located at 16945 Camino San Bernadino, San Diego, CA 92127.

17. Hawthorne is a lessor, seller, and servicer of heavy machinery. It is a licensed dealer of Caterpillar brand equipment and does business under the trade name "Hawthorne CAT."

18. Defendant Comerica is a financial institution with headquarters located at Comerica Bank Tower, 1717 Main Street, MC 6404, Dallas, TX 75201. It is a wholly-owned subsidiary of the holding company Comerica Incorporated.

## IV.   LEGAL BACKGROUND

### A.   The Federal False Claims Act

19. The federal FCA imposes liability on any person who:

> (A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim....

31 U.S.C. §§ 3729(a)(1)(A) & (B).

20. The term "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that ... is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii).

21. The term "knowingly" means "that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

22. Section 3729(a)(1) of the FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus civil penalties. The FCA civil penalties are $5,500 to $11,000 for violations occurring from September 29, 1999 to August 1, 2016; $10,781 to $21,563 for violations occurring from August 2, 2016 to February 3, 2017; $10,957 to $21,916 for violations occurring from February 4, 2017 to January 29, 2018; $11,181 to $22,363 for violations occurring from January 30, 2018 to June 19, 2020; and $11,665 to 23,331 for violations occurring thereafter. *See* 28 C.F.R. §§ 85.3 & 85.5; 85 Fed. Reg. 37004 (June 19, 2020).

**B.     The Paycheck Protection Program**

23. The Paycheck Protection Program is an economic stimulus measure that is designed to provide financing to certain types of businesses in order to allow those businesses to avoid laying off employees as a result of the economic disruption caused by the Coronavirus pandemic.

24. On March 27, 2020, the CARES Act was enacted, which established the PPP by adding new Section 7(a)(36) to the Small Business Act of 1953. 15 U.S.C.

§ 636(a)(36). The PPP was later expanded and extended by the Paycheck Protection Program and Health Care Enhancement Act (Apr. 24, 2020) and the Paycheck Protection Program Flexibility Act (June 5, 2020), respectively.

25.     The PPP is structured as a guaranteed loan program under the Small Business Administration and is subject to the same laws and regulations as other "Section 7(a)" loans, except where expressly provided otherwise by the CARES Act or other relevant law. PPP loans are made by private lenders under federal laws and regulations, and are fully guaranteed by the federal government.[1]

26.     The basic mechanism of PPP loans is as follows. Eligible borrowers are able to obtain government-backed loans at below-market interest rates in an amount determined by reference to their payroll costs. They do so by submitting an application for a PPP loan to a financial institution that participates as a lender in the PPP. If the lender approves their loan application, it will issue the loan and the SBA will guarantee its repayment. If borrowers use the proceeds of their PPP loans for qualifying purposes, such as to pay employee salaries or healthcare benefits, their PPP loans will be forgiven by the government, meaning that the SBA will pay the lender in an amount equal to the

---

[1] *See* 85 Fed. Reg. 29845, 29846 (May 19, 2020) ("Loans under the PPP are 100 percent guaranteed by SBA, and the full principal amount of the loans and any accrued interest may qualify for loan forgiveness.").

"forgiven" balance.[2] Otherwise, the loans must be repaid by the borrower. If the borrower is required to but does not repay some or all of the outstanding balance, the government will repay the lender any amounts owed under the SBA guarantee.

27.     The laws and regulations implementing the PPP establish the set of eligible borrowers. Only those entities that are expressly eligible for PPP loans are legally entitled to obtain them. Compliance with the PPP eligibility requirements "is essential to ensure that PPP loans are directed to the entities Congress intended, and that PPP loan proceeds are used for the purposes Congress required, including the CARES Act's central purpose of keeping workers paid and employed." 85 Fed. Reg. 33010, 33012 (June 1, 2020).

28.     As the PPP was enacted as part of the SBA's "7(a)" loan program, it is primarily directed towards small businesses. The exclusive list of entities that are eligible to obtain PPP loans is set forth in federal law as follows:

- "Small business concerns" as defined by pre-existing SBA standards;
- Certain specified nonprofit, veterans, or Tribal organizations; and
- Any other business that employs no more than the greater of (I) 500 employees; or (II) if applicable, the size standard in number of employees

---

[2] 85 Fed. Reg. 33004, 33005 (June 1, 2020) ("If the lender determines that the borrower is entitled to forgiveness of some or all of the amount applied for under the statute and applicable regulations, the lender must request payment from the SBA .... SBA will, subject to any SBA review of the loan or loan application, remit the appropriate forgiveness amount to the lender, plus any interest accrued through the date of payment....").

established by the Administration for the industry in which the business concern ... operates.

