POLLOCK COHEN LLP
Christopher K. Leung (SBN 210325)
Max E. Rodriguez (admitted *pro hac vice*)
Adam Pollock (admitted *pro hac vice*)
Tel: 212-337-5361
Max@PollockCohen.com
*Attorneys for Plaintiff-Relator Roger S. Craig*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ROGER S. CRAIG,<br><br>          Plaintiff,<br><br>   v.<br><br>HAWTHORNE MACHINERY CO., BRIAN VERHOEVEN, TEE NESS, and DAVID NESS,<br><br>          Defendants. | Case No. 3:20-cv-01625-WQH-AHG<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.     Plaintiff-Relator Roger S. Craig ("Relator") brings this action on behalf of the United States of America against Hawthorne Machinery Co. ("Hawthorne Machinery"), as well as individuals Brian Verhoeven, Tee Ness, and David Ness (collectively, the "Defendants") for violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA") to recover all damages, civil penalties, and other remedies provided for under that statute.

## I.     INTRODUCTION

2.     This action concerns Hawthorne Machinery's false and fraudulent application for an $8,083,800 loan under the government's Paycheck Protection Program ("PPP"), and Hawthorne Machinery principals Brian Verhoeven, Tee Ness, and David Ness's actions causing this false and fraudulent PPP application to be submitted.

3.     The PPP was one of our nation's most aggressive economic responses to the Coronavirus pandemic. It represented over $950 billion of government loan support for specified entities that sought to continue employing their workers during this time of severe economic disruption. Private lenders issued these below-market rate PPP loans, and the federal government guaranteed them.  If borrowers used the proceeds of PPP loans for qualifying purposes such as payroll or rent, the federal government would forgive the repayment of all money so used. A critical aspect of the PPP was its limitation on the types of entities that are eligible for these government-backed loans.

4.     When Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")—the emergency legislation that authorized the PPP and other programs to respond to the pandemic—it included clear and unambiguous statutory provisions concerning the application of both program-specific and general SBA requirements for how employees should be counted to determine eligibility for PPP loans. Among other things, businesses that were not otherwise qualified as "small business concerns" under the laws and regulations administered by the Small Business Administration ("SBA") were only eligible to receive PPP loans if they had averaged 500 or fewer employees over the prior year, as calculated under relevant law, or if they met certain other industry-specific criteria, if applicable.

5.     Hawthorne Machinery met none of these criteria. As a California company with over $200 million in annual revenue, Hawthorne Machinery did not qualify as a "small business concern" or otherwise meet the SBA's industry-specific size requirements for small businesses. And as calculated by longstanding SBA regulations and specific guidance related to the PPP program, Hawthorne Machinery—when counted together with the necessary affiliate entities under applicable federal laws and regulations—had more than 500 employees for the year preceding its submission of a PPP loan application to its commercial bank, Comerica Bank.

6.     Accordingly, Hawthorne Machinery was ineligible to receive a PPP loan. Hawthorne Machinery applied for one anyway.

7.     In a cynical attempt to obtain an over $8 million PPP loan to which it was not entitled, Hawthorne Machinery submitted payroll materials in support of its PPP application that were materially altered and/or misrepresented to support its representation that it and two disclosed affiliates, Hawthorne Pacific Corporation ("Hawthorne Pacific"), and Hawthorne of Samoa, Inc. ("Hawthorne Samoa"), had fewer than 500 employees. Hawthorne Machinery then falsely represented on its PPP loan application that it and these disclosed affiliates had only an annual average of 489 employees, when the correct calculation of its employee size under applicable laws would have been over 500.

8.     Hawthorne Machinery's deceitful actions were plainly contrary to the goal of the PPP, which was to allow qualifying businesses to retain employees using the proceeds of government-backed, below-market loans. This is why the SBA and the laws and regulations applicable to PPP had specific rules for calculating employee counts, to ensure that the substantial but limited funds in the program went to those businesses that Congress intended.

9.     After reviewing materials for less than a day on April 5, Comerica approved Hawthorne Machinery's requested loan (for over $8 million in PPP relief) shortly after midnight on April 6, 2020.

10.    In addition to failing to accurately disclose the correct employee count of the entities it disclosed, Hawthorne Machinery also was "affiliated" with numerous related companies by means of overlapping management and ownership, including at least one other company—CQ Pacific LLC (d/b/a CarQuest) ("CQ Pacific").

11.    CQ Pacific separately applied for and received a PPP loan in the amount of $564,000. The SBA and PPP rules require that loan applicants disclose all "affiliates" and aggregate their employee headcount for purposes of determining

eligibility, unless certain tailored and unambiguous exceptions apply. And because the PPP is aimed at small businesses, the affiliation rules represent an important safeguard to prevent large corporate conglomerates from circumventing the size limitations.

12.     Despite Defendants knowing Hawthorne Machinery was affiliated with CQ Pacific and having reviewed the unambiguous statutory text requiring its disclosure on Hawthorne Machinery's application, Hawthorne Machinery chose not to disclose its affiliation with CQ Pacific, allowing it to present a purported average employee count of under 500.

13.     Had Hawthorne Machinery and its affiliates complied with these rules—disclosing all affiliated companies and aggregating their employee headcount—Hawthorne Machinery would not have obtained its PPP loan, since adding the (fraudulently-low) 489 employees reported by Hawthorne Machinery on its loan application and the 61 employees reported by CQ Pacific LLC on its loan application would have made Hawthorne Machinery ineligible on its face.

14.     In other words, through two separate means, Defendants omitted necessary information that caused Comerica to determine Hawthorne Machinery was eligible for its PPP loan when it was not, causing the SBA to guarantee and then ultimately forgive the loan.

