Edward C. Walton (Bar No. 78490)
E-mail: ed.walton@procopio.com
Eric A. Plourde (Bar No. 320451)
E-mail:      eric.plourde@procopio.com
PROCOPIO, CORY, HARGREAVES &
    SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Defendants
Hawthorne Machinery Co., Brian
Verhoeven, Tee Ness and David Ness

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA ex rel. ROGER S. CRAIG,<br><br>Plaintiffs,<br><br>v.<br><br>HAWTHORNE MACHINERY CO., BRIAN VERHOEVEN, TEE NESS, and DAVID NESS,<br><br>Defendants. | Case No. 3:20-cv-01625-WQH-AHG<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>**[Fed. R. Civ. P. 12(b)(6)]**<br><br>Hearing Date: **December 15, 2023**<br>Judge: Hon. William Q. Hayes<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................... 6

II. FACTUAL AND PROCEDURAL BACKGROUND ..................................... 8

III. LEGAL STANDARDS ................................................................................. 9

IV. ARGUMENT ............................................................................................... 11

    A. The Franchise Affiliation Waiver Forecloses the Affiliation Theory ... 11

    B. The Miscounting Theory Lacks Merit ..................................................... 13

        1. The Miscounting Theory Ignores the SBA's Three *Alternative* Employee Calculation Methods ................................................. 13

        2. Hawthorne's Payroll Documents Do Not Suggest Fraud ........... 14

        3. Relator Fails to Allege Facts Sufficient Support an Inference that Hawthorne "Altered" Its Payroll Records ........................... 16

    C. Relator Fails to Allege Scienter ............................................................. 18

        1. Relator Fails to Allege Scienter as to the Affiliation Theory ...... 18

        2. The Totality of Circumstances Does Not Show Fraud with Scienter ..................................................................................... 20

    D. The Public Disclosure Bar Requires Dismissal of the SAC ................. 22

V. CONCLUSION ........................................................................................... 30

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:20-CV-01625-WQH-AHG

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

5    *Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ...................................................................................... 9, 10

6

7    *Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ...................................................................................... 9, 10

8

9    *Bly-Magee v. California*
    236 F.3d 1014 (9th Cir. 2001) .......................................................................... 10

10

11   *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*
    559 U.S. 280 (2010) ........................................................................................... 22

12   *Kearns v. Ford Motor Co.*
    567 F.3d 1120 (9th Cir. 2009) .......................................................................... 10

13

14   *Mendiondo v. Centinela Hosp. Med. Ctr.*
    521 F.3d 1097 (9th Cir. 2008) ............................................................................ 9

15

16   *S. ex rel. Hochman v. Nackman*
    145 F.3d 1069 (9th Cir. 1998) .......................................................................... 21

17

18   *Shroyer v. New Cingular Wireless Servs., Inc.*
    622 F.3d 1035 (9th Cir. 2010) .......................................................................... 16

19

20   *Silbersher v. Valeant Pharms. Int'l, Inc.*
    76 F.4th 843 (9th Cir. 2023) ............................................................................. 22

21   *Sprewell v. Golden State Warriors*
    266 F.3d 979 (9th Cir. 2001) ............................................................................ 10

22

23   *U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*
    324 F.3d 492 (7th Cir. 2003) ............................................................................ 22

24

25   *U.S. ex rel. Hendow v. Univ. of Phx.*
    461 F.3d 1166 (9th Cir. 2006) ............................................................... 10, 15, 18

26

27   *U.S. ex rel. Hopper v. Anton*
    91 F.3d 1261 (9th Cir. 1996) ............................................................................ 21

28

3

*U.S. ex rel. Lamers v. City of Green Bay*
 168 F.3d 1013 (7th Cir. 1999) ............................................................................. 21

*U.S. ex rel. Modglin v. DJO Glob. Inc.*
 48 F. Supp. 3d 1362 (C.D. Cal. 2014), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017) ............................................................................. 16

*U.S. ex rel. Saunders v. Unisys Corp.*.
 2014 WL 1165869 (E.D. Va. Mar. 21, 2014) ..................................................... 22

*United States ex rel. Calva v. Impac Secured Assets Corp.*
 2018 WL 6016152 (C.D. Cal. June 12, 2018) ..................................................... 23

*United States ex rel. Colucci v. Beth Israel Med. Ctr.*
 785 F.Supp.2d 303 (S.D.N.Y. 2011) ................................................................. 19

*United States ex rel. Englund v. Los Angeles Cnty.*
 2006 WL 3097941 (E.D.Cal. Oct. 31, 2006) ..................................................... 19

*United States ex rel. Hong v. Newport Sensors, Inc.*
 728 F. App'x 660 (9th Cir. 2018) ..................................................................... 22

*United States ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*
 580 F. Supp. 3d 876 (S.D. Cal. 2022) ............................................................... 18

*United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*
 2011 WL 976482 (D. Neb. Mar. 15, 2011) ........................................................ 19

*United States ex rel. Schutte v. SuperValu Inc.*
 143 S. Ct. 1391 (2023) ..................................................................................... 18

*United States v. Sodexho, Inc.*
 2009 WL 579380 (E.D.Pa. Mar. 6, 2009) .......................................................... 19

*United States v. Valley Campus Pharmacy, Inc.*
 2021 WL 5406148 (C.D. Cal. Oct. 12, 2021), *aff'd sub nom. Gharibian ex rel. United States v. Valley Campus Pharmacy, Inc.*, 2023 WL 195514 (9th Cir. Jan. 17, 2023) ..................................................................................................... 19

*Vess v. Ciba-Geigy Corp. USA*
 317 F.3d 1097 (9th Cir. 2003) ......................................................................... 10

*Wang v. FMC Corp.*
 975 F.2d 1412 (9th Cir. 1992) ......................................................................... 21

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:20-CV-01625-WQH-AHG

**FEDERAL STATUTES, REGULATIONS, AND RULES**

15 U.S.C.
    § 636(a)(36)(D)........................................................................11, 12, 19
    § 636(a)(36)(D)(iv)...............................................................................12
    § 636(a)(36)(D)(iv)(II) ....................................................................11, 19

31 U.S.C.
    § 3729(a)(1)(A)....................................................................................18
    § 3729(b)(1)(A)(i)................................................................................18
    § 3729(b)(1)(A)(ii)..............................................................................18
    § 3729(b)(1)(A)(iii).............................................................................18
    § 3730(e)(4)(A)–(B) ...........................................................................23

CARES Act..................................................................................6, 11, 19, 20

Title 13, Code of Federal Regulations
    § 121.103 ......................................................................................11, 12

False Claims Act .......................................................................................21

Federal Rule of Civil Procedure 12(b)(6) ...................................................9