15 U.S.C. § 636(a)(36)(D)(i).

29. Federal regulations specify the methodology for calculating the number of employees of a business for purposes of determining size for SBA purposes.

30. The SBA's employee-counting regulation directs that the measure of employees is the average number of all individuals employed on a full-time, part-time, or other basis for each pay period in the preceding completed 12 calendar months. 13 C.F.R. §§ 121.106(a), (b)(1).

31. The SBA has also published federal regulations that specify, for certain industry classifications, employee size standards and/or annual receipts standards for determining small business qualification. 13 C.F.R. § 121.201. As relevant here, the SBA has established an annual receipts standard of $35 million for companies within the classifications of "Construction, Mining and Forestry Machinery and Equipment Rental and Leasing" (NAICS #532412) and "Other Commercial and Industrial Machinery and Equipment Rental and Leasing" (NAICS #532490). *Id.* There is no employee size standard for these two industry classifications.

32. Among other penalties for misrepresentation of SBA size standards are "severe penalties under the False Claims Act." 13 C.F.R. § 121.108(e)(2).

33. The maximum amount of a PPP loan is determined by a calculation involving the borrower's monthly payroll for the prior year, subject to an upper limit of $10 million. 15 U.S.C. § 636(a)(36)(E).

## V. FACTUAL ALLEGATIONS

**A. On March 26, 2020, Hawthorne Terminated Twenty Or More Employees In Order To Reduce Headcount To Less Than 500 And Submitted A False And Fraudulent PPP Loan Application To Comerica On April 3, 2020, The Same Day These Terminations Became Effective**

34. On March 26, 2020, while at work in Hawthorne's offices, Relator was approached by Greg Vena, Hawthorne's Director of Sales and Rental, and instructed to immediately attend an unscheduled meeting.

35. Approximately 20 to 30 other employees were similarly hastily assembled for this meeting, which was led by Jeffrey Boman, Hawthorne's General Counsel. Mr. Boman told the group of employees that "there is no easy way to say this," and then announced that all of the gathered employees were terminated and were to be escorted out of the building that day.

36. In addition, at least one employee who was not present at this March 26, 2020 meeting because she was not in the office that day was also terminated by Hawthorne on or around that date.

37. On April 3, 2020, Relator received by mail from Hawthorne a "Notice to Employee as to Change in Relationship," indicating that his employment status had

12

changed due to "Reduction in Force due to Covid 19 Pandemic." The effective date of his termination was April 3, 2020.

38. Hawthorne submitted a PPP loan application to its pre-existing commercial bank, Comerica. On information and belief, this application was submitted on April 3, 2020. PPP loan applications are submitted on SBA Form 2483, or through analogous forms used by PPP lenders that contain the same requirements.

39. One of the first items on SBA Form 2483 requires the applicant to identify its number of employees. Hawthorne's PPP loan application stated that it employed 489 individuals.

40. In order to apply for a PPP loan, the borrower must perform calculations involving its payroll costs for the prior year to determine the amount of the requested loan. In general, PPP loans can be issued in amounts equal to 2.5 times a borrower's average monthly payroll, subject to specific parameters.

41. Hawthorne's PPP loan application sought a loan in an amount between $5 and $10 million. $10 million is the largest amount in which a PPP loan may be issued.

42. In submitting its SBA Form 2483, Hawthorne made the following certifications, which are incorporated into the form itself:

(a) ***The Applicant is eligible to receive a loan*** *under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program...;*

13

(b) ***The Applicant ... employs no more than the greater of 500 employees*** *or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry;*

(c) ***The funds will be used to retain workers and maintain payroll*** *or make mortgage interest payments, lease payments, and utility payments ....;*

(d) *The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employee's on the Applicant's payroll ... for the eight-week period following this loan;* [and]

(e) ***I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects.*** *I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law....*

SBA Form 2483 (April 2020) (emphasis added).[3]

43. Hawthorne's knowledge of the legal requirements for PPP loans is beyond dispute. In an apparent attempt to assist its customer base in applying for PPP loans, Hawthorne's business website contains a page dedicated to COVID-19 that includes references to information regarding PPP loan requirements.[4]

. 44. Hawthorne's website contains a link to a "Small Business Owners: CARES Act FAQ," which is a webpage maintained by J.P. Morgan Private Bank.[5] Among other information, this webpage answers the question "What is the definition of an employee,

---

[3] *See also* 15 U.S.C. § 636(a)(36)(G)(i) (requiring certain borrower certifications).
[4] "COVID-19 Statement," Hawthorne Website, available at https://www.hawthornecat.com/in-the-know/covid-19-statement (visited July 25, 2020).
[5] "Small Business Owners: CARES Act FAQ," JPMorgan Website, available at https://privatebank.jpmorgan.com/gl/en/insights/planning/small-business-owners-cares-act-faq (visited July 25, 2020).

and how is the number of employees calculated?" with the statement, "For non-seasonal businesses, headcount is calculated by using the average number of employees: (i) from the previous 12 months; (ii) from calendar year 2019; or (iii) per pay period in the 12 completed calendar months prior to the date of the loan application."