15.     Defendants' conduct was not a victimless sleight of hand. It is a matter of public record that $349 billion earmarked for the first round of the PPP program (in which Hawthorne Machinery obtained its loan) was exhausted between April 3 and April 16, 2020 — i.e., in just 13 days. Numerous genuine small businesses in the United States, many of them businesses for which the program was genuinely intended (i.e., independently owned restaurants, coffee shops, and more) were

unable to obtain loans when they needed them (if they did at all).[1] Those with strong existing commercial banking relationships, like Hawthorne Machinery, could push to the front of line, even when ineligible. Other small businesses, many of them minority-owned businesses, were shut out if they lacked those connections, even if they were eligible and in dire need of the funds.[2]

16.   This national dynamic played out locally in this District as well, where PPP application approval rates for small businesses in certain low-income communities in or near San Diego were as low as four or five percent of those who applied.[3] Some in this District who were eligible and applied were unable to get money because "the funding ran out" while they were waiting to close.[4]

17.   Because of the shameless greed and inside game played by those like Defendants, many thousands of businesses and (indirectly) many more thousands of employees that were entitled to the money Congress appropriated, but who lacked Hawthorne Machinery's banking connections, were not able to benefit from the program at all. These businesses and their employees suffered so Defendants could benefit.

18.   The cynicism of this conduct does not end at obtaining the money. Unlike small business owners struggling to pay their bills and their employees while unable to operate, once Hawthorne Machinery received its PPP money, Defendants went on a spending spree and enjoyed a lavish lifestyle. Among other things, Tee and David Ness—through entities or otherwise—bought numerous properties in

---

[1] https://www.cnbc.com/2020/05/04/small-businesses-squeezed-out-of-government-loans-survey-reveals.html

[2] https://www.nytimes.com/2020/04/10/business/minority-business-coronavirus-loans.html

[3] https://www.kpbs.org/news/midday-edition/2021/05/03/business-loans-went-wealthy-north-county-neighborh

[4] https://www.nbcsandiego.com/news/local/local-clothing-chain-flashbacks-faces-uncertainty-after-being-denied-ppp-loan/2311270/

Case No. 3:20-cv-01625-WQH-AHG
SECOND AMENDED COMPLAINT

1    Hawaii and California, and the Ness family continued to enjoy their 78-foot
2    superyacht owned by a Hawthorne Machinery subsidiary.

3        19.    The actions of Defendants have undermined the government's response
4    to the Coronavirus pandemic and have defrauded the United States into
5    guaranteeing an over $8 million loan to which Hawthorne Machinery was not
6    entitled. The government suffered separate and additional economic harm because
7    Hawthorne Machinery applied for and obtained forgiveness of its PPP loan based on
8    the same lies and omissions, in an amount of the forgiven balance.

9    **II.   JURISDICTION & VENUE**

10       20.    Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3729 *et seq.*,
11   specifically 31 U.S.C. § 3732(a) & (b) and 28 U.S.C. §§ 1331 and 1345.

12       21.    The Court may exercise personal jurisdiction over the Defendants
13   because they transact business in this District, engaged in the alleged illegal
14   activities and practices in this District, and are located in this District.

15       22.    Venue in this District is appropriate under 31 U.S.C. § 3732(a), because
16   many of the acts complained of took place in this District.

17   **III.   PARTIES**

18       23.    The United States is a real party in interest to the claims in this action.
19   Through the Small Business Administration and the Department of the Treasury, the
20   United States administered the PPP.

21       24.    Relator Roger S. Craig is an individual who resides in Vancouver,
22   Washington. Relator worked at Hawthorne Machinery as a Finance Manager from
23   October 14, 2019 until he was terminated effective on April 3, 2020.

24       25.    Defendant Hawthorne Machinery is a California corporation with its
25   principal executive office located at 16945 Camino San Bernardo, San Diego, CA
26   92127.

27

28

26.     Hawthorne Machinery is a lessor, seller, and servicer of heavy machinery. It is a licensed dealer of Caterpillar brand equipment and does business under the trade name "Hawthorne CAT."

27.     Defendant Brian Verhoeven is an individual who is, *inter alia*, the Chief Financial Officer, Treasurer, and Executive Vice President of Hawthorne Machinery, Hawthorne Pacific, and Hawthorne of Samoa. On information and belief, Verhoeven resides in Escondido, California.

28.     Defendant Tee Ness is an individual who is, *inter alia*, President/Chief Executive Officer, and Chairman of the Board of Directors of Hawthorne Machinery, Hawthorne Pacific, and Hawthorne of Samoa. Tee Ness is also the Manager of CQ Pacific. Tee Ness is also an owner (directly or beneficially) of Hawthorne and Hawthorne Pacific. On information and belief, Tee Ness resides in Fallbrook, California.

29.     Defendant David Ness is an individual who is, *inter alia*, Chief Operating Officer/Senior Vice President of Hawthorne Machinery, Hawthorne Pacific, and Hawthorne of Samoa. David Ness is also an owner (directly or beneficially) of Hawthorne Machinery and Hawthorne Pacific. On information and belief, David Ness resides in Fallbrook, California.

## IV.    RELEVANT NON-PARTY ENTITIES

30.     Hawthorne Pacific is a Hawaii corporation with its principal place of business located at 94-025 Farrington Highway, Waipahu, HI 96797. Because Hawthorne Pacific has overlapping ownership and management with Hawthorne Machinery including but not limited to Verhoeven, Tee Ness, and David Ness. Hawthorne Pacific is a lessor, seller, and servicer of heavy machinery under various trade names, including but not limited to Hawthorne Power Systems, Hawthorne Rent-it Service, and Ness Turf Equipment.

31.     Hawthorne Samoa is a corporation with its principal place of business located at Tafuna Industrial Park, Pago Pago, American Samoa. Because Hawthorne

Samoa has overlapping ownership and management with Hawthorne Machinery including but not limited to Verhoeven, Tee Ness, and David Ness. Hawthorne Samoa is a heavy machinery merchant wholesaler.

32.     Ness Pacific Group LLC ("Ness Pacific") is a California limited liability corporation with its principal executive office located at 16945 Camino San Bernardo, San Diego, CA 92127. Ness Pacific is partially owned by Tee Ness and David Ness.