**CALIFORNIA STATUTES, REGULATIONS, AND RULES**

California Labor Law ...............................................................................26

**OTHER STATE STATUTES, REGULATIONS, AND RULES**

Rule 9(b) .........................................................................................7, 10, 16

UCC ......................................................................................................26, 28

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS

Defendants Hawthorne Machinery Co. ("Hawthorne"), Brian Verhoeven ("Verhoeven"), Tee Ness ("Tee Ness"), and David Ness ("David Ness") (collectively, "Defendants") hereby submit the following Memorandum of Points and Authorities in Support of their Motion to Dismiss the Second Amended Complaint ("SAC") filed by Relator Roger S. Craig ("Relator").[1]

# I.    **INTRODUCTION**

The SAC is based entirely on conclusory allegations, "information and belief," unsupported inferences and leaps of faith, and publicly available information that Relator pulled from the internet in an effort to exact revenge on Hawthorne's leadership after they terminated his employment.  Defendants did not commit fraud under any conceivable interpretation of the facts.  Relator's FCA theory fails under the heightened pleading standard and the Court should dismiss the SAC in its entirety.

Relator proffers two fraud theories.  First, Relator alleges Hawthorne failed to disclose its affiliate, CQ Pacific, and its 61 employees on its PPP loan application, thereby undercounting its employees and artificially remaining under the 500-employee limit for PPP loan eligibility (the "Affiliation Theory").  However, the CARES Act *waived* the typical affiliation rule.  Therefore, the Affiliation Theory fails.

Second, Relator alleges "on information and belief" that even without CQ Pacific, Hawthorne exceeded 500 employees, but engaged in a "systematic undercounting" intended to make itself "appear eligible for the PPP loan when it was not" (the "Miscounting Theory").  This theory fails.  PPP borrowers were permitted to utilize, at their discretion, one of ***three*** methods to calculate employee headcount, any of: (1) average monthly headcount during the prior 12 months, (2) average monthly headcount during the calendar year 2019, or (3) average pay period headcount during the prior 12 months.  Because these were alternative methods, to state a valid fraud claim, Relator must allege that Hawthorne exceeded the 500-employee limit under ***all***

---

[1] Capitalized terms not defined herein are given their meaning as set forth in the SAC.

*three* methods. But he does not. The SAC only alleges that Hawthorne exceeded the limit "on a rolling month-by-month basis" from April 2019-March 2020 (*i.e.*, method #1). Hawthorne utilized the calendar year 2019 method, not the rolling 12-month method. This deficiency, on its own, requires dismissal.

Even Relator's "rolling 12-month" theory fails. In arguing that Hawthorne exceeded the monthly employee cap, the SAC relies only on vague "discrepancies" in Hawthorne's payroll documents, most of which are easily explainable and none of which supports an inference of fraud. Indeed, the SBA was in possession of all of the same documents and information cited in the SAC, and had been on notice of Relator's lawsuit for approximately 14 months, yet **forgave** Hawthorne's loan **in its entirety**.

The alleged "discrepancies" are also immaterial. For example, Relator alleges that Hawthorne's payroll records show a monthly average of 497.4 employees, rather than 487.4, but that figure is still below 500. Additionally, the SAC relies heavily on allegations made "on information and belief," such as the contention that Hawthorne "altered" its payroll records before submitting them. The Ninth Circuit has repeatedly held that fraud allegations made "on information and belief," including under the FCA, "do not satisfy" the heightened pleading requirements of Rule 9(b) unless accompanied by a "specific statement of facts upon which the belief is founded."

Third, as an independent basis for dismissal, Relator fails to allege scienter. As to the Affiliation Theory, even assuming *arguendo* Hawthorne's interpretation of the affiliation waiver were deemed incorrect, its interpretation was patently reasonable and consistent with the SBA's own guidance. Courts have repeatedly held that differences in interpretation or a lack of clarity in the law are not false under the FCA.

Further, the totality of circumstances does not show fraud with scienter. Even accepting every single unsupported and conclusory allegation in the SAC, Relator still alleges only that the sum of Hawthorne's monthly employee count for the rolling 12-month period exceeded the limit by a **single** annual employee, *i.e.* 6,00*1* resulting in a monthly average of 500.083 employees, rather than 6,000 resulting in a monthly

7

average of 500.000 employees.  It is not even clear as a matter of law that exceeding the limit by a ***fraction*** of a monthly employee renders a borrower ineligible.  In any event, the Ninth Circuit has made clear that errors based on faulty calculations or innocent mistakes are not actionable fraud under the FCA.  It is difficult to conceive of a more innocent mistake than exceeding the monthly cap by ***one-twelfth of a single employee*** (and, again, only under one of three alternatively acceptable calculation methods, which Hawthorne did not use).

Finally, Relator's claims are barred by the public disclosure bar.  This rule was enacted to weed out FCA suits by opportunistic relators utilizing publicly available information rather than legitimate whistleblowers.  Here, Relator had no role in Hawthorne's PPP loan application process and was terminated before Hawthorne submitted its application.    Thus, ***all*** of his purported knowledge regarding Hawthorne's application necessarily came from public and external sources available to anyone.  Indeed, in a string of erratic social media posts, Relator cited a plethora of ***publicly available*** online sources and articles in support of the same theories he alleges in the SAC, leaving no doubt that his "fraud" theory stems entirely from searches he did on the internet after he was terminated, rather than true whistleblower information.  This is exactly the kind of strike suit the public disclosure bar was enacted to prevent.

For these reasons, and those set forth more fully below, Defendants respectfully request that the Court grant this motion and dismiss the SAC in its entirety.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On October 14, 2019, Relator began working for Hawthorne.  Dkt. No. 51, SAC, ¶ 14.  On April 3, 2020, less than six months later, he was terminated.  *Id.*  Hawthorne applied for its PPP loan on April 5, 2020.  *Id.* ¶ 56.  On August 21, 2020, Relator filed his Complaint, alleging violations of the FCA by Hawthorne in applying for a PPP loan.  Dkt. No. 1.  On March 11, 2021, Relator amended his Complaint.  Dkt. No. 4.

By October 4, 2021, the federal government had been on notice of Relator's allegations for approximately 14 months, yet on that date, the SBA forgave

Hawthorne's loan in full.  Declaration of Brian Verhoeven ("Verhoeven Decl."), Ex. 4.  On October 20, 2022, the Department of Justice notified the Court of its decision not to intervene in this action.  Dkt. No. 15.  Recently, despite previously alleging that Comerica "undermined the government's response to the Coronavirus and [ ] defrauded the United States," Relator dismissed his claims against Comerica in their entirety without any settlement payment.  *See* Dkt. No. 4, ¶¶ 12, 74; Dkt. No. 52.