45.     Hawthorne's website contains a separate link to the Department of the Treasury's "Paycheck Protection Program (PPP) Information Sheet: Borrowers."[6] This document, in the section titled "Who can apply?," states that "All businesses … with 500 or fewer employees can apply," and directs the reader to click on a link for additional detail.  That link corresponds to the SBA's website for "Size Standards," which defines "Employee calculation" as "the average number of people employed for each pay period over the business's latest 12 calendar months."[7]

46.     Hawthorne's website further identifies "a quick list of things you can be doing now to be prepared" to apply for a PPP loan, including "Gather documentation on your business's: Payroll … for the previous 12-month period."

---

[6] "Paycheck Protection Program (PPP) Information Sheet: Borrowers," Department of the Treasury, available at https://home.treasury.gov/system/files/136/ PPP%20Borrower%20Information%20Fact%20Sheet.pdf (visited July 25, 2020).

[7] "Size Standards," SBA Website, available at https://www.sba.gov/federal-contracting/contracting-guide/size-standards (visited July 25, 2020).

**B. On April 6, 2020, Comerica Approved Hawthorne's PPP Loan Application And Issued A Government-Backed PPP Loan To Hawthorne Even Though It Was On Notice That Hawthorne Was Not An Eligible Borrower**

*The Roles and Responsibilities of PPP Lenders*

47. The structure of the PPP relies on private financial institutions, like Comerica, to administer the loan approval and lending process consistent with federal laws and regulations. 15 U.S.C. § 636(a)(36)(F)(ii) ("For purposes of making covered loans … a lender approved to make loans under this subsection shall be deemed to have been delegated authority by the Administrator to make and approve covered loans….").

48. Financial institutions that are either approved SBA 7(a) lenders, or who obtain approval to participate as PPP lenders, are authorized to approve PPP loan applications and make PPP loans that are guaranteed by the SBA. 15 U.S.C. § 636(a)(36)(F)(iii).

49. Illustrating these lender requirements, the SBA requires that financial institutions that wish to issue PPP loans (and who are not already approved 7(a) lenders) expressly agree that, "[f]or purposes of making covered loans to an eligible recipient under the Paycheck Protection Program, Lender is responsible, to the extent set forth in the PPP Loan Program Requirements, for all decisions concerning the eligibility (including size) of a borrower for a covered loan." SBA Form 3506 (July 2020).

50. Because the government will guarantee PPP loans upon approval by a PPP lender without further diligence, PPP lenders are the government's first (and often, last) line of defense to ensure that only eligible borrowers obtain PPP funds. Lenders

16

participating in the PPP must comply with all Section 7(a) loan requirements, except where expressly provided otherwise by the CARES Act or other relevant law. *See, e.g.,* 13 C.F.R. § 120.180 ("SBA Lenders and Intermediaries must comply and maintain familiarity with Loan Program Requirements for the 7(a) Loan Program …. An SBA Lender or Intermediary must maintain sufficient documentation to demonstrate that Loan Program Requirements have been satisfied."); § 120.197 ("Lenders, CDCs, Borrowers, and others must notify the SBA Office of Inspector General of any information which indicates that fraud may have occurred in connection with a 7(a) or 504 loan.").

51.    In order to expedite the processing of PPP loans to immediately prevent additional job losses, the government has relaxed certain 7(a) program requirements, such as the requirement that lenders independently evaluate the creditworthiness of borrowers. *See, e.g.*, 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) ("For example, for loans made under the PPP, SBA will not require the lenders to comply with section 120.150 'What are SBA's lending criteria?.'").

52.    In addition, the government has stated that "SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower" and that "Lenders must comply with the applicable lender obligations set forth in this interim final rule, but will be held harmless for borrowers' failure to comply with program criteria; remedies for borrower violations or fraud are separately addressed in this interim final rule." 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020).