33.     CQ Pacific is a Hawaii limited liability corporation with its principal executive office located at 16945 Camino San Bernardo, San Diego, CA 92127. CQ Pacific operates multiple retail locations in Hawaii under the "Carquest" trade name. CQ Pacific is owned by Ness Pacific Group and its Manager is Tee Ness.

34.     Comerica Bank is a financial institution with headquarters located at Comerica Bank Tower, 1717 Main Street, MC 6404, Dallas, TX 75201. Comerica is the bank that reviewed, approved, and processed Hawthorne Machinery's PPP application.

## V.     LEGAL BACKGROUND

### A. The Federal False Claims Act

35.     The federal FCA imposes liability on any person who:

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

> (B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ….

31 U.S.C. § 3729(a)(1)(A) & (B).

36.     The term "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that … is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf

or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A)(ii).

37.     The term "knowingly" means "that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent to defraud is not required. *See id.* § 3729(b)(1)(B).

38.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus civil penalties. The FCA civil penalties are $13,508 to $27,018 for violations assessed from January 30, 2023 thereafter.  *See* 28 C.F.R. §§ 85.3 & 85.5; 88 Fed. Reg. 5776 (Jan. 30, 2023).

**B. The Paycheck Protection Program**

39.     The PPP was an economic stimulus measure that is designed to provide financing to certain types of businesses in order to allow those businesses to avoid laying off employees as a result of the economic disruption caused by the Coronavirus pandemic.

40.     On March 27, 2020, the CARES Act was enacted, which established the PPP by adding new Section 7(a)(36) to the Small Business Act of 1953. 15 U.S.C. § 636(a)(36). The PPP was later expanded and extended by the Paycheck Protection Program and Health Care Enhancement Act (Apr. 24, 2020) and the Paycheck Protection Program Flexibility Act (June 5, 2020), respectively.

41.     The PPP is structured as a guaranteed loan program under the Small Business Administration and is subject to the same laws and regulations as other "Section 7(a)" loans, except where expressly provided otherwise by the CARES Act

or other relevant law. PPP loans are made by private lenders under federal laws and regulations, and are fully guaranteed by the federal government.[5]

42.   The basic mechanism of PPP loans is as follows. Eligible borrowers are able to obtain government-backed loans at below-market interest rates in an amount determined by reference to their payroll costs. They do so by submitting an application for a PPP loan to a financial institution that participates as a lender in the PPP. If the lender approves their loan application, it will issue the loan and the SBA will guarantee its repayment. If borrowers use the proceeds of their PPP loans for qualifying purposes, such as to pay employee salaries or healthcare benefits, their PPP loans will be forgiven by the government, meaning that the SBA will pay the lender in an amount equal to the "forgiven" balance.[6]  Otherwise, the loans must be repaid by the borrower. If the borrower is required to but does not repay some or all of the outstanding balance, the government will repay the lender any amounts owed under the SBA guarantee.

43.   The laws and regulations implementing the PPP establish the set of eligible borrowers. Only those entities that are expressly eligible for PPP loans are legally entitled to obtain them. Compliance with the PPP eligibility requirements "is essential to ensure that PPP loans are directed to the entities Congress intended, and that PPP loan proceeds are used for the purposes Congress required, including the

---

[5] *See* 85 Fed. Reg. 29845, 29846 (May 19, 2020) ("Loans under the PPP are 100 percent guaranteed by SBA, and the full principal amount of the loans and any accrued interest may qualify for loan forgiveness.").

[6] 85 Fed. Reg. 33004, 33005 (June 1, 2020) ("If the lender determines that the borrower is entitled to forgiveness of some or all of the amount applied for under the statute and applicable regulations, the lender must request payment from the SBA …. SBA will, subject to any SBA review of the loan or loan application, remit the appropriate forgiveness amount to the lender, plus any interest accrued through the date of payment ….").

CARES Act's central purpose of keeping workers paid and employed." 85 Fed. Reg. 33010, 33012 (June 1, 2020).

44.     As the PPP was enacted as part of the SBA's "7(a)" loan program, it is primarily directed towards small businesses. The exclusive list of entities that are eligible to obtain PPP loans is set forth in federal law as follows:

- "small business concerns" as defined by pre-existing SBA standards;
- certain specified nonprofit, veterans, or Tribal organizations; and
- any other business that employs no more than the greater of (I) 500 employees; or (II) if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern … operates.

15 U.S.C. § 636(a)(36)(D)(i).

45.     Federal regulations specify the methodology for calculating the number of employees of a business for purposes of determining size for SBA purposes.

46.     The SBA's employee-counting regulation directs that the measure of employees is the average number of all individuals employed on a full-time, part-time, or other basis for each pay period in the preceding completed 12 calendar months. 13 C.F.R. § 121.106(a), (b)(1) (effective Jan. 6, 2020 – July 5, 2022).

47.     The SBA and the PPP have affiliation rules designed to ensure that companies do not elude the requirements of the program by understating the true size and scope of their operations. *See* 15 U.S.C. § 636(a)(36)(D)(vi). The affiliation rules require that "[f]or purposes of … determining the number of employees of an applicant to the Paycheck Protection Program, the applicant is considered together with its affiliates." SBA's "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program," Apr. 3, 2020. The Small Business Administration ("SBA") has explained the affiliation rules as follows:

> **Four tests for affiliation based on control apply to participants in the Paycheck Protection Program. For purposes of the [sic]**

> **determining the number of employees of an applicant to the Paycheck Protection Program, the applicant is considered together with its affiliates. Following is a summary of the applicable affiliation tests.**
>
> Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists. Affiliation under any of the circumstances described below is sufficient to establish affiliation for applicants for the Paycheck Protection Program.

SBA's "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program," Apr. 3, 2020.

48.     These four tests are (1) affiliation based on ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on management; and (4) affiliation based on identity of interest. 13 C.F.R. § 121.301(f).