Despite these setbacks, Relator has persisted.  On June 12, 2023, Relator requested leave to amend his pleading again, which Hawthorne did not oppose.  Dkt. No. 43.  On August 21, 2023, Relator filed the SAC.  Dkt. No. 51.  While the SAC is longwinded, it boils down to an allegation that Defendants violated the FCA "through two separate means."  *Id.*, ¶ 14.

***First***, the SAC alleges that Hawthorne "made an express omission in its PPP application by failing to disclose CQ Pacific, even though its affiliation was known to Defendants and the PPP franchise waiver provision was plainly inapplicable to Hawthorne" (the Affiliation Theory).  *Id.* ¶ 146.

***Second***, the SAC alleges, largely "on information and belief," that Hawthorne "included an express false statement on its PPP loan application by providing a false number of employees."  *Id.* ¶ 145.  Relator alleges the number Hawthorne provided "omitted material information" and "was not calculated pursuant to applicable legal requirements, including the affiliation rules" (the Miscounting Theory).  *Id.*

## III.  <u>LEGAL STANDARDS</u>

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must be granted when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint must plead facts sufficient "to state a claim that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' "  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

9

(*quoting Twombly*, 550 U.S. at 555)).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (*quoting Twombly*, 550 U.S. at 557).  Although a court must assume the truth of allegations of material fact, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, to "state as claim for relief that is plausible on its face." *Twombly*, 544 U.S. at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id.* at 556.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.* at 557.

Rule 9(b) requires more of a litigant who alleges fraud.  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).  "Rule 9(b) requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud.' " *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  "To comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.' " *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001).  "Averments of fraud must be accompanied by 'the who, what, when, where, and how of the misconduct charged.' " *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

To state an FCA claim, a relator must allege with particularity: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *U.S. ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006).

10

## IV.    <u>ARGUMENT</u>

### A.    <u>The Franchise Affiliation Waiver Forecloses the Affiliation Theory</u>

The SAC alleges that "[t]he SBA and PPP have affiliation rules designed to ensure that companies do not elude the requirements of the program by understating the true size and scope of their operations." Dkt. No. 51, SAC, ¶ 47. "The affiliation rules require that '[f]or purposes of … determining the number of employees of an applicant to the Paycheck Protection Program, the applicant is considered together with its affiliates.' " *Id.* ¶ 107. Relator alleges that Hawthorne committed a "false claim of omission by failing to disclose CQ Pacific and its 61 employees as an additional affiliate of Hawthorne[.]" *Id.* ¶ 105. However, the CARES Act contained an express waiver of the typical affiliation rules. Therefore, the Affiliation Theory fails and cannot support a cognizable claim.

The same statutory section cited repeatedly in the SAC states plainly: "During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are *waived* with respect to eligibility for a covered loan for ... any business concern operating as a franchise that is assigned a franchise identifier code by the Administration." 15 U.S.C. § 636(a)(36)(D)(iv)(II) (emphasis added). The statute was facially aimed at increasing access to the PPP program beyond those who might not qualify under the typical rules. Subpart D of Section 636 is titled: "*Increased eligibility* for certain small businesses and organizations." 15 U.S.C. § 636(a)(36)(D) (emphasis added). Indeed, the guidance published by the SBA, the "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program" dated April 3, 2020 – cited by Relator in Footnote 9 – stated plainly: "The affiliation rules described above are *waived* for … any business concern operating as a franchise that is assigned a franchise identifier code by the SBA[.]" Verhoeven Decl., Ex. 1 at 2. (emphasis added).

The SAC admits: "CQ Pacific operates retail locations under the trade name 'Carquest.' Carquest Corporation is a listed franchisor that has a 'franchise identifier

code' from the SBA." Dkt. No. 51, SAC, ¶ 115.  That is all that is required for the waiver to apply.  CQ Pacific is "a business concern operating as a franchise that is assigned a franchise identifier code" by the SBA, for which the typical affiliation rule is waived.  15 U.S.C. § 636(a)(36)(D).  Thus, the affiliation rule was waived as to CQ Pacific and there was no requirement that Hawthorne list CQ Pacific on its loan application or include its employees in its headcount.

Relator seeks to plead around this plain statutory waiver by alleging that Hawthorne's "own affiliation with CQ Pacific was not waived and needed to be both disclosed and incorporated into the headcount calculation" on Hawthorne's PPP loan application.  *Id.* ¶ 117.  This interpretation is untenable.  First, Relator cites no language in the statute to support such an interpretation, and none exists.  Rather, the statute plainly states that for any qualifying franchise – like CQ Pacific – "the provisions" applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations – *i.e.*, **all** such provisions – "are waived."  15 U.S.C. § 636(a)(36)(D)(iv).  Moreover, Relator's interpretation is contrary to the statute's stated goal to "[i]ncrease eligibility" for PPP loans beyond the typical rules.  15 U.S.C. § 636(a)(36)(D).

The practical application of Relator's theory illustrates its irrationality.  The amount of money PPP loan applicants were eligible to receive depended on their employee headcount—the more employees, the more money a company was eligible to receive.  *See* Verhoeven Decl., Ex. 3 at 1-2.  Relator contends that companies like Hawthorne applying for PPP loans were required to include their franchise affiliates' employees within the own headcount in their own PPP loan applications.  However, this would result in thousands of companies ***double-counting*** employees and artificially increasing their loan amounts.  For example, if a company with 350 employees had an affiliated franchise with 40 employees, the franchise affiliation waiver meant the company should file an application listing 350 employees, the franchise affiliate should file an application listing 40 employees, and the two entities would receive loans in proportionate sizes to their relative employee headcounts.

Relator, on the other hand, contends that in such a circumstance, the company should list its 350 employees *plus* the franchise's 40 employees for a total of 390 employees, thus double counting 40 employees (once in each application) and leading to the government to issue loan money twice for the same 40 employees.  That is not the law.

The obvious truth is that Relator carelessly failed to consider the franchise affiliation waiver before hastily filing his lawsuit – neither the initial Complaint nor Amended Complaint even mentioned the franchise affiliation waiver, let alone explain why it should not apply – and he is now scrambling to cobble together a colorable theory in the face of a plain and unambiguous statutory waiver that he missed.[2]

### B.    The Miscounting Theory Lacks Merit

Relator's Miscounting Theory, described in paragraphs 56 through 104, proffers that Hawthorne "had more than 500 employees" when it applied for the PPP loan, but "cut out employees" in a "systematic undercounting" intended to make Hawthorne "appear eligible for the PPP loan when it was not."  Dkt. No. 51, SAC, ¶¶ 5, 63, 78. This theory relies heavily on "information and belief" and a smattering of purported "discrepancies" in Hawthorne's payroll documents, most of which are explainable and immaterial and none of which create any inference of impropriety, let alone fraud.