53.     However, these regulations do not relieve PPP lenders of their obligation to review borrowers' applications and to obtain from borrowers "such documentation as is necessary to establish eligibility." 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020).  Federal regulations further provide that "[i]f the lender identifies ... material lack of substantiation in the borrower's supporting documents, the lender should work with the borrower to remedy the issue." 85 Fed. Reg. 33010, 33013 (June 1, 2020).

54.     In addition, "Lenders are expected to perform a good-faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning amounts eligible for loan forgiveness." 85 Fed. Reg. 33010, 33013 (June 1, 2020). Importantly, loan forgiveness is not available to borrowers who were not eligible to obtain a PPP loan in the first place. *Id.* at 33012.

55.     In exchange for performing a valuable screening function for the review and approval or denial of PPP loan applications, participating lenders receive fees from the government for each loan made.  These fees range from 5% for loans less than $350,000, to 3% for loans between $350,000 and $2,000,000, to 1% for loans of at least $2,000,000. 15 U.S.C. § 636(a)(36)(P).

56.     The government has referred to these fees as "substantial" and, along with the fully-guaranteed nature of PPP loans, "ample inducement for lenders to participate in the PPP." 85 Fed. Reg. 20811, 20813 (Apr. 15, 2020).

57.     A lender is not entitled to any fee, however, if the borrower is not eligible for a PPP loan. *See* 85 Fed. Reg. 33010, 33014 (June 1, 2020) ("If SBA conducts a loan

18

review and determines that the borrower was ineligible for a PPP loan, the lender is not eligible for a processing fee."). And the SBA can claw back fees that were paid if it is later learned that a borrower was ineligible, or if a lender fails to comply with its obligations under the PPP. *Id.*

58. The PPP's limit on the eligibility of businesses such as Hawthorne to no more than 500 employees is contained in the express language of the CARES Act and incorporated into the U.S. Code. 15 U.S.C. § 636(a)(36).

59. Federal regulations had contained the required method for calculating employee headcount for SBA loan purposes prior to the enactment of the PPP. 13 C.F.R. § 121.106(a), (b)(1).

60. As an SBA preferred lender, Comerica was well aware of the requirements for obtaining SBA loans, which had long included the federal regulations regarding the proper calculation of employee headcount.[8]

61. Indeed, on April 4, 2020, prior to Comerica's approval of Hawthorne's loan, the SBA issued a statement that made it absolutely clear that "the general rules that average the number of individuals employed in the preceding completed 12 calendar months as of the date of application apply for Paycheck Protection Program eligibility." The April 4th SBA statement further explained that "SBA does not allow, and cannot

---

[8] "How to apply for an SBA business loan," Comerica Website, available at https://www.comerica.com/insights/business-finance/how-to-apply-for-an-sba-business-loan.html (visited July 25, 2020).

allow, a lender to disburse loan funds to business concerns that have not demonstrated their eligibility prior to disbursement as part of the normal application processing."

*Comerica Failed in its Responsibilities as a PPP Lender when it Approved Hawthorne's False and Fraudulent Application and Issued it a $5-10 Million Government-Backed Loan*

62.    Comerica had functioned as Hawthorne's commercial bank prior to the time that Hawthorne applied for a PPP loan.

63.    Comerica approved Hawthorne's PPP loan application on April 6, 2020, which was just one business day after Hawthorne submitted it to Comerica.

64.    Comerica plainly failed in its responsibility to evaluate Hawthorne's PPP application for compliance with applicable requirements, specifically the core requirement that Hawthorne be among the type of businesses to which federal law permits PPP loans to be issued.

65.    As Hawthorne's pre-existing commercial bank, Comerica had knowledge of, and was likely in possession of extensive documentation concerning, Hawthorne's financial operations.

66.    In addition, PPP borrowers are required to submit to their PPP lender sufficient documentation to establish their payroll calculations for purposes of determining their eligible loan amount.

67.    This information would necessarily include payroll information for the prior 12 months, since that information is required to calculate the maximum loan amount to which the borrower is entitled.

68.     The payroll information that Hawthorne was required to submit to Comerica, and that Comerica was required to review, would have established that Hawthorne had employed more than 500 employees over the preceding year.

69.     Hawthorne falsely represented on its PPP loan application that it had 489 employees. That number being very close to the 500-employee limit at the very least should have caused Comerica to review or request from Hawthorne documentation that established that it calculated this number correctly.

70.     Reviewing or requesting such confirmatory documentation was not only a legal obligation of Comerica, but would have represented a minimal amount of diligence for a bank that would receive a processing fee from the government of $50,000 to $100,000 for this loan.