49.     In an effort to "help potential borrowers identify other businesses with which they may be deemed to be affiliated under the common management standard, the Borrower Application Form (SBA Form 2483, released on April 2, 2020) requires applicants to list other businesses with which they have common management. The information supplied by the applicant in response to that information request should be used by applicant as they assess whether they have affiliates that should be included in their number of employees reported on SBA Form 2483." SBA Interim Final Rule, "Business Loan Program Temporary Changes; Paycheck Protection Program," 13 C.F.R. Part 131, at n.2.

50.     The SBA has also published federal regulations that specify, for certain industry classifications, employee size standards and/or annual receipts standards for determining small business qualification. 13 C.F.R. § 121.201. SBA classifies companies by their "primary industry." 13 C.F.R. § 121.107 ("In determining the primary industry in which a concern or a concern combined with its affiliates is

engaged, SBA considers the distribution of receipts, employees and costs of doing business among the different industries in which business operations occurred for the most recently completed fiscal year. SBA may also consider other factors, such as the distribution of patents, contract awards, and assets.").

51.     Hawthorne Machinery's Statement of Information filed with the California Secretary of State on Jan. 7, 2014 stated, under "Describe the type of business of the corporation," the answer "Caterpillar Inc. Dealer."  Hawthorne Machinery's website makes clear that its business is the sale, lease, and maintenance of construction equipment that is manufactured by a different company, Caterpillar. *See* Hawthorne Website at https://www.hawthornecat.com/new.

52.     Hawthorne is appropriately categorized under Sector 53 of the North American Industry Classification System ("NAICS"), which covers "Real Estate and Rental and Leasing," and which includes NAICS code 532412 ("Construction, Mining and Forestry Machinery and Equipment Rental and Leasing"). According to the U.S. Census Bureau, "This U.S. industry comprises establishments primarily engaged in renting or leasing heavy equipment without operators that may be used for construction, mining, or forestry, such as bulldozers, earthmoving equipment, well drilling machinery and equipment, or cranes."

53.     There is a separate NAICS code for "Other Commercial and Industrial Machinery and Equipment Rental and Leasing," which is 532490.  The SBA has a size standard for both codes 532412 and 532490 of $35 million in average annual receipts, which Hawthorne Machinery clearly exceeds. There is no separate employee count standard for 532412, 532490, or any other industry code within Sector 53.

54.     Among other penalties for misrepresentation of SBA size standards are "severe penalties under the False Claims Act."  13 C.F.R. § 121.108(e)(2).

55.     The maximum amount of a PPP loan is determined by a calculation involving the borrower's monthly payroll for the prior year, subject to an upper limit of $10 million. 15 U.S.C. § 636(a)(36)(E).

## VI.     FACTUAL ALLEGATIONS

### A. Hawthorne Machinery applies and is quickly approved for an over $8 million PPP loan.

56.     On or about April 5, 2020, Hawthorne Machinery, on behalf of itself, Hawthorne Pacific, and Hawthorne Samoa, submitted a PPP application by claiming a rolling average 12-month headcount of 489 employees.

57.     The submission of Hawthorne Machinery's PPP application was caused by Tee Ness and David Ness, as owners and directors of Hawthorne Machinery, and Brian Verhoeven, as CFO.

58.     On April 5, 2020, the same day the PPP application was submitted, Hawthorne Machinery held a special meeting of its board of directors, attended only by Tee Ness and David Ness as directors and Verhoeven as CFO. At this meeting, Tee Ness and David Ness authorized Verhoeven to submit the PPP application for Hawthorne Machinery.

59.     Verhoeven signed all versions of the PPP application that were submitted by Hawthorne Machinery to Comerica for the PPP loan, including certifying that all information in the application was "true and accurate in all material respects."

60.     Verhoeven also communicated directly with Comerica and made all relevant representations to Comerica and the SBA on behalf of Hawthorne Machinery.

61.     Hawthorne Machinery (via Verhoeven) provided several documents to Comerica to provide payroll support for the purported headcount, including a spreadsheet (and/or PDFs thereof) of a 2019 payroll document, as well as a PDF of a payroll document dated February 13–14, 2020.

62.     These documents and other sources show that what Hawthorne Machinery claimed on its PPP application was inaccurate. In particular, Hawthorne Machinery (1) inaccurately characterized its employee counts on the PPP application in a manner that was irreconcilable with the very support documents it sent Comerica; (2) provided incomplete payroll information to Comerica that bears indicia of having been altered to remove a material number of employees; and (3) claimed employee counts that were irreconcilable with other public disclosures made by Hawthorne Machinery covering the same time period.

63.     Taken together, these data points show that Hawthorne Machinery, along with its disclosed affiliates, applied for and obtained a PPP loan for which it was not eligible. Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa collectively had more than 500 employees on a rolling annual basis and cut out employees and information in a hasty attempt to present otherwise to Comerica.

### i.     Hawthorne Machinery Claims 489 Employees on its PPP Application.

64.     One of the first items on SBA Form 2483 requires the applicant to identify its number of employees. Hawthorne Machinery's PPP loan application stated that it employed an average of 489 individuals during the relevant twelve-month period from April 2019–March 2020.

65.     To apply for a PPP loan, the borrower must perform calculations involving its payroll costs for the prior year to determine the amount of the requested loan. In general, PPP loans can be issued in amounts equal to 2.5 times a borrower's average monthly payroll, subject to specific parameters.

66.     Hawthorne Machinery's PPP loan application sought a loan of approximately $8 million. $10 million is the largest amount in which a PPP loan may be issued.

67.     In submitting its SBA Form 2483, Hawthorne Machinery made the following certifications, which are incorporated into the form itself:

(a) **The Applicant is eligible to receive a loan** *under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program …;*

(b) **The Applicant … employs no more than the greater of 500 employees** *or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry;*

(c) *The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments ….;*

(d) *The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employee's on the Applicant's payroll … for the eight-week period following this loan;* [and]

(e) **I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects.** *I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law ….*

SBA Form 2483 (April 2020) (emphasis added).[7]

68.    Defendants were aware of the legal requirements for PPP loans. Among other things, Hawthorne Machinery reviewed the relevant statutory language in preparing its PPP application.