    1.    The Miscounting Theory Ignores the SBA's Three *Alternative Employee Calculation Methods*

On April 6, 2020, the SBA issued guidance regarding "Frequently Asked Questions" related to PPP loan applications.  Verhoeven Decl., Ex. 2.  Question 14 stated: "What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?"  *Id.* at 4-5.

---

[2] Relator admits CQ Pacific's operation of retail locations for Carquest brings it within the scope of the franchise affiliation waiver.  However, Hawthorne, Hawthorne Pacific, and Hawthorne Samoa are *also* franchises.  Hawthorne operates as a retail distributor for Carquest, Hawthorne Pacific operates as a retail distributor for Carquest and Toro, and Hawthorne Samoa operates as a retail distributor for Carquest.  Carquest and Toro are each assigned franchise identifier codes.  Verhoeven Decl., Ex. 5.  Thus, even under Relator's own interpretation, each of these entities could have filed their own independent PPP application and remained *well* below the 500-employee limit.

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:20-CV-01625-WQH-AHG

In its response, the SBA made clear there were three *alternative* methods borrowers could use.  *Id.*  Specifically, borrowers were permitted to calculate "their average employment" utilizing data "either [1] from the previous 12 months or [2] from calendar year 2019."  *Id.*  The SBA also permitted a third method: "[3] Alternatively, borrowers may elect to use SBA's usual calculation: the average number of employees per pay period in the 12 completed calendar months prior to the date of the loan application (or the average number of employees for each of the pay periods that the business has been operational, if it has not been operational for 12 months)."  *Id.*

Thus, to state a valid fraud claim, Relator must allege that Hawthorne's headcount exceeded 500 under *all three* calculation methods.  But he does not.  Instead, the SAC alleges exclusively that Hawthorne exceeded the employee limit on a rolling 12-month basis.  *See* Dkt. No. 51, SAC, ¶ 92 (alleging that Hawthorne's employee count exceeded 500 based "on a rolling month-by-month basis" from April 2019 through March 2020).  Hawthorne did not utilize the "rolling 12-month" method.  Hawthorne utilized the "calendar year 2019" method.  Indeed, the "payroll spreadsheet" repeatedly referenced in the SAC is titled: "Calendar Year 2019."  Verhoeven Decl., Ex. 7 at 9.  This deficiency, on its own, requires dismissal.

### 2.   Hawthorne's Payroll Documents Do Not Suggest Fraud

During his few months as a Hawthorne employee, Relator had no job responsibilities or training related to Hawthorne's payroll or employee records, the methods of calculation of those records, or the purposes of the various types of employee records Hawthorne prepared and maintained.  *See* Dkt. No. 51, SAC, ¶ 24.  Rather, he was a "Finance Manager."  *Id.*  Nevertheless, Relator recklessly alleges that Hawthorne's various payroll documents show fraud.  Dkt. No. 51, SAC, ¶¶ 76-83.  These conclusory allegations are false, lack supporting allegations, are contrary to the SBA's own review, and are insufficient to support a fraud claim.

As an overarching matter, "discrepancies" are not fraud.  Given the fluid nature of employment, one would expect discrepancies among various types of employee

lists.  Each month, employees are hired and terminated.  Some employees are classified differently than others, *e.g.* full-time, part-time, etc.  Different lists serve different purposes.  The number of employees on a list will vary depending on when the snapshot is taken, *e.g.* the end of the month versus the beginning.  And of course, there can be any number of confounding factors, *e.g.* an employee changing his or her start or end date, imperfect data, human error, etc.  Relator's allegations regarding Hawthorne's payroll documents fail to create an inference of fraud.

First, Relator alleges that Hawthorne "claimed on its PPP application that it had an average of 487.4 employees," whereas the "payroll, on its face, showed an average headcount during [the] period of 497.4."  *Id.* ¶ 82.  However, 497.4 is still below the PPP loan eligibility limit of 500.  Thus, Relator's allegation, even if true, is immaterial and non-actionable.  *Hendow*, 461 F.3d at 1174 (recognizing that an allegedly false statement must be "material" in order to support FCA claim).

Second, time and time again, Relator fails to adequately explain the purported "cornucopia of misrepresentations" he alleges, and his theories are at times difficult to follow.  *See id.* ¶ 76-83.  For example, the 2019 payroll spreadsheet submitted with Hawthorne's PPP application did not list employees in a month-by-month basis (Verhoeven Decl., Ex. 7 at 9-14), but Relator alleges that the 2019 payroll spreadsheet contains "month-by-month disparities" when compared with the "PPP application," which also did not list employees on a month-by-month basis.  *Id.*; SAC, ¶ 80.  This does not make sense.  Similarly, Relator cites purportedly suspicious "changes" to Hawthorne's headcount "on a month-by-month basis in the 2019 payroll," but again, the 2019 payroll spreadsheet did not list employees on a month-by-month basis.  Relator's allegations are simply not clear enough to follow.

Critically, the SBA did not agree with Relator's strained interpretation of Hawthorne's payroll documents.  On the contrary, the SBA was in possession of all of the PPP loan application documents, and aware of Relator's allegations, yet ***forgave*** the loan ***in full***, creating a strong inference against Relator's fraud theory.

For these reasons, the facts alleged by Relator with respect to Hawthorne's payroll spreadsheet are insufficient to create an inference of fraud.

### 3.    Relator Fails to Allege Facts Sufficient Support an Inference that Hawthorne "Altered" Its Payroll Records

Relator alleges "[o]n information and belief" that Hawthorne "altered" its payroll records, citing only purported "discrepancies" in the payroll documentation. These allegations are insufficient to create an inference of fraud. It is well-established that "[a]llegations of fraud based on information and belief do not satisfy FRCP 9(b) requirements. … unless accompanied by a specific statement of facts upon which the belief is founded." *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1407 (C.D. Cal. 2014), *aff'd sub nom. United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010) ("[Fraud] [c]laims made on information and belief are not usually sufficiently particular [under Rule 9(b)], unless they accompany a statement of facts on which the belief is founded."). Here, Relator's allegations wholly fail to support an inference that Hawthorne "altered" its payroll records.

Quarterly Payroll Discrepancies. Relator alleges that between Q2 and Q3 of 2019, there was a $1.32 million increase in gross wages reported on Hawthorne's Form 941s, yet during the same period, Hawthorne's headcount fell on a net basis by four employees. Dkt. No. 51, SAC, ¶ 88. This is not suspicious. Payroll will increase, despite headcount falling, any time the company grants raises or pays sales commissions or other forms of compensation during the year. Assuming headcount of 450, an increase of $1.32 million in payroll constitutes an increase of less than $3,000 in compensation per employee during the year—a perfectly foreseeable figure.