## C.     Defendants' Actions Violated The False Claims Act And Undermined The Government's Response To The Coronavirus Pandemic

71.     Defendants have violated the False Claims Act in multiple ways and have together undermined the critical public purpose behind the PPP.

72.     Hawthorne included an express false statement on its PPP loan application regarding its number of employees, since that number was not calculated pursuant to applicable legal requirements.

73.     Hawthorne falsely certified in its PPP loan application the accuracy of the information it contained and Hawthorne's compliance with the requirements of the PPP.

74. Comerica failed in its responsibilities as a PPP lender when it approved Hawthorne's facially false application.

75. As Hawthorne's commercial bank, Comerica was uniquely positioned to review Hawthorne's PPP loan application because it was already very familiar with Hawthorne's financial position and its business operations. In addition, Comerica was required to obtain payroll information from Hawthorne prior to approving a PPP loan in order to verify the legally permissible amount of any PPP loan. This or any other information regarding Hawthorne's employee headcount that Comerica would have reviewed would clearly have demonstrated that Hawthorne employed more than 500 individuals up to the exact date on which it submitted its PPP loan application, and therefore that Hawthorne was ineligible to obtain a PPP loan.

76. Hawthorne and Comerica's actions constitute the submission of false claims and false statements material to such false claims to the United States. Defendants' actions fraudulently induced the United States to guarantee Hawthorne's PPP loan, for which it was not eligible under law.

77. In addition, to the extent that Hawthorne applies to Comerica (or a future lender) for SBA loan forgiveness for some or all of its PPP loan balance, such loan forgiveness application and approval would constitute additional false claims and result in a separate form of economic damages to the United States.

78. Defendants' fraud undermined the core governmental purpose of the PPP, which was to prevent, rather than incentivize, job losses. Through affirmative false

statements and certifications, Hawthorne obtained from Comerica a PPP loan that should

never have issued at a time when other, deserving borrowers have been unable to access

PPP loans.[9]  Indeed, Comerica has at present stopped approving and issuing additional

PPP loans.[10]  This constitutes injury to a governmental program that is separate from the

economic injury caused by Defendants' fraud.

## VI.    COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

79.    Relator re-alleges and incorporates each allegation in paragraphs 1 through

78 as if fully set forth herein and further alleges as follows:

80.    By virtue of the acts described above, Defendants "knowingly present[ed],

or caus[ed] to be presented, false or fraudulent claims for payment or approval" in

violation of 31 U.S.C. § 3729(a)(1)(A).

81.    The United States, unaware of the foregoing circumstances and conduct, and

in reliance on the truth and accuracy of the claims for payment, paid or authorized

payment of those claims and has been damaged in an amount to be proven at trial.

---

[9] *See* 15 U.S.C. § 636(a)(36)(P)(iv) (sense of the Senate that PPP loans should be prioritized for small business concerns and entities in underserved and rural markets).

[10] Comerica Website, available at https://www.comerica.com/campaigns/covid-19/Business/paycheck-protection-program.html (visited July 25, 2020).

23

## Count II
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(B)

82. Relator re-alleges and incorporates each allegation in paragraphs 1 through 78 as if fully set forth herein and further alleges as follows:

83. By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

84. The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator demands that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.

Further, Relator requests that he receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

# DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

DATED: August 20, 2020

Respectfully submitted,

ZIMMERMAN REED LLP

By: _____

Christopher P. Ridout (SBN 143931)
Caleb Marker (SBN 269721)
ZIMMERMAN REED LLP
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Christopher.Ridout@zimmreed.com
Caleb.Marker@zimmreed.com

Jeanne A. Markey
Gary L. Azorsky
Raymond M. Sarola
COHEN MILSTEIN SELLERS & TOLL PLLC
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: (267) 479-5700
gazorsky@cohenmilstein.com
jmarkey@cohenmilstein.com
rsarola@cohenmilstein.com

Carolyn G. Anderson
June P. Hoidal
Charles R. Toomajian III (SBN 302153)
ZIMMERMAN REED LLP
80 South 8th Street, Suite 1100
Minneapolis, MN 55402
Telephone: (612) 341-0400
Carolyn.Anderson@zimmreed.com
June.Hoidal@zimmreed.com
Charles.Toomajian@zimmreed.com

*Counsel for Relator*

25

## CERTIFICATE OF SERVICE

I hereby certify that I will cause a copy of the above Complaint to be served on the following counsel by certified U.S. Mail, return receipt requested:

The Honorable William P. Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

Robert S. Brewer, Jr.
United States Attorney for the
Southern District of California
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 20, 2020

_____
Christopher P. Ridout