69.    Verhoeven submitted Hawthorne Machinery's PPP loan application to Comerica by email on April 5, 2020. The application was submitted on SBA Form 2483, with an attached addendum.

70.    SBA Form 2483 included a question, identified as "Question 3," which required applicants to answer whether "the Applicant or any owner of the Applicant

---

[7] *See also* 15 U.S.C. § 636(a)(36)(G)(i) (requiring certain borrower certifications).

[is] an owner of any other business, or ha[s] common management with, any other business?" Question 3 went on to say that if the answer was yes, the applicant should "list all such businesses and describe the relationship on a separate sheet identified as addendum A."

71.     Hawthorne Machinery, represented by Verhoeven, selected yes in response to Question 3.

72.     On an "Addendum A" to Hawthorne Machinery's PPP application, Hawthorne Machinery disclosed that it was "the owner of the following qualified affiliates and has included the combined average monthly payroll and number of jobs" from those so-called "qualified affiliates" on the PPP application.

73.     The so-called "qualified affiliates" Hawthorne Machinery disclosed were Hawthorne Pacific and Hawthorne Samoa.

74.     With respect to its headcount (number of employees), and as relevant here, Hawthorne Machinery's PPP application disclosed 12-month average and month-by-month (from April 2019–March 2020) headcounts on both a combined and individual basis for Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa, totaling to an average of 489 employees for all entities.

75.     Among other things, Hawthorne Machinery listed the following headcount information collectively for Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa, during the 12-month period before the PPP loan:

- 483 employees in April 2019;
- 479 employees in May 2019;
- 489 employees in June 2019;
- 490 employees in July 2019;
- 488 employees in August 2019;
- 485 employees in September 2019;
- 493 employees in October 2019;
- 494 employees in November 2019;

- 486 employees in December 2019;
- 486 employees in January 2020;
- 478 employees in February 2020; and
- 477 employees in March 2020.

ii.    **Hawthorne Machinery's Payroll Documents do not Match the PPP Application.**

76.    Hawthorne Machinery's PPP loan application was also supported by several documents, which were necessary for the bank to substantiate the representations of the applicant on the application and determine their eligibility for a PPP loan.

77.    All of Hawthorne Machinery's application and supporting materials were submitted to Comerica by Verhoeven with the approval of Tee Ness and David Ness.

78.    These documents show systematic undercounting and misrepresentation that was a part of Hawthorne Machinery's cornucopia of misrepresentations to Comerica to appear eligible for the PPP loan when it was not.

79.    These support documents included information from a payroll spreadsheet purporting to provide Hawthorne Machinery's complete payroll (including Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa) for the year 2019.

80.    That 2019 payroll did not reconcile with the PPP application, with month-by-month disparities of between 5 and 14 fewer employees in each month listed in the PPP application addendum than what is in the payroll data between April and December 2019.

81.    Hawthorne Machinery's claimed monthly headcount in the PPP application also doesn't comport with the *changes* to its headcount on a month-by-month basis in the 2019 payroll. For example, on a net basis, Hawthorne Machinery's 2019 payroll shows that it added six additional employees in April

2019. However, the PPP application addendum claims that Hawthorne Machinery had 483 employees in both March and April 2019.

82.     The discrepancy in the average further bears out how important this misrepresentation was. During this operative period of 2019 (April–December), Hawthorne Machinery claimed on its PPP application that it had an average of 487.4 employees. The payroll, on its face, showed an average headcount during that period of 497.4.

83.     The payroll also flatly contradicted specific representations that Verhoeven made to Comerica on behalf of Hawthorne Machinery. In an email to Comerica attaching this payroll, Verhoeven told the bank that Hawthorne Machinery never exceeded 500 employees (between Hawthorne Machinery, Hawthorne Pacific, and Hawthorne of Samoa) during the year 2019. But the 2019 payroll included 500 or more active employees in at least June, July, August, October, and November 2019.

### iii.     Alteration of Hawthorne Machinery's Payroll Records

84.     As explained above, there were significant discrepancies between Hawthorne Machinery's representations to Comerica in the PPP application and elsewhere, and its payroll documentation, even taking that documentation at face value.

85.     On information and belief, Hawthorne Machinery also altered these payroll records in a further attempt to present a credibly eligible application for the PPP loan.

86.     This inference, asserted by Relator on information and belief, is founded on numerous discrepancies in the documents.

### a.     Quarterly Payroll Discrepancies

87.     The 2019 payroll document includes material discrepancies between payroll information purportedly from Hawthorne Machinery's Form 941 quarterly

wage filings with the IRS, and the ebb-and-flow of Hawthorne Machinery's headcount over the course of 2019 as listed in the payroll.

88.    For example, Hawthorne Machinery's payroll data purported that between Q2 and Q3 of 2019, there was a $1.32 million increase in gross wages reported on Hawthorne Machinery's Form 941s. But during the same period, according to the payroll, Hawthorne Machinery's headcount fell on a net basis by 4 employees.

89.    Even when the employees added to Hawthorne Machinery's headcount during Q2 (who would be the driving contribution to an increase in payroll reflected in Q3) are added together to determine their maximum contribution to payroll in Q3, they account for no more than $478,630.14 of new payroll in Q3. In other words, the very documents Hawthorne Machinery relied on to prove its eligibility for a PPP loan showed a discrepancy of approximately $841,369 between the employees listed and the quarterly payroll.

90.    This discrepancy indicates that information is missing from the payroll that was disclosed to Comerica.

### b.  Missing Employees

91.    Furthermore, a review of several documents—i.e., (1) the 2019 payroll shared with Comerica; (2) the February 13–14, 2020 payroll document shared with Comerica; (3) lists of employees *not* shared with Comerica that Hawthorne Machinery intended to furlough if it didn't get the PPP loan (that were never furloughed); and (4) public records including but not limited to Hawthorne Machinery's websites, social media profiles of employees of Hawthorne Machinery-related entities, and more—reveals that at least eight employees verifiable at this time (and likely more) are missing from the 2019 and/or 2020 payrolls sent to Comerica.