Missing Employees. Relator alleges that certain employees are included on some employee lists and not others. Dkt. No. 51, SAC, ¶ 91. This allegation does not create an inference of fraud. Paragraphs 91 through 93 fail to explain why one would expect the various documents Relator cites to be identical. In reality, one would very

16

much ***not*** expect them to be identical, for any number of reasons. As just one example, Relator alleges inconsistencies between the 2019 payroll document and the February 13-14, 2020 payroll document. *Id.* ¶¶ 91-93. However, employees who started in January or February 2020 would appear on the latter, but not the former. There are numerous other reasons for minor discrepancies that are far more plausible than fraud.

Form 5500. Relator alleges that Hawthorne's Form 5500 for 2020 creates an inference of fraud. *Id.* ¶¶ 96-104. This argument fails for many reasons. As a threshold matter, a Form 5500 is a public document and therefore cannot form the basis of an FCA claim under the public disclosure bar (discussed further below).

Second, Relator again fails to compare apples to apples. For example, he alleges that the four entities' Form 5500 "active participant" figure in ***January*** 2020 was 567, but then deducts CQ Pacific's 61 employees as of ***April*** 2020 (when CQ Pacific submitted its loan application), purportedly resulting in 506 active participants. However, it is easily foreseeable that the various entities' employee headcounts would fluctuate between January and April (or be subject to other various differences).

Third, Relator disingenuously cites only Hawthorne's Form 5500 for ***2020***, yet fails to disclose Hawthorne's Form 5500 for ***2019***. One would expect fluctuations between the end of the year 2019 and the beginning of the year 2020, for example if certain employees' last day was December 31, 2019 or first day was January 1, 2020. And, Hawthorne utilized the "calendar year 2019" method to calculate its employee count. Thus, the end-of-the-year figure in Hawthorne's Form 5500 for 2019 is more relevant than the beginning-of-the-year figure in Hawthorne's Form 5500 for 2020. Indeed, Hawthorne's Form 5500 listed a total number of "active participants" at the end of 2019 as "548." Verhoeven Decl., Ex. 6 at 2. Subtracting CQ Pacific's

employees brings the total figure to 487, rendering it consistent with Hawthorne's loan application figures and eliminating Relator's argument altogether.[3]

### C.    Relator Fails to Allege Scienter

In addition to the other elements, a relator must allege with particularity that the defendant made the purportedly false statement "with scienter" (*i.e.* "knowingly"). *Hendow*, 461 F.3d at 1174; 31 U.S.C. § 3729(a)(1)(A).  The FCA defines the term "knowingly" as encompassing three mental states: First, that the person "has actual knowledge of the information." § 3729(b)(1)(A)(i).  Second, that the person "acts in deliberate ignorance of the truth or falsity of the information."  § 3729(b)(1)(A)(ii).  And, third, that the person "acts in reckless disregard of the truth or falsity of the information." § 3729(b)(1)(A)(iii).  "In short, either actual knowledge, deliberate ignorance, or recklessness will suffice."  *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1399-1400 (2023).  Relator fails to adequately allege scienter by Defendants as to either his Affiliation Theory or Miscounting Theory.

#### 1.    Relator Fails to Allege Scienter as to the Affiliation Theory

Relator's Affiliation Theory is foreclosed by the CARES Act's franchise affiliation waiver.  However, even assuming *arguendo* that the franchise affiliation waiver were deemed not to waive the requirement for Hawthorne to include CQ Pacific on its loan applicable, it was plainly reasonable, and certainly not ***fraudulent***, for Hawthorne to interpret the law that way.  Therefore, Relator's FCA theory fails.

At most, Relator has alleged a difference in interpretation concerning ambiguous statutory language, which is insufficient to support an FCA claim.  *United States ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*, 580 F. Supp. 3d 876, 892 (S.D. Cal. 2022) ("[D]ifferences in interpretation growing out of a disputed legal question are ... not false under the FCA.") (citing Ninth Circuit, Seventh Circuit, and

---

[3] It is materially misleading for Relator to cite Hawthorne's Form 5500 for 2020 while omitting any reference to the more relevant 2019 version, which he no doubt possesses.

Fifth Circuit precedent); *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F.Supp.2d 303, 316 (S.D.N.Y. 2011) ("Even assuming the claims submitted by [defendants] were 'false,' given the lack of clarity in the law, it cannot be said that defendants 'knew' the claims were false."); *United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*, 2011 WL 976482, at *9 (D. Neb. Mar. 15, 2011) ("[N]othing indicates that [plaintiff's] allegations of GAAP violations are anything more than imprecise statements or differences in interpretation of a disputed or unclear legal question, neither of which are false claims under the FCA."); *United States v. Sodexho, Inc.*, 2009 WL 579380, at *17 (E.D.Pa. Mar. 6, 2009) ("The lack of clarity regarding the proper interpretation of the regulations indicates that no basis exists for imposing FCA liability on Defendants, who merely adopted a reasonable interpretation of regulatory requirements which favored their interests."); *United States ex rel. Englund v. Los Angeles Cnty.*, 2006 WL 3097941, at *7 (E.D.Cal. Oct. 31, 2006) ("Claims are not 'false' under the FCA when reasonable persons can disagree regarding whether the service was properly billed to the Government.").

Here, the statutory language supports Hawthorne's interpretation of the affiliation waiver. *See* 15 U.S.C. § 636(a)(36)(D)(iv)(II). Subpart D of Section 636 is titled **"*Increased eligibility*** for certain small businesses and organizations," adding further support to Hawthorne's interpretation. 15 U.S.C. § 636(a)(36)(D) (emphasis added). Moreover, the SBA's own guidance highlighted that the CARES Act waived the typical franchise affiliation rules. Verhoeven Decl., Ex. 1 at 2. Additionally, the SBA *forgave* Hawthorne's loan, despite the federal government having been on notice of Relator's Affiliation Theory for 14 months. *Id.*, Ex. 4. These facts fall utterly short of creating an inference of fraud with scienter. *United States v. Valley Campus Pharmacy, Inc.*, 2021 WL 5406148, at *3 (C.D. Cal. Oct. 12, 2021), *aff'd sub nom. Gharibian ex rel. United States v. Valley Campus Pharmacy, Inc.*, 2023 WL 195514 (9th Cir. Jan. 17, 2023) ("The scienter element includes … the knowledge that one's

conduct is unlawful. … Relator never alleges, even generally, that Defendants *knew* that their [conduct] was unlawful.") (emphasis in original).

        2.    <u>The Totality of Circumstances Does Not Show Fraud with Scienter</u>

The totality of circumstances does not support an inference of fraud with scienter as to either Relator's Affiliation or Miscounting Theories.