92.    When these eight employees verifiable at this time are added to what is reflected in the payroll documents—on a rolling month-by-month basis where

appropriate—the resulting average for Hawthorne Machinery, Hawthorne Pacific, and Hawthorne of Samoa is over 500 employees:

| Month | Verified[8] Headcount (to date) | Headcount in PPP Application |
|---|---|---|
| April 2019 | 499 | 483 |
| May 2019 | 497 | 479 |
| June 2019 | 507 | 489 |
| July 2019 | 506 | 490 |
| August 2019 | 504 | 488 |
| September 2019 | 503 | 485 |
| October 2019 | 506 | 493 |
| November 2019 | 504 | 494 |
| December 2019 | 495 | 486 |
| January 2020 | 499 | 486 |
| February 2020 | 491 | 478 |
| March 2020 | 490 | 477 |

93.    The inference and inescapable conclusion from this analysis is that Hawthorne Machinery materially altered and misrepresented payroll information submitted to Comerica in order to appear eligible for a PPP loan when it was not eligible.

---

[8] This count incorporates ~~the actual headcount reflected by Hawthorne's payroll documents (i.e., the accurate count of the payroll info submitted to Comerica on its face)~~, as well as including the eight employees Relator has already been able to verify should have been in ~~the payroll~~ and were not, due to public records or other Hawthorne documents reflecting their continuing employment at Hawthorne.

iv.   **Hawthorne Machinery later admitted in an unrelated government filing that the three entities on its PPP application had more than 500 employees at the beginning of 2020.**

94.   As explained above, Hawthorne Machinery's average headcount of employees from April 2019 to March 2020 was over 500.

95.   An average headcount over 500 from April 2019–March 2020 for the three entities disclosed on the PPP application (Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa) is also consistent and necessary to reconcile with the headcount Hawthorne Machinery itself disclosed for these entities a year and a half after getting the PPP loan.

96.   On September 7, 2021 Hawthorne Machinery submitted its Form 5500 for 2020 concerning its 401(k) program to the Department of Labor.

97.   On that date, Brian Verhoeven signed the Form 5500 on Hawthorne Machinery's behalf.

98.   This 2020 Form 5500 for Hawthorne Machinery's 401(k) program disclosed the "[t]otal number of active participants at the beginning of the plan year" (i.e., January 2020) as 567 employees, including Hawthorne Machinery, Hawthorne Pacific, Hawthorne of Samoa, and CQ Pacific.

99.   The Department of Labor defines "active participants" in this context as "any individuals who are currently in employment covered by the plan and who are earning or retaining credited service under the plan." In other words, "active participants" must be both active employees *and* covered by and participating in the relevant retirement plan.

100.   CQ Pacific disclosed in its separate PPP application that it had 61 employees.

101.   Even if every CQ Pacific employee were an active participant in the 401(k) plan, which is not assured, that would necessarily mean that the three

1  Hawthorne Machinery entities (the three disclosed on the PPP application) had

2  about 506 employees in January 2020.

3    102.  But in the PPP application, Hawthorne Machinery — through Brian

4  Verhoeven as authorized by Tee Ness and David Ness — claimed these three

5  entities had 486 employees in January 2020.

6    103.  This further reinforces Relator's conclusion, on information and belief,

7  that Hawthorne Machinery selectively omitted employees in its payroll documents

8  to present itself to Comerica and the SBA as eligible for its PPP loan when it in fact

9  was not eligible.

10    104.  Furthermore, and among other things, the disclosure of at least 506

11  employees in January 2020 in the Form 5500, signed by Brian Verhoeven, shows

12  that the companies' true collective headcount was known and readily available to

13  Hawthorne Machinery and its principals, including Verhoeven, Tee Ness, and David

14  Ness.

15  **B. Hawthorne Machinery separately deceived the SBA by failing to disclose**

16      **its affiliation with — and the employees of — CQ Pacific in its PPP**

17      **application.**

18    105.  Hawthorne Machinery committed a further false claim of omission by

19  failing to disclose CQ Pacific and its 61 employees as an additional affiliate of

20  Hawthorne Machinery. This omission, either in combination with or independent of

21  the issues described above, had it been disclosed, would have made Hawthorne

22  Machinery ineligible for the PPP loan it wrongfully obtained.

23    106.  Had those CQ Pacific employees been disclosed, Hawthorne

24  Machinery's headcount for PPP purposes would have been not just over 500, but

25  over 561. Even if Hawthorne Machinery's headcount on its PPP application for

26  Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa were accurate

27  (which it was not), the headcount would have been 550.

28

107.   The PPP affiliation rules require that "[f]or purposes of … determining the number of employees of an applicant to the Paycheck Protection Program, the applicant is considered together with its affiliates."[9] The four tests for affiliation are (1) affiliation based on ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on management; or (4) affiliation based on identity of interest. 13 C.F.R. § 121.301(f).

108.   Hawthorne Machinery was and remains affiliated with a number of related companies based on management and ownership. These companies include CQ Pacific LLC, Hawthorne Pacific Corp., Hawthorne Power Systems, Ness Turf Equipment, and others.

109.   Hawthorne Machinery is run by Tee Ness who is, among other things, the CEO and Chairman of the Board. Mr. Ness is also the CEO (or equivalent) of numerous other Hawthorne Machinery affiliates, including CQ Pacific LLC. Tee Ness is the Manager of CQ Pacific.

110.   This level of managerial overlap squarely satisfies the "affiliation based on management" standard. 13 C.F.R. § 121.301(f)(3) ("Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns.").