First, as Relator recognizes, the PPP program was "emergency legislation" representing "one of our nation's most aggressive economic responses to the Coronavirus pandemic." Dkt. No. 51, SAC, ¶¶ 3-4. The clear goal was to get money into the hands of business as quickly as possible to fend off a national or global depression, and all parties – the government, borrowers, and lenders – were moving extremely quickly. The law passed on March 27, 2020; the SBA issued initial guidance on April 3, 2020; Hawthorne applied on April 5, 2020; and Comerica approved the loan the same day. *Id.* ¶¶ 9, 40, 56, 107 n.9. It is also notable that the SBA offered three alternative methods to calculate employee headcount, any one of which would render a borrower eligible. Quite clearly, the federal government did not want borrowers second-guessing their interpretation of the law (*e.g.*, the franchise affiliation waiver) or calculations in fear of future opportunistic strike suits by litigious terminated former employees. In fact, the SBA's own guidance stated that "[b]orrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act, … The U.S. government will not challenge lender PPP actions that conform to this guidance[.]" Verhoeven Decl., Ex. 3 at 1.

Second, even accepting every single conclusory allegation in the SAC as valid, Relator still contends only that Hawthorne's employee count exceeded the limit by a ***single*** annual employee. Relator's chart in paragraph 92 alleges that the sum of Hawthorne's monthly employee count on a rolling 12-month basis was 6,00*1* employees. *Id.* ¶ 92. This would mean its average monthly employee count was 500.083. *Id.* In other words, even when taking every possible liberty and stretching

20

the bounds of his allegations far beyond their reasonable limits, Relator could still only muster an allegation that Hawthorne exceeded the monthly limit by a ***single*** employee during the prior rolling 12-months, or ***one-twelfth*** of an employee on a monthly basis during that same time period. *Id.* It is not even clear as a matter of law that exceeding the monthly limit by a fraction of an employee renders a borrower ineligible (and again, Hawthorne was permitted to use, and did use, other employee calculation methods). In any event, exceeding the 500-employee monthly limit by a ***fraction of a single monthly employee*** retrospectively under a potential method rightfully not used by the applicant, while seeking emergency funds during a global economic meltdown, does not remotely suggest fraud committed knowingly.

"The Ninth Circuit has found that errors based simply on faulty calculations or flawed reasoning are not false under the FCA." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1420 (9th Cir. 1992)[4]). "Bad math is no[t] fraud." *Wang*, 975 F.2d at 1420; *see also U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) ("Innocent mistakes, mere negligent misrepresentations and differences in interpretations are not false certifications under the [False Claims Act]"). "Congress specifically amended the False Claims Act to include this definition of scienter, to make 'firm ... its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" U.*S. ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (citing the Congressional record). Here, Relator's allegations that Hawthorne misinterpreted the franchise affiliation waiver or submitted a loan application that exceeded the monthly limit by one-twelfth of one employee in the midst of a calamitous global pandemic do not plausibly support an inference of knowing fraud.

---

[4] Overruled on other grounds by *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015)

### D.    The Public Disclosure Bar Requires Dismissal of the SAC

"To weed out FCA claims not based on genuine whistleblower information, the FCA contains a "public-disclosure bar" that requires dismissal of any claim grounded on publicly available information, such as a government report or a news article." *United States ex rel. Hong v. Newport Sensors, Inc.*, 728 F. App'x 660, 662 (9th Cir. 2018).  "Where a public disclosure has occurred, [the government] is already in a position to vindicate society's interests, and a qui tam action would serve no purpose." *U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003).  The public disclosure bar was enacted to " 'strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits' in which relators simply feed off previous disclosures of fraud known to the public, rather than exposing independently discovered fraud."  *U.S. ex rel. Saunders v. Unisys Corp..*, 2014 WL 1165869, at *5 (E.D. Va. Mar. 21, 2014) (citing *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010)).  "The FCA's public disclosure bar requires federal courts to dismiss *qui tam* suits under certain circumstances where the complaint's allegations closely match information that was publicly disclosed in one of three specified channels." *Silbersher v. Valeant Pharms. Int'l, Inc.*, 76 F.4th 843, 852 (9th Cir. 2023).  Specifically, the statute states:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office [("GAO")], or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who

22

has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A)–(B). The inquiry involves two steps. *United States ex rel. Calva v. Impac Secured Assets Corp.*, 2018 WL 6016152, at *3 (C.D. Cal. June 12, 2018). "First, the Court must determine whether there was a prior 'public disclosure' of the allegations or transactions underlying the qui tam suit through one of the enumerated sources." *Id.* "If there has been a public disclosure, the Court must then determine whether the relator is an 'original source' within the meaning of the statute." *Id.* Relator's claims fail under this analysis.

As a preliminary matter, Relator is/was in no way an original source. Prior to being terminated, Relator does not allege to have been (and was not) involved in any way in Hawthorne's PPP loan application discussions. *See generally* Dkt. No. 51, SAC. Nor did he have any access to any financial or payroll information. *See id.* By the time Hawthorne submitted its PPP loan application on April 5, 2020, Relator had already been terminated. *Id.* ¶ 24. Thus, Relator's purported knowledge regarding Hawthorne's loan application necessarily came ***entirely*** from public and external sources available to anyone. Relator was nothing more than a former employee bitter that he had been terminated after less than six months on the job. *See id.*

Indeed, Relator's judicially noticeable social media posts[5] show that after his termination, he became enraged, scoured the internet for ***publicly available*** tidbits of information, then assembled them into a series of unhinged, abusive, and inflammatory LinkedIn posts aimed at Hawthorne, its principals, Comerica, and even the Assistant United States Attorney and the California Labor Commissioner. These posts, based entirely on public sources, laid out the exact theories Relator now alleges in his SAC.

---

[5] As discussed in Hawthorne's accompanying Request for Judicial Notice, the Court may take judicial notice of these posts (without regard to the truth of their contents) in assessing whether the public disclosure bar applies.