111.   Tee Ness and David Ness are also CQ Pacific's beneficial owners through ownership of Ness Pacific Group. Tee and David Ness's ownership interests in CQ Pacific LLC and one or more of the above companies is independently sufficient to establish their "affiliation." 13 C.F.R. § 121.301(f)(1) ("For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50

---

[9] SBA's "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program, Apr. 3, 2020.

percent of the concern's voting equity."). According to a lease assignment dated February 10, 2017 and filed with the State of Hawaii Department of Land and Natural Resources:

> Assignee, CQ Pacific is a newly formed Hawaii limited liability company that is solely owned by another newly formed parent California limited liability company, Ness Group Pacific LLC [sic]. NGP is a holding company for various investments of the Ness family. Being that CQ Pacific is a newly formed LLC, it was unable to provide income tax returns for staff review. In lieu of tax returns, CQ Pacific submitted a balance sheet and income statement for the company. Also submitted in lieu of Assignee's financial history, were audited financial statements of Hawthorne Machinery Co., who has committed to guarantee all lease obligations for CQ Pacific. Hawthorne Machinery Co. is a California corporation also owned by the Ness family. They are the sole shareholder of the Hawthorne Pacific Corp., which is a registered Hawaii corporation in good standing.

112.   In the CARES Act, Congress provided a limited waiver to the SBA's affiliation regulations for businesses operating as franchises, so these businesses could separately apply for PPP loans even if affiliated through common management or ownership with non-franchise entities.

113.   The so-called "franchise waiver" — the CARES Act's affiliation waiver for franchise entities — provides in relevant part:

> (iv) Waiver of affiliation rules.—During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived **with respect to eligibility for a covered loan for**— …
>
> (II) **any business concern operating as a franchise** that is assigned a franchise identifier code by the Administration[.]

15 U.S.C. § 636(a)(36)(D)(iv)(II) (emphasis added).

114.   As stated above, CQ Pacific also applied for and received a PPP loan in the amount of $564,000. CQ Pacific disclosed that it had 61 employees during the operative period between April 2019–March 2020.

115.   Also as stated above, CQ Pacific operates retail locations under the trade name "Carquest." Carquest Corporation is a listed franchisor that has a "franchise identifier code" from the SBA.

116.   The CARES Act franchise waiver provision would permit CQ Pacific — a "business concern operating as a franchise that is assigned a franchise identifier code" — to be exempted from disclosing its affiliation to other entities "with respect to eligibility for a covered loan for" itself.

117.   However, because Hawthorne Machinery's PPP loan was not "a covered loan for … any business concern operating as a franchise," its own affiliation with CQ Pacific was not waived and needed to be both disclosed and incorporated into the headcount calculation on Hawthorne Machinery's PPP application.[10]

118.   Nevertheless, even though Hawthorne Machinery knew it was affiliated with CQ Pacific through, among others, Tee Ness (as owner and director), David Ness (as owner and director), and Verhoeven (as CFO and signatory of both PPP applications), *and* specifically reviewed 15 U.S.C. § 636 as a part of its decision to apply for its PPP loan, Hawthorne Machinery failed to disclose its affiliation with CQ Pacific (and its 61 employees) on its PPP application or in any related communications with Comerica.

119.   This omission further allowed Hawthorne Machinery to present itself as eligible for its PPP loan, and obtain the PPP loan, when in fact it was not eligible.

120.   Notably, Hawthorne Machinery and CQ Pacific's common management and ownership went to great lengths to ensure that the entities would not appear affiliated on their respective PPP applications.

121.   CQ Pacific's PPP loan application listed its address as one of its retail locations (1914 Republican St., Honolulu, HI) rather than its business address

---

[10] As mentioned above, Hawthorne Machinery is primarily a dealer and repair business for Caterpillar, Inc. equipment, for which it does not operate as a franchise.

registered with the Hawaii Secretary of State. That registered business address is 16945 Camino San Bernardo, San Diego, CA, which is the address of Hawthorne Machinery's headquarters and the address that Hawthorne Machinery itself used on its own PPP loan application.

122.   CQ Pacific also failed to disclose its affiliation to any of the Hawthorne Machinery entities, even if for eligibility purposes that affiliation was waived.

123.   CQ Pacific also used a different bank — not Comerica — to further obscure its relationship to Hawthorne Machinery.

124.   Hawthorne Machinery never sought Comerica's view on whether CQ Pacific should be included. Instead, Defendants chose for themselves to omit that information and take every step possible to obscure its discovery by the banks approving the loans or by the SBA.

125.   The decision to hide and obscure the connection between Hawthorne Machinery and CQ Pacific shows that Defendants knew or should have known that, had they been forthcoming, they would not have obtained the over $8 million PPP loan for Hawthorne Machinery.

126.   This coordinated and multi-pronged omission had the effect of deceiving Comerica and the SBA into determining Hawthorne Machinery was eligible for an over $8 million PPP loan, when for this independent reason it was not eligible for a loan at all.

**v.   <u>Hawthorne Machinery Reviewed the Relevant Statutory Language about the Relevant PPP Requirements.</u>**

127.   Both before and after the CARES Act (which created the PPP program and appropriated the money for the program) was passed, Hawthorne Machinery — through emails to Brian Verhoeven — received guidance from Comerica and others that PPP loans would not be available to applicants with more than 500 employees in most circumstances.

128.   Hawthorne Machinery reviewed the relevant statutory provisions that imposed the 500-employee restriction in 15 U.S.C. § 636.

129.   Hawthorne Machinery was also asked by Comerica to fill out "Addendum A" to the PPP application. Comerica did not provide any qualification limiting which affiliates Hawthorne Machinery needed to disclose when making this request. On information and belief, Hawthorne Machinery never explained the interpretation underlying its incomplete disclosures to Comerica.

130.   Hawthorne Machinery also had access to and reviewed the relevant statutory language in the CARES Act concerning waivers, which reads:

> (iv) Waiver of affiliation rules.—During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived **with respect to eligibility for a covered loan for**— …
>
> (II) **any business concern operating as a franchise** that is assigned a franchise identifier code by the Administration[.]