For example, after his termination, Relator published a post on LinkedIn stating that Hawthorne, a "PAYCHECK PROTECTION PROGRAM recipient literally – and physically – hastily and with no warning, escorted 50 employees out the door (Like a bouncer at a bar ON THE SAME DA[Y]…"  Verhoeven Decl., Ex. 10 at 1.  The remainder of the post was cut off, but contained screenshots or links to publicly available loan information pulled from the SBA's website and a link to an internet article about a yacht in an apparent effort to suggest some sort of impropriety.  *Id.*  Relator later published another similar post, in which he wrote:

> "Timing is everything" Words to hang by…like a dangling participle. … While cruising in his 86' yacht, (that he owns through an Oregon Shell corporation Wilson Marine avoiding sales and property taxes) Hawthorne Caterpillar dealer Tee K Ness took $8,644,000 in emergency pandemic relief.  To qualify, it was necessary for Ness to reduce headcount, so on the SAME DAY he submitted his PPP loan application to the SBA, he terminated 50 employees then had them escorted out the door like a bouncer at a bar.  Nine (9) days later he began purchasing real estate.  One of the purchases was this eight (8) bedroom, six and a half (6.5) bath – 6,700 square foot home for his $3,195,000 pictured below his yacht. ….
>
> Do you think Tee Ness was struggling financially? … Do you think the FBI is tolerating Tee Ness? … Do you think the FBI is tackling Tee Ness head on with its law enforcement partners? …
>
> Anyone?

Verhoeven Decl., Ex. 11 at 1.  In support of his post, Relator linked to a publicly available internet article related to a yacht and cited publicly available land and real estate records.  *Id.* at 2.  In another post, Relator cited to additional publicly available real estate records and stated: "Here's another one of the real estate purchases made by Tee Ness after taking $8,644,000 in emergency pandemic relief" and continued that the "same bank," *i.e.* Comerica, that "gave Hawthorne $8 million in PPP" funds financed the purchase of Mr. Ness's home.  *Id.* at 3.

In another post, Relator stated: "Here you can see where NINE (9) days after certifying he needed emergency pandemic relief to support his ongoing operations and

had no other sources of liquidity [Tee] Ness purchased this prop[erty]," citing publicly available PPP loan records and publicly available Hawaii property records. *Id.* at 4.

In another post, Relator stated: "Here you can see Question 3 of the PPP application asking whether the applicant [Hawthorne] owns any other businesses. To qualify for a PPP loan the headcount of all affiliates combined must be less than 500," citing Hawthorne's PPP loan application that he pulled from publicly available online sources. *Id.* at 5.

Relator also utilized publicly available information in his posts to suggest the U.S. Attorney's office was in on the conspiracy. In two LinkedIn posts, Relator wrote:

> San Diego received 55,823 PPP loans for $6 Billion. To date the local U.S. Attorney has one (1) press release relating to PPP fraud. Prior to the new administration asking for the resignation of Robert Brewer, the Trump appointed U.S. Attorney, Brewer's replacement (Randy Grossman), had been strategically placed by Brewer to assume the role. Only months prior, Grossman was a Partner at Jones Day, taking a large pay cut ($300,000 + annual paycut) to join the Southern California U.S. Attorneys' Office. … The new administration has yet to appoint its own U.S. Attorney. … This is how much an Assistant U.S. Attorney makes. A large pay cut for a Partner with Jones Day to say the least.

*Id.* at 6-8. In support of his post, Relator linked to publicly available U.S. Attorney salary information pulled from the internet. *Id.* In another post, Relator wrote:

> This is cute. Here you can see Stephen Wittman, Hawthorne's in-house counsel, recorded Wilson Marine's business activity as "Real Estate" after Wittman retired Jeffrey Boman [Hawthorne's in-house counsel] filed an amended …."

*Id.* at 9. The post was cut off, but cited and linked to publicly available land records that Relator pulled from the internet. *Id.*

In another string of posts, Relator continued his attacks and citations to publicly available sources, this time going after the office of the California Labor Commissioner and suggested that they too were improperly influenced and biased:

> Raging with greed, and with zero notice (so he could qualify for $8,080,000 in PPP money), Tee Ness surreptitiously corralled 50 employees into a meeting room directing his in-house attorney to terminate them. Five (5) minutes later Tee had those employees physically escorted out of the building. … In his haste, Ness delayed

the terminated employees' final paychecks which violated California Labor Law.  A California Labor Commission hearing was held on the matter only to have, almost two (2) years later, an influenced Hearing Officer, Michael Jackman, refuse [sic] to rule. … In the final analysis [of Hawthorne's PPP loan] – you have a high net worth individual taking $8,644,000 in emergency pandemic relief and an FDIC insured bank [Comerica] willing to gamble on the safety of its political connections.

Verhoeven Decl., Ex. 12 at 1-20.  In another string of posts, Relator again repeated his theory of impropriety with respect to Hawthorne's PPP loan application, including its affiliation with CQ Pacific, and supported his posts by linking to publicly available PPP loan information pulled form the internet, publicly available UCC records, publicly available corporate filings with the State of Hawaii, and publicly available Secretary of State Filings with the State of California.  *See id.* at 3-4.

In another post, Relator continued his attacks on the office of the California Labor Commissioner's conduct with respect to Hawthorne, posting:

Adding insult to injury, almost two (2) years after the complaint was filed relating to California's (objective standard) final paycheck law, an influenced California Labor Commsion [sic] Hearing Office, Michael Neal Jackman, refuses to rule. … Someone should talk to him about the quality of the company he keeps.

*Id.* at 5.  Relator then posted an email that Relator purportedly received from Mr. Jackman, in which he wrote that "[t]he timeframe for decisions is 15 days to 2 years." *Id.*  Relator concluded his post by writing: "Does that last sentence sound suspicious to you?" *Id.*

In another string of posts, Relator wrote: "Tee K Ness real estate purchases after receiving $8,644,000 in emergency pandemic relief: …", then listed five purported real estate transactions pulled from publicly available land records and again linked to publicly available PPP loan information and a publicly available internet posting related to a yacht.  Verhoeven Decl., Ex. 13 at 1-2.

In another set of posts, Relator repeated his allegations that the U.S. Attorney's Office and Comerica were in on the conspiracy for Hawthorne to commit "fraud":

U.S. Attorney Waldref stated: "COVID relief funding is a precious and limited resource.["] … "Lying to gain access to SBA's pandemic

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:20-CV-01625-WQH-AHG

> response programs is not without consequence," said SBA OIG's Western Regional Special Agent in Charge Weston King. …
>
> Do you think Caterpillar dealer Tee K Ness is a millionaire owner? Not only is he a millionaire owner, to gain access, he actually terminated 50 employees on the SAME DAY he made application for a $8,03,800 PPP loan.  After the terminations he claimed 489 employees. (True story) … It gets better…the bank who facilitated the $8,083,800 PPP loan (Comerica) provides payroll services for Ness and had hard data in its' [sic] immediate possession indicating Tee Ness did not qualify.