15 U.S.C. § 636(a)(36)(D)(iv)(II) (emphasis added).

131.   The above statutory language, reviewed by Hawthorne Machinery, does not exempt a non-franchise business affiliated with a franchise business from including the franchise business as an affiliate, even if the reverse is true (i.e., that the franchise need not include its non-franchise affiliates).

132.   Nevertheless, Hawthorne Machinery chose to omit CQ Pacific and its 61 employees from Hawthorne Machinery's disclosure of affiliates and related employee headcount on Addendum A of its PPP application.

**C. After obtaining over $8 million in much-needed PPP money, Defendants rewarded themselves by going on a substantial personal and business spending spree.**

133.   As stated above, numerous small businesses that were eligible for the PPP program were unable to participate because the program was quickly exhausted by sophisticated actors like Hawthorne Machinery who had existing relationships

1    with senior bank executives that allowed them to rapidly apply for and receive

2    approval for PPP loans, in this case even if they were not eligible.

3        134.   Having obtained money that should have rightfully gone to real small

4    businesses struggling in the pandemic, Defendants added insult to injury by going

5    on a spending spree, both personally and through their various affiliated business

6    and shell entities.

7        135.   On April 17, 2020, Ness Pacific Group — owned by Tee Ness and

8    David Ness — purchased property in Kona, Hawaii for $2.9 million with a cash

9    down payment of $652,000. The signatures confirming the transaction — from Tee

10   Ness and Verhoeven — were notarized a week before the closing on April 10, 2020,

11   a mere five days after Hawthorne Machinery applied for and was wrongfully

12   approved for its over $8 million government-backed loan.

13       136.   On August 17, 2020, Tee Ness and other entities and individuals

14   purchased property for his daughter in Temecula, California for $1.115 million.

15       137.    On February 25, 2021, Hawthorne Machinery purchased property in

16   Chula Vista, California for $800,000, with no recorded mortgage.

17       138.   On March 16, 2021, Ness Pacific Properties LLC — an entity owned

18   and/or controlled by David Ness — purchased property in Chula Vista, California

19   for $3.7 million.

20       139.   On July 20, 2021, Tee Ness and other entities and individuals

21   purchased a home in Fallbrook, California for $3.195 million, with no recorded

22   mortgage.

23       140.   On September 30, 2021, Cal Pacific Properties LLC — another entity

24   managed and/or owned by Hawthorne Machinery, Tee Ness, and David Ness —

25   purchased property in Waipahu, Hawaii for $3.2 million. As a part of the loan for

26   this property, an additional $3.2 million was provided to Cal Pacific as a line of

27   credit.

28

141.   During this time, the Ness family also continued to make use of their 78-foot superyacht, the "Annie Lu," which is owned by Wilson Marine LLC, a subsidiary of Hawthorne Machinery.

142.   During the early period of the pandemic, many struggling independent small business owners, those who owned single-location businesses like coffee shops, restaurants, laundromats, and more who lacked Hawthorne Machinery's connections, were unable to make rent, pay employees, or even support themselves and their families. This was especially the case for those that were unable to access the first round of the PPP program when the need was most dire. Certainly, few of them were in such a position that they could purchase many millions of dollars in new real estate or enjoy a family superyacht.

143.   Despite the fact that Defendants knew or should have known that Hawthorne Machinery was ineligible for its loan, they saw the opportunity for "free money" from the government and took it. Having received enough money to fund almost an entire average quarter of Hawthorne Machinery, Hawthorne Pacific, and Hawthorne Samoa's combined payroll, Defendants were free to spend these or other moneys indiscriminately for personal and business gain while real small businesses scraped to survive or didn't survive at all.

**D. Defendants' Actions Violated The False Claims Act And Undermined The Government's Response To The Coronavirus Pandemic**

144.   Defendants have violated the False Claims Act in multiple ways and have together undermined the critical public purpose behind the PPP.

145.   Hawthorne Machinery included an express false statement on its PPP loan application by providing a false number of employees, since that number omitted material information and was not calculated pursuant to applicable legal requirements, including the affiliation rules.

146.   Hawthorne Machinery also made an express omission in its PPP application by failing to disclose CQ Pacific, even though its affiliation was known

to Defendants and the PPP franchise waiver provision was plainly inapplicable as to Hawthorne Machinery.

147.   Hawthorne Machinery falsely certified in its PPP loan application the accuracy of the information it contained and Hawthorne Machinery's compliance with the requirements of the PPP.

148.   Defendants' actions constitute the submission (or causing of submission) of false claims and false statements material to such false claims to the United States. Defendants' actions fraudulently induced the United States to guarantee and forgive Hawthorne Machinery's PPP loan, for which it was not eligible under law.

149.   Defendants' fraud undermined the core governmental purpose of the PPP, which was to support struggling small businesses during the pandemic. Through false statements and omissions, Hawthorne Machinery obtained from Comerica a PPP loan that should never have been issued at a time when other, deserving borrowers have been unable to access PPP loans.

## VII.   COUNTS

### Count I

### Federal False Claims Act

### 31 U.S.C. § 3729(a)(1)(A)

150.   Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

151.   By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

152.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count II**

**Federal False Claims Act**

**31 U.S.C. § 3729(a)(1)(B)**

153.    Relator repeats and re-alleges the preceding paragraphs as if fully set forth herein.

154.   By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

155.   The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Relator demands that judgment be entered in favor of the United States and against Defendants for the maximum amount of damages, penalties, attorney's fees, and such other relief as the Court may deem appropriate on each Count.

Further, Relator requests that he receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

**DEMAND FOR JURY TRIAL**

A jury trial is demanded in this case.

Dated:  August 18, 2023

Respectfully submitted,

POLLOCK COHEN LLP


By     _____/s/ Max E. Rodriguez_____
        Christopher K. Leung (SBN 210325)
        Max E. Rodriguez (admitted *pro hac vice*)
        Adam Pollock (admitted *pro hac vice*)
        Tel: 212-337-5361
        Max@PollockCohen.com
        *Attorneys for Plaintiff-Relator Roger S. Craig*