Verhoeven Decl., Ex. 14 at 1-2.  In support, Relator cited publicly available internet articles, online records, and publicly available real estate transactions.  *Id.*

In another post, Relator wrote that Jeffrey Boman, Hawthorne's in-house counsel, "fancies himself a boxer which may be the reason he had the 50 terminated employees escorted out of the building like…" *Id.* at 3.  The post cut off, but linked to publicly available social media profiles for Mr. Boman and Mr. Verhoeven.  *Id.*

In another post, Relator wrote: "Tee K Ness purchased [a] $2,900,000 [house] through a real estate holding company called Ness Pacifc [sic] Group, LLC.  The purchase was recorded on 4/17/2020." *Id.*  In his post, Relator included a picture of publicly available land records he pulled from the internet. *Id.*  In another post, Relator wrote: "The 6,700 square foot home Tee K Ness purchased after taking the $8,644,000 in emergency pandemic relief: …" and posted a link to an online and publicly available real estate listing for the home that he pulled from the internet.  *Id.* at 4.

In another post, Relator posted a picture of an individual's face and wrote: "Hawthorne Machinery's Banker: John W. Cardosa, Comerica Banker." *Id.* at 5.  It appears Relator simply pulled a publicly available image of this man off of the internet and included it in his post.  *Id.*  He then repeated allegations he had made in earlier posts that Mr. Boman engaged in impropriety, that Mr. Verhoeven "likely" falsely certified Hawthorne's PPP loan application, and that Tee Ness engaged in improper real estate purchases, again linking to and citing numerous publicly available online sources and records.  *Id.*  In the same string of posts, Relator wrote:

> The reason Tee K Ness isn't worried…San Diego received 55,823 in PPP loans for $6 Billion.  To date, the local U.S. attorney has one (1) press release relating to PPP fraud. …Do you think there's a reason why the current [Trump] administration has not appointed their own U.S. Attorney? … Counter clockwise rotation. … Say what you will…they put on one heck of a boat parade.

*Id.* at 7.  Relator's post included what appear to be publicly available images of former President Donald Trump, former Attorney General Bill Barr, former U.S. Attorney Robert Brewer Jr., and others, suggesting some sort of improper conspiracy.  *Id.*

In another post, Relator continued his attacks on Comerica utilizing publicly available records and filings, writing:

> Why is Comerica using the Chabad of the Valleys' address in Tarzana for an active UCC filed on San Diego Caterpillar dealer Hawthorne Machinery? … Anyone?

> Since John [Cardoza] is Hawthorne's banker I'll bet he can answer our question.  How about it John? … While you think about your answer…We have another question:  Since you handle Hawthorne's payroll, did you tell Hawthorne, in order to qualify, they needed to fire 50 employees on the same day they made application for $8,080,000 in emergency pandemic relief? …

> Comerica made an $80,000 fee when it facilitated the PPP loan for which Hawthorne Machinery did not qualify. … Let's hope John gets back to us soon with his answers. …

> "DECADES OF ILLEGAL CONDUCT":

> Tell me again why Comerica is using the Chabad of the Valleys' address in Tarzana on a UCC filing for property located in San Diego County owned by Hawthorne Machinery who is also located in San Diego?

> Anyone?

Verhoeven Decl., Ex. 15 at 1-2.  In support of his post, Relator cited to publicly available UCC and online records.  *Id.*  In related posts, Relator continued his attacks on Hawthorne, Tee Ness, and Comerica, citing and linking to numerous publicly available records and articles he pulled from the internet, including Google images, publicly available PPP loan information, Department of Justice press releases, corporate records from the California Secretary of State, publicly available online real estate and UCC records, and other public real estate and corporate records.  *Id.* at 3-9.

Relator's reliance on publicly available sources of information has only continued since he filed his lawsuit. For example, Relator alleges "on information and belief" that Hawthorne "altered" its payroll records, citing the Form 5500 that Hawthorne filed with the Department of Labor for 2020. Dkt. No. 51, SAC, ¶¶ 94-104. The Form 5500 is plainly a public source of information available to anyone on the internet. Indeed, in one of his LinkedIn posts, Relator admitted he pulled this information from the internet and that anyone could have done the same thing:

> [N]ow that we know Trump removed all the flags from the PPP loans over \$2MMM just days before leaving office we're going to fix that. … A simple reference to the U.S. Department of Labor website which allows **the public** to search employer's 401K IRS Form 5500 filings. … So, as you can see, it's a very simple process that **any concerned taxpayer** can follow.

Verhoeven Decl., Ex. 16 at 1-2 (emphasis added). In a related post, Relator continued his attacks on Hawthorne and Comerica, citing to publicly available internet articles and PPP records he pulled from the internet related to Hawthorne's PPP loan applications and the real estate transactions now alleged in the SAC. *Id.* at 3-4.

The import of Relator's social media firestorm is clear. Virtually the entirety of his fraud theory originated from publicly available governmental records and internet articles Relator sought out long after he had already been terminated. Relator was angry that he was terminated and made it his personal vendetta to exact revenge by manufacturing a fanciful conspiracy theory utilizing publicly available information and filings and innuendo. Relator's posts were reckless and defamatory. His indiscriminate and wholly unsupported attacks – on Hawthorne, its principals, Comerica, its employees, the U.S. Attorney's Office, U.S. Attorney Brewer, the office of the California Labor Commission, its employees, President Trump, Attorney General Barr, and many others – were utterly detached from reality. In any event, Relator's imaginative fraud theory was sourced entirely from publicly available sources and is therefore foreclosed by the public disclosure bar.

After the filing of this lawsuit, Relator appears to have deleted all of these posts. Hawthorne preserved some of them. It is unclear whether there were others. In any event, the existing judicially noticeable evidence leaves no question that Relator's claims emanate entirely from publicly available sources, are barred by the public disclosure bar, and must be dismissed in their entirety.

Even setting all of these public posts aside, the SAC still violates the public disclosure bar. The SAC relies fundamentally on Hawthorne's publicly available Form 5500. Dkt. No. 51, SAC, ¶¶ 96-98, 104. It also relies heavily on conspiratorial allegations of various financial and real estate transactions that were clearly pulled from public records. *Id.* ¶¶ 133-141. For example, Relator alleges that one such purported transaction was subject to "no recorded mortgage." *Id.* ¶ 137. The public disclosure bar plainly prohibits this type of canvassing of publicly available internet sources (a bar the DOJ undoubtedly took into account in passing on Relator's claim). Relator is in no way a true whistleblower. The SAC must be dismissed.

## V.    CONCLUSION

For the reasons set forth herein, Defendants respectfully request that the Court grant this motion and dismiss the SAC in its entirety.

DATED: October 20, 2023                    PROCOPIO, CORY, HARGREAVES &
                                           SAVITCH LLP


By: _____/s/Eric A. Plourde_____
    Edward C. Walton
    Eric A. Plourde
    Attorneys for Defendants
    Hawthorne Machinery Co.,
    Brian Verhoeven, Tee Ness,
    and David Ness

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS
CASE NO. 3:20-CV-01625-WQH-AHG