POLLOCK COHEN LLP
Max E. Rodriguez (admitted *pro hac vice*)
Adam Pollock (admitted *pro hac vice*)
111 Broadway, Suite 1804
New York, NY 10006
Tel: (212) 337-5361
Email: Max@PollockCohen.com

Liana R. Vitale (SBN 348772)
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (646) 415-9001
Email: liana@pollockcohen.com

DICELLO LEVITT LLP
Li Yu (*pro hac vice* motion pending)
Molly Knobler (admission pending)
485 Lexington Ave., Suite 1001
New York, NY 10017
Tel: (212) 337-5361
Email: lyu@dicellolevitt.com
*Attorneys for Plaintiff-Relator Roger S. Craig*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ROGER S. CRAIG,<br><br>Plaintiff,<br><br>v.<br><br>HAWTHORNE MACHINERY CO., BRIAN VERHOEVEN, TEE NESS, and DAVID NESS,<br><br>Defendants. | Case No. 3:20-cv-01625-WQH-AHG<br><br>**RELATOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS**<br><br>**[Fed. R. Civ. P. 12(b)(6)]**<br><br>Hearing Date: **December 15, 2023**<br>Judge: Hon. William Q. Hayes<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# **<u>TABLE OF CONTENTS</u>**

I.    PRELIMINARY STATEMENT ....................................................... 1

II.   SUMMARY OF RELATOR'S ALLEGATIONS IN THE SAC ..................... 3

III.  STANDARD OF REVIEW ........................................................... 5

IV.   ARGUMENT ......................................................................... 6

  A.  Defendants Falsely Claimed Eligibility for a PPP Loan by Failing to Disclose All of Hawthorne's Affiliates and Their Employees. ........................ 6

  B.  Defendants Also Defrauded the Government by Undercounting Employees. ................................................................................. 11

  C.  The SAC Plausibly Alleges That Defendants Acted "Knowingly" ............... 15

  D.  Defendants Fail to Identify a Qualifying Public Disclosure or Show That Relator Was Not the Original Source of Such Disclosure. ........................... 20

  E.  Any Dismissal Should Be with Leave to Replead ......................... 25

V.    CONCLUSION ...................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Edgerly v. City & Cnty. of San Francisco*,
  713 F.3d 976 (9th Cir. 2013) ............................................................... 7, 8

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ................................................................ 25

*Godecke v. Kinetic Concepts, Inc.*,
  937 F.3d 1201 (9th Cir. 2019) ................................................................ 16

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ................................................................................. 7

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  136 S. Ct. 1923 (2016) ........................................................................... 19

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
  521 F.3d 1097 (9th Cir. 2008) ................................................................ 14

*Pa. Dep't of Corrections v. Yeskey*,
  524 U.S. 206 (1998) ................................................................................. 9

*Prather v. AT&T, Inc.*,
  847 F.3d 1097 (9th Cir. 2017) ................................................................ 21

*Shroyer v. New Cingular Wireless Servs., Inc.*,
  622 F.3d 1035 (9th Cir. 2010) ................................................................ 11

*Silbersher v. Valeant Pharms. Int'l, Inc.*,
  76 F.4th 843 (9th Cir. 2023) ............................................................. 2, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................... 18

*U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*,
  933 F. Supp. 2d 825 (E.D. Va. 2013) ..................................................... 25

*U.S. ex rel. Booker v. Pfizer, Inc.*,
  2014 WL 1271766 (D. Mass Mar. 26, 2014) .......................................... 25

*U.S. ex rel. Calva v. Impac Secured Assets Corp.*,
  2018 WL 6016152 (C.D. Cal. June 12, 2018) ......................................... 21

Case No. 3:20-cv-01625-WQH-AHG

MEMORANDUM OF POINTS AND AUTHORTIIES IN OPP. TO MOTION TO DISMISS

*U.S. ex rel. Campie v. Gilead Scis., Inc.*,
   862 F.3d 890 (9th Cir. 2017) ........................................................................5

*U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*,
   785 F. Supp. 2d 303 (S.D.N.Y. 2011) ........................................................19

*U.S. ex rel. Durkin v. Cnty. of San Diego*,
   300 F. Supp. 3d 1107 (S.D. Cal. 2018) ...............................................14, 15

*U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*,
   2023 WL 2467170 (E.D. Pa. Mar. 10, 2023) ..............................................9

*U.S. ex rel. Englund v. Los Angeles Cnty*,
   2006 WL 3097941 (E.D. Ca. 2006).............................................................20

*U.S. ex rel. Escobar v. Universal Health Servs., Inc.*,
   842 F. 3d 103 (1st Cir. 2016)........................................................................5

*U.S. ex rel. Everest Principals v. Abbot Labs., Inc.*,
   622 F. Supp. 3d 920 (S.D. Cal. 2022) ......................................................17

*U.S. ex rel. Goldberg v. Sacramento Heart & Vascular Med. Assocs.*,
   2023 WL 5435890 (E.D. Cal. Aug. 23, 2023)............................................14

*U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*,
   44 F.4th 838 (9th Cir. 2022) ......................................................................19

*U.S. ex rel. Hochman v. Nackman*,
   145 F.3d 1069 (9th Cir. 1998) ...................................................................20

*U.S. ex rel. Hong v. Newport Sensors, Inc.*,
   728 F. App'x 660 (9th Cir. 2018) ..............................................................22

*U.S. ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) .....................................................................20

*U.S. ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.*,
   189 F. Supp. 2d 862 (S.D. Ill. 2002) ...................................................7, 11

*U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
   2019 WL 3282619 (C.D. Cal. July 16, 2019)............................................22

*U.S. ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) ...................................................................20

MEMORANDUM OF POINTS AND AUTHORTIIES IN OPP. TO MOTION TO DISMISS

*U.S. ex rel. Lardner v. Smith & Nephew Inc.*,
  2019 WL 7050835 (W.D. Tenn. Sept. 17, 2018) ........................................... 6, 8, 11

*U.S. ex rel. Mateski v. Raytheon Co.*,
  816 F.3d 565 (9th Cir. 2016) ........................................................................... 23

*U.S. ex rel. MC2 Sabtech Holdings v. GET Eng'ring Corp.*,
  580 F. Supp. 3d 876 (S.D. Cal. 2022) ......................................................... 19, 23

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
  812 F.3d 294 (3d Cir. 2016) ............................................................................ 22

*U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*,
  2011 WL 976482 (D. Neb. 2011) ..................................................................... 20

*U.S. ex rel. Schumer v. Hughes Aircraft Co.*,
  63 F.3d 1512 (9th Cir. 1995) ........................................................................... 24

*U.S. ex rel. Schutte v. SuperValu Inc.*,
  598 U.S. 739 (2023) ........................................................................................ 15

*U.S. ex rel. Silingo v. WellPoint, Inc.*,
  904 F.3d 667 (9th Cir. 2018) ...................................................................... 6, 18

*U.S. ex rel. STF, LLC v. Vibrant Am., LLC*,
  2020 WL 4818706 (N.D. Cal. Aug. 19, 2020) ................................................. 18

*U.S. ex rel. Swoben v. United Healthcare Ins. Co.*,
  848 F.3d 1161 (9th Cir. 2016) .................................................................... 6, 12

*U.S. ex rel. Wuestenhoefer v. Jefferson*,
  105 F. Supp. 3d 641 (N.D. Miss. 2015) ........................................................... 16

*U.S. v. Allergan, Inc.*,
  46 F.4th 991 (9th Cir. 2022) ........................................................................... 21

*U.S. v. Kiewit Pacific Co.*,
  41 F. Supp. 3d 796 (N.D. Cal. 2014) ............................................................... 24

*United States v. Cabaccang*,
  332 F.3d 622 (9th Cir. 2003) ........................................................................... 10

*United States v. Corinthian Colleges*,
  655 F.3d 984 (9th Cir. 2011) .................................................................. 5, 6, 14

*United States v. Mariner Health Care, Inc.*,
   552 F. Supp. 3d 938 (N.D. Cal. 2021) ................................................................ 14

*United States v. Sodexho, Inc.*,
   2009 WL 579380 (E.D. Pa. 2009) ...................................................................... 20

*United States v. Spectrum Painting Corp.*,
   2020 WL 5026815 (S.D.N.Y. Aug. 25, 2020) ................................................... 17

*United States v. Valley Campus Pharmacy, Inc.*,
   2021 WL 5406148 (C.D. Ca. 2021) .................................................................... 16

*Winter ex rel. U.S. v. Gardens Regional Hosp. and Medical Ctr., Inc.*,
   953 F.3d 1108 (9th Cir. 2020) .............................................................. 15, 16, 17

**Statutes & Rules**

13 C.F.R. § 121.103 ......................................................................................... 9

15 U.S.C. § 636 ........................................................................................ 7, 15

31 U.S.C. § 3729 ..................................................................................... 15, 16

31 U.S.C. § 3730 ..................................................................................... passim

42 U.S.C. § 1320a-7b ..................................................................................... 16

Fed. R. Civ. P. 9 ............................................................................................. 6

Relator Roger S. Craig ("Relator") respectfully submits this Memorandum of Points and Authorities in Opposition to the Motion to Dismiss the Second Amended Complaint ("SAC") by Defendants Hawthorne Machinery Co. ("Hawthorne"), Brian Verhoeven, Tee Ness, and David Ness (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

Defendants' motion should be denied because the SAC plausibly alleges, consistent with the requirements of Rules 8 and 9, that Defendants knowingly and improperly obtained an $8 million PPP loan for which Hawthorne was ineligible.

Specifically, the SAC sets forth how Defendants knew Hawthorne's total headcount exceeded the 500-employee threshold for PPP loan eligibility, yet chose to circumvent that threshold by falsifying Hawthorne's loan application in two key respects—first, by leaving out an affiliate with 60-plus employees, CQ Pacific, in violation of the applicable Affiliation Rules; and, second, by altering and manipulating employee headcount data for the three Hawthorne entities listed to keep the reported headcount below 500. *See infra* at 3–5.

Defendants' arguments for dismissal lack merit.  <u>*First*</u>, contrary to their misinterpretation, the plain text of the CARES Act limits waiver of the Affiliation Rules to a PPP loan "***for … any business concern operating as a franchise.***" Therefore, Hawthorne, which was *not* operating as a franchise, was required to report CQ Pacific as an affiliate. The fallacy of Defendants' misinterpretation also is made clear by a recent Government enforcement action against a business that, like Hawthorne, obtained a PPP loan for which "it was ineligible [due to] its size after inclusion of its [franchise] Affiliates" and because the "affiliation rules applied [] as it was not operating as a franchise[.]" *See infra* at 6–11.

<u>*Second*</u>, Defendants' attacks on Relator's allegations about their efforts to falsify the headcount in Hawthorne's PPP loan application are equally meritless. To obfuscate their fraud, Defendants suggest that Hawthorne could have qualified under a counting method different from the 12-month average described in the SAC.

But the SAC focuses on that 12-month average because **Defendants** chose to submit payroll data relevant to that method. Further, the SAC makes clear that the true headcount was over 500—irrespective of the counting method. In other words, absent Defendants' data alterations and manipulations, Hawthorne would have exceeded the 500-employee threshold under any method. *See infra* at 11–14.

*Third*, Defendants' *scienter* argument fails. The SAC details how Defendants (1) "were aware of the legal requirements for PPP loans" and nonetheless failed to comply, (2) consciously chose "to hide and obscure the connection between Hawthorne[] and CQ Pacific," (3) deliberately "altered [] payroll records," and (4) purposely or recklessly engaged in "systematic undercounting" of their employees. *See* SAC ¶¶ 68, 78, 85, 125. As *scienter* can be pled generally under Rule 9, these facts amply support an inference that Defendants had actual knowledge of the falsity in Hawthorne's PPP loan application or acted in deliberate ignorance or reckless disregard. By contrast, Defendants' efforts to inject specific intent — that they "knew that their [conduct] was unlawful" — into the *scienter* element of the False Claims Act ("FCA") contravenes both the statutory text and the central holding of the Supreme Court's recent *SuperValu* decision. *See infra* at 14–20.

*Finally*, Defendants' effort to present a "public disclosure" defense fails because they wholly fail to meet their burden to identify a qualifying disclosure. The statements they cite either are irrelevant to the FCA's "public disclosure" analysis as a matter of law or are "scattered disclosures" that do not reveal the "combination" of violative facts necessary to trigger the public disclosure bar. *Silbersher v. Valeant Pharms. Int'l, Inc.*, 76 F.4th 843, 857 (9th Cir. 2023) (recognizing *qui tam* relators can rely on public sources as long as they "fill the gaps by putting together the material elements of the allegedly fraudulent scheme"). In any event, Relator was the "original source" (and Defendants do not meaningfully argue otherwise) because his independent knowledge — including facts he learned from working at Hawthorne — materially added to the SAC's allegations. *See infra* at 20–24.

## II.    SUMMARY OF RELATOR'S ALLEGATIONS IN THE SAC

On April 5, 2020, Hawthorne submitted an application to Comerica Bank — signed by defendant Brian Verhoeven and approved by defendants Tee Ness and David Ness — seeking a PPP loan in the amount of $8,083,894.30. *See* SAC ¶¶ 56-60; *see also* Ex. 1 at HMC0000007 (copy of Hawthorne's PPP loan application).[1] As specified in the PPP loan application, eligibility for a PPP loan is conditioned on Hawthorne "employ[ing] not more than … 500 employees[.]" *Id.* at HMC0000008; *see also* SAC ¶¶ 43–45, 67 (summarizing CARES Act requirements).

To "determine[e] the number of employees," the CARES Act required applicants like Hawthorne to comply with the SBA's Affiliation Rules, *i.e.*, that "the applicant is considered together with its affiliates." *Id.* ¶ 47. Question 3 in the PPP loan application, moreover, directed Defendants to "***list all [] businesses***" for which Hawthorne "[is] an owner[] or ha[s] common management with" and to "describe the relationship" in Addendum A.  *Id.* ¶ 70 (emphasis added).

Defendants, however, did not disclose CQ Pacific, which was managed by Hawthorne's CEO, defendant Tee Ness, and owned by Hawthorne's owners, Tee and David Ness, in Hawthorne's PPP loan application. *See id.* ¶¶ 28–29, 109, 111. Instead, they only disclosed Hawthorne's two affiliates that also had Hawthorne in their business names — Hawthorne Pacific and Hawthorne Samoa. *Id.* ¶¶ 70–73.[2]

Defendants omitted CQ Pacific from the PPP loan application even though (A) they certified "that the information provided in this application and … in all supporting documents and forms is true and accurate in all material aspects" and (B) there was no applicable exemption for not including CQ Pacific. *Id.* ¶¶ 67, 117, 117 n.10. Had Defendants included CQ Pacific and its 61 employees — as they should

---

[1]    All references to exhibits herein are to Exhibits 1 through 6 appended to the Declaration of Roger S. Craig filed in tandem with this brief.

[2]    Collectively, Hawthorne Machinery and these two affiliates, Hawthorne Pacific, and Hawthorne Samoa, are referred to herein as the "Hawthorne Entities."

have — they would have had to report a true headcount of well over 500 employees, rendering Hawthorne ineligible for a PPP loan. *Id.* ¶¶ 105–106.

In Hawthorne's PPP loan application, Defendants also stated that the three reported Hawthorne Entities had 489 employees in total. *Id.* ¶ 74. As the monthly employee headcounts that Defendants attached as an addendum to the application showed, the 489 figure relied on the 12-month rolling average of the breakdown from April 2019 to March 2020. *Id.* ¶ 75; *see also* Ex. 1 at HMC0000012.

The headcount figures that Defendants reported in Hawthorne's PPP loan application addendum, however, were at odds with both other payroll data that Defendants submitted to Comerica and the SBA, public records, and other information available. For example, a "spreadsheet purporting to provide [the] complete payroll (including Hawthorne Machinery, Hawthorne Pacific and Hawthorne, Samoa) for the year 2019," which Defendants sent to Comerica as an email attachment, showed substantial discrepancies with the monthly employee headcounts reported in the PPP loan addendum. *See* SAC ¶ 79. A comparison of the two revealed "month-by-month disparities of between 5 and 14" more employees than what was reported in the addendum. *Id.* ¶ 80.[3]

Further, neither the employee headcount reported in the PPP loan addendum nor the payroll data spreadsheet could be squared with Hawthorne's IRS Form 941 filings, Department of Labor Form 5500 filings, and other records, which indicated that yet more employees should have been included in the headcounts shown in Hawthorne's PPP loan application. *Id.* ¶¶ 87–102. With those additional employees added back in, Hawthorne's loan application — even without CQ Pacific — should

---

[3]    These disparities can be observed in the payroll document itself. Taking the 2019 payroll document as an example, it includes 592 employees and provides each person's hire date and (if relevant) termination date. *See* ECF No. 58-09 at 10–15. There were 502 employees as of January 1, 2019, and one can add and subtract based on "Start Dt" and "Term Dt" for each month thereafter. *Id.* Thus, Defendants' own payroll submitted to Comerica and SBA provides an incomplete snapshot (because Defendants also omitted employees) of their own misrepresentation.

have reported more than 500 employees. *Id*. ¶¶ 92, 104.

Defendants took a variety of steps to conceal these improper omissions and inaccurate data. For example, to obscure the improper omission of CQ Pacific as an affiliate in Hawthorne's PPP loan application, Defendants used a retail address for CQ Pacific's own PPP application, even though its actual registered business address is the same as Hawthorne's. *Id*. ¶ 121. Defendants likewise avoided disclosing CQ Pacific's affiliation with Hawthorne in that application. *Id*. ¶ 122.

Similarly, Defendants both made express misrepresentations to Comerica — for example, asserting that the headcount at Hawthorne, Hawthorne Pacific, and Hawthorne Samoa "never exceeded 500," *id*. ¶ 84 — and deliberately altered and manipulated headcount and payroll data to understate the number of their employees. *Id*. ¶¶ 80–93.

In the months after they obtained the $8 million PPP loan for Hawthorne, defendants Tee Ness and David Ness purchased a series of commercial and luxury properties in Hawaii and California. *Id*. ¶¶ 135–140. In December 2020, moreover, Defendants made the same misrepresentations to obtain forgiveness of Hawthorne's PPP loan, which caused the SBA to pay on its guarantee for that loan.[4] *See id*. ¶ 19.

## III.  STANDARD OF REVIEW

In considering a motion to dismiss, a court must accept as true all well-pleaded allegations in the complaint, construing them in the light most favorable to the plaintiff. *United States v. Corinthian Colleges*, 655 F.3d 984, 991 (9th Cir. 2011). The Court determines whether the complaint contains "sufficient factual matter that,

---

[4]   Defendants speculate that the SBA had notice of the allegations in the SAC before Hawthorne's loan was forgiven. *See* MTD Br. at 8–9. This is not only impossible because the SAC had not yet been shared with the Government, but it also introduces a factual dispute. Further, "[m]ere awareness of allegations concerning noncompliance" by an agency "is different from knowledge of actual compliance." *U.S. ex rel. Escobar v. Universal Health Servs., Inc*., 842 F. 3d 103, 112 (1st Cir. 2016); *accord U.S. ex rel. Campie v. Gilead Scis., Inc*., 862 F.3d 890, 906-07 (9th Cir. 2017).

taken as true, state[s] a claim for relief [that] is plausible on its face." *Id*. (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be plead[ed] generally, or in accordance with Rule 8." *Corinthian Colleges*, 655 F.3d at 992. Rule 9(b) ensures that the allegations are "specific enough to give defendants notice of the particular misconduct [] alleged to constitute the fraud charged so that they can defend against the charge," but "this standard does not require absolute particularity or a recital of the evidence." *U.S. ex rel. Swoben v. United Healthcare Ins. Co*., 848 F.3d 1161, 1180 (9th Cir. 2016) (cleaned up). Further, Rule 9(b)'s standard does not apply to knowledge, which may be pleaded generally. *U.S. ex rel. Silingo v. WellPoint, Inc*., 904 F.3d 667, 679 (9th Cir. 2018).

## IV.   ARGUMENT

### A.   Defendants Falsely Claimed Eligibility for a PPP Loan by Failing to Disclose All of Hawthorne's Affiliates and Their Employees.

Obtaining federal funds by concealing an affiliate relationship in violation of the Affiliation Rules violates the FCA. *See U.S. ex rel. Lardner v. Smith & Nephew Inc*., 2018 WL 7050835, at *1, 3 (W.D. Tenn. Sept. 17, 2018) (denying motion to dismiss FCA claim alleging that defendant was "ineligible for [] small business government contracts" due to its failure to disclose affiliation). Here, Defendants implicitly acknowledge Hawthorne's affiliation with CQ Pacific and rely on the CARES Act's franchise affiliate waiver provision to dispute falsity. MTD Br. at 12. But that provision "waive[s]" the Affiliation Rule only "with respect to ***eligibility*** for a covered loan ***for … any business concern operating as a franchise***." This waiver did not apply to Hawthorne because *Hawthorne* was not "operating as a franchise."

The PPP loan application itself, as well as the text of the CARES Act, spelled out the 500-employee threshold for eligibility that is relevant here. *See* Ex. 1 at HMC0000008; 15 U.S.C. § 636(a)(36)(D)(i)(I). The CARES Act also made clear that absent a specific waiver, the SBA's regulations concerning affiliation would apply. *Id.* § 636(a)(36)(D)(iv). The only waiver of the Affiliation Rules that is potentially relevant here relates to franchisees—specifically:

> (iv) Waiver of affiliation rules.—During the covered period, the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived **with respect to eligibility for a covered loan for**— …
> (II) **any business concern operating as a franchise** that is assigned a franchise identifier code by the Administration[.]

*Id.* § 636(a)(36)(D)(iv), (iv)(II) (emphasis added) (the "Franchise Waiver").

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). In doing so, courts must "strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous." *Edgerly v. City & Cnty. of San Francisco*, 713 F.3d 976, 984 (9th Cir. 2013) (internal quotation marks omitted). Courts apply the same analysis to decide whether a statute's plain meaning renders a claim false under the FCA. *See U.S. ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.*, 189 F. Supp. 2d 862, 871–874 (S.D. Ill. 2002).

Here, the Franchise Waiver applies to "covered loans" (*i.e.*, PPP loans) "for … any business concern operating as a franchise that is assigned a franchise identifier code by [SBA]," and the word "*for*" acts as a "function word to indicate" a "purpose," an "intended goal," or the "recipient of a perception, desire, or activity." *For*, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/for. The plain meaning thus limits this waiver to entities that were (1) applying for a PPP loan *and* (2) operating as an SBA-approved franchise. Accordingly, because

Hawthorne itself was not "operating as a franchise," it could not rely on the Franchise Waiver to avoid compliance with the Affiliation Rules. *See* SAC ¶¶ 117.[5] By omitting Hawthorne's affiliation with CQ Pacific — which existed based on overlapping ownership and management, *see id.* ¶¶ 107–111 — and thereby circumventing the 500-employee threshold, Defendants thus falsely claimed eligibility for Hawthorne's PPP loan. *See Lardner*, 2018 WL 7050835, at *3.

There is no merit to Defendants' efforts to avoid this clear textual conclusion for four reasons. *First*, insofar as they wrongly assert that cherry-picked words and phrases from the Franchise Waiver provision's title, description, or generic purpose about making PPP loans "more" accessible somehow alter the plain meaning of the statutory text, *see* MTD Br. at 11, this turns canons of statutory interpretation on their head. Defendants ask this Court to read the second "for" in the phrase "eligibility *for* a covered loan *for*" a "business concern operating as a franchise" out of the statute altogether. This contravenes the principle that courts must "strive to give meaning to every word in a statute[.]" *Edgerly*, 713 F.3d at 984. Defendants also seek to prioritize generic section titles and generalized descriptions of legislative purpose over specific statutory text. But generic descriptions like the "title of a statute cannot limit the plain meaning of the text. For interpretive

---

5  As Relator acknowledges, CQ Pacific's *own* PPP loan application appears to have qualified for the Franchise Waiver. *See* SAC ¶ 115. But this of course did not obviate Hawthorne's duty to comply with the Affiliation Rules for its own PPP loan.

Defendants also assert, in a footnote, that "Hawthorne, Hawthorne Pacific, and Hawthorne Samoa are also franchises." *See* MTD Br. at 13 n.2. This claim not only introduces a factual dispute unsuitable for a motion to dismiss, *see* SAC ¶ 117 (Hawthorne is not a franchise), but it is also belied by two prior sworn statements by Defendants. First, when the PPP loan application asked Defendants whether Hawthorne "is listed in the SBA's Franchise Directory," Defendants said no. Ex. 1 at HMC0000007. Second, in written interrogatory responses to the Government, Hawthorne said that it "did not consider [Hawthorne Pacific], [Hawthorne Samoa], or itself as franchises for purposes of the waiver, but did understand CQ to be a franchise for purposes of the waiver[]." Ex. 2 at HMC0001447.

purposes, it is of use only when it sheds light on some ambiguous word or phrase." *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998).[6] Here, the plain meaning of "for a covered loan for" a franchisee is clear, and Defendants cannot inject ambiguity where there is none just because they do "[n]ot lik[e] the trickle-down implications of a statute." *U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 2023 WL 2467170, at *12 (E.D. Pa. Mar. 10, 2023) (denying motion to dismiss FCA claim based on the statute's plain text).

*Second*, Defendants incorrectly claim that the CARES Act's purpose exempts its misconduct. *See* MTD Br. at 11–12. But agency guidance and recent government enforcement efforts show the opposite. For example, the PPP loan application itself asked Hawthorne whether it was "a franchise [] listed in the SBA's Franchise Directory?" *See* Ex. 1 at HMC0000007. Similarly, a PPP "Affiliation Worksheet," which the SBA issued in 2021, asked applicants whether they are "a franchisee whose franchise identifier code is listed in SBA's Franchise Directory." *See* Ex. 3 at 2. These make clear that the Franchise Waiver turns on the status of the ***applicant***.[7]

More tellingly, the Government's recent enforcement action in *U.S. ex rel. Jones v. Victory Automotive Group, LLC*, 8:21-cv-1742 (M.D. Fla), reflects the same interpretation. According to the *qui tam* complaint, Victory Automotive Group "act[ed] as the de facto corporate headquarters for [an] association of [43] car dealerships" and had "ownership and control" over those car dealerships, *see* Ex. 4 ¶¶ 12, 63, but Victory did not operate as a franchise and thus did "not qualify for PPP funds." *Id.* ¶¶ 19, 66–67. Yet, Victory went ahead and obtained a $6,282,362

---

[6] If Congress had defined the scope of the Franchise Waiver with a less clear term like "related to" or "affiliated with" a franchise, Defendants' argument might carry more weight. But Congress did not. Instead, the statute specifies the scope of the waiver with the word "for."

[7] This makes sense because the SBA's standard affiliation rules include a provision contemplating the potential affiliation of franchisors and franchisees depending on the nature of the franchise relationship. *See* 13 C.F.R. § 121.103(i).

PPP loan. *Id.* ¶ 61. The Government intervened and simultaneously reached a $9 million settlement with Victory. In the Settlement Agreement, the Government alleged that Victory "was ineligible for [its PPP] loan … due to its size after inclusion of [its] Affiliates" and because the "affiliation rules applied to [Victory] as it was not operating as a franchise[.]" *See* Ex. 5 at 2.

*Third*, Defendants' proffered interpretation would create an overbroad exception that would frustrate the core purpose of the PPP program: helping small businesses. "Whenever possible," courts must "interpret statutes so as to preclude absurd results." *United States v. Cabaccang*, 332 F.3d 622, 631 (9th Cir. 2003) (internal quotation marks omitted). To illustrate — suppose a private equity fund had 499 employees and its investment strategy involved acquiring, managing, and profiting from all of the approximately 13,000 McDonalds franchise locations in the United States. If we assume each McDonalds location owned and managed by the fund had 15 employees, the fund would be affiliated with entities employing 195,000 people. Under Defendants' interpretation of the Franchise Waiver, the private equity fund would still be allowed to obtain a PPP loan for itself.

*Finally*, conflating two different sections of the PPP application relevant to, respectively, eligibility and maximum loan amount, Hawthorne falsely posits that adhering to the plain text of the Franchise Waiver would create an "absurd result." See MTD Br. at 12–13. Not so. The SBA FAQ, which Defendants rely on in their brief, makes clear that, by asking for a list of affiliates and their total number of employees, the PPP loan application sought to determine *eligibility*; by contrast, by separately asking for an average payroll and the amount sought, the PPP application sought data relevant to deciding the *maximum loan amount*. *Compare* ECF No. 58-4 at 2–3 (discussing Questions 2, 3, and 5, which seek affiliate information and total headcount, in terms of PPP eligibility), *with id.* at 5–6 (describing calculation of "aggregate payroll costs" using twelve-month average data "to calculate [] maximum loan amounts").

In short, nothing about the requests for these different types of information relevant for different purposes gave Defendants an excuse to ignore their obligation to identify CQ Pacific as an affiliate.[8] Nor can they evade the plausible allegations of PPP fraud in the SAC by conflating these different sections of the PPP loan application. *See Lardner*, 2018 WL 7050835, at *1, 4 (denying motion to dismiss FCA claim that plausibly alleged that defendant improperly obtained "small business government contracts" due to failure to disclose affiliation relationships); *see also Humphrey*, 189 F. Supp. 2d at 871–874.

**B.      Defendants Also Defrauded the Government by Undercounting Employees.**

In addition to falsely omitting Hawthorne's affiliation with CQ Pacific, Relator also independently and plausibly alleged that Defendants falsified the headcounts at the three Hawthorne Entities identified in the PPP loan application to circumvent the 500-employee threshold. As summarized above, Defendants both altered the payroll data in a spreadsheet they submitted to Comerica by email in support of Hawthorne's loan application and understated the employee headcount in the PPP loan application itself.[9] *See* SAC ¶¶ 76–102.

Defendants try to sow confusion by suggesting that the SAC used a wrong counting method. *See* MTD Br. at 13–14. At the outset, Defendants are simply

_____

[8]    The SBA's affiliation rules are intended to catch what may colloquially be called "structured smallness." An entity should not be eligible for small-business benefits by virtue of cleverly structuring itself when its true size — once common ownership, management, and controls are taken into account — is not small at all. That is exactly what Relator has plausibly alleged Defendants did here.

[9] Defendants claim that because certain allegations are made "on information and belief," there is not sufficient specificity to satisfy Rule 9(b). Not so. The Ninth Circuit — in a case cited by Defendants — has explained that where the allegations, among other things, "explain[] exactly what it is that [plaintiff] believes constituted the fraud[] … the [] claims have been pleaded with particularity sufficient to allow [defendant] to prepare an answer." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010). Relator has done that here, and merely alleges certain discrete inferences on information and belief based on "a statement of facts on which the belief is founded" which is sufficient. *Id.*

wrong that Hawthorne could have used "three *alternative* methods" for counting employees. *Id.* at 14 (emphasis in original). Hawthorne could only use two methods to count its employees — either calculating its average number of employees in the twelve months prior to the loan application (in this case, April 2019–March 2020) or its average number of employees in each month in 2019. *See* ECF No. 58-4 at 5–6. The third counting method suggested by Defendants was only available for seasonal or new businesses, which did not include Hawthorne. *See id.*

Relator focused on the rolling twelve-month method of calculation because Hawthorne's PPP loan application appeared to use that method to derive 489 as the "Reported" number of employees. *See* Ex. 1 at HMC0000012.[10] Thus, the SAC details how Defendants omitted between 5 and 14 employees in each month relevant to that calculation. *See* SAC ¶¶ 80, 91–93. However, the choice between the two counting methods is immaterial. As detailed below, the SAC plausibly and sufficiently alleges that the true headcount at the three entities included in Hawthorne's PPP loan application was over 500 under either method for three separate reasons.

<u>*First*</u>, Relator plausibly alleges that at least eight employees — and likely more — were missing from various monthly counts in 2019 and 2020 because they were listed in one place that showed they were employed by the Hawthorne Entities but were absent from the payroll records that Defendants submitted.[11] For example, employees listed in the 2019 spreadsheet who had later termination dates — or no discernable termination dates — were absent from the February 2020 payroll Defendants submitted to Comerica. *See* SAC ¶ 91. Others were listed as part of a contemplated-but-abandoned furlough effort (*i.e.*, were never furloughed and

_____

[10]  This sheet, which immediately follows the first page of Hawthorne Machinery's PPP application addendum and uses the same font, is notably omitted from Defendants' exhibit purporting to include the PPP application.

[11]  More is not needed at this early stage. *See Swoben,* 848 F.3d at 1180 (explaining that neither "absolute particularity or a recital of the evidence" is necessary).

remained as employees) but were absent from payroll records submitted to Comerica. *Id.* Yet more employees had time ranges of employment listed on LinkedIn, for example, showing they were employed at one of the Hawthorne Entities during the relevant period, but were missing from one or both payroll documents that Defendants submitted to Comerica.

*Second*, Relator has also specifically alleged that Defendants filed a Form 5500 with the Department of Labor stating the three Hawthorne Entities — along with CQ Pacific — had a "[t]otal number of active participants" of 567 on January 1, 2020.[12] *See* SAC ¶¶ 96–99. Subtracting the 61 employees at CQ Pacific, this leaves the three Hawthorne Entities with 506 employees in January 2020, *see id.* ¶¶ 100–02, which is *20* more than the 486 employees that Defendants reported in Hawthorne's PPP loan application.[13]

*Third*, the discrepancies apparent in the rolling twelve-month method of calculation (which Hawthorne seemingly relied on) are also present in early 2019 as well. Thus, when considering the 2019 payroll document and the missing employees from April–December 2019 laid out in the SAC, even if Hawthorne had used the 2019-average method, it would still have exceeded an average of 500 employees had it reported its actual employee count.[14] Similar material disparities existed in

---

[12]   As DOL's instructions for the form explain, the term "active participants" in this context refers to "any individuals who are currently in employment covered by the plan and who are earning or retaining credited service under the plan." SAC ¶ 99.

[13]   Defendants fared no better in their disclosures on their 2019 Form 5500, which disclosed that the three Hawthorne Entities and CQ Pacific had 561 employees at the beginning of January 2019. Yet, they claimed in Hawthorne's PPP application that the Hawthorne Entities only had 483 employees — seemingly undercounting, again, by almost 20. *Compare* Ex. 1 at HMC0000012 *with* ECF No. 58-9 at 10–15.

[14]   In January 2019, while the PPP application addendum said there were 483 employees at the three Hawthorne Entities, the payroll spreadsheet indicates there were between 500 and 502 employees. In February 2019, Defendants claimed the entities had 481 employees, but they had between 493 and 500 according to the payroll spreadsheet. In March 2019, Defendants claimed the entities had 483

(continued…)

Defendants' claimed employee count from April 2019 to March 2020. *See* SAC ¶¶ 76–83. Thus, regardless of counting methodology (*i.e.*, 2019 or rolling twelve-month), Hawthorne had more than 500 employees.

In an effort to evade these clear discrepancies, Defendants claim the numbers are "apples and oranges" and this somehow precludes Relator from stating a claim. *See* MTD Br. at 14-15. But the inquiry on a 12(b)(6) motion is *not* whether Defendants can offer an alternative explanation for these discrepancies; instead, the motion must be denied if the SAC adequately alleges "the who, what, where, when, and how of the alleged fraud" and "the alleged fraud is a plausible explanation for th[e] discrepancy." *U.S. ex rel. Goldberg v. Sacramento Heart & Vascular Med. Assocs.*, 2023 WL 5435890, at *9 (E.D. Cal. Aug. 23, 2023); *accord United States v. Mariner Health Care, Inc.*, 552 F. Supp. 3d 938, 949 (N.D. Cal. 2021) (relators "need not rule out obvious alternative explanations" on a motion to dismiss).[15]

Defendants ask the Court to adopt their own cherry-picked factual explanation for these discrepancies as a matter of law. But that contravenes the 12(b)(6) standard where, as here, the SAC plausibly alleges facts that show the use of false headcount data by Defendants. *See Corinthian Colleges*, 655 F.3d at 991 (on a 12(b)(6) motion, "facial plausibility" is satisfied as long as the facts pled "allow[] the court to draw the reasonable inference that defendant is liable for the misconduct

---

employees again, but they had between 489 and 497 according to the payroll spreadsheet. *Compare* Ex. 1 at HMC0000012 *with* ECF No. 58-9 at 10–15. Averaged together with the headcounts in April–December 2019, *see* SAC ¶ 92, Hawthorne had an average of over 500 employees. In light of the Form 5500, the true number was likely around 506.

[15] *See also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."); *U.S. ex rel. Durkin v. Cnty. of San Diego*, 300 F. Supp. 3d 1107, 1122 (S.D. Cal. 2018) ("at [the pleadings] stage, a court does not make factual findings" concerning a relator's claims of falsity) (cleaned up).

alleged"). These allegations are more than sufficient to support an inference that the employee headcounts submitted by Defendants were false.[16] The Court, therefore, should reject Defendants' arguments and find that the SAC plausibly "alleges Defendant[s'] statement was false … with the specificity required under Rule 9(b)." *Durkin*, 300 F. Supp. 3d at 1122.

## C.     The SAC Plausibly Alleges That Defendants Acted "Knowingly"

The SAC plausibly alleges that Defendants "knowingly" made false statements in their PPP loan application by not disclosing CQ Pacific and by understating headcounts. The FCA specifies "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b)(1)(B); *see also U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 n.3 (2023); *Winter ex rel. U.S. v. Gardens Regional Hosp. and Medical Ctr., Inc.*, 953 F.3d 1108, 1122 (9th Cir. 2020) (recognizing this standard differs from common law fraud). Thus, Defendants' contention that Relator must allege they "knew that their conduct was unlawful" contravenes both the FCA's text and controlling precedents. *See* MTD Br. at 19-20 (Defendants improperly cite *United States v. Valley Campus Pharm., Inc.*, 2021 WL 5406148 (C.D. Cal. Oct. 12, 2021) for this standard. In that case, the court was ***not*** discussing the FCA's *scienter* standard, but the Anti-Kickback Statute — a criminal statute that requires proof of both "knowing" and "***willful***" misconduct. *See* 42 U.S.C. § 1320a-

---

[16] Defendants also claim that even if the average of their employees was more than 500, when they claimed it was 489, that that is still not fraud because the number is *close* to 500. As Relator has alleged, Defendants had more than 500 employees, and likely had around 506 employees based on their own disclosures to the Department of Labor. Congress said in the CARES Act that, unless some exception applied, a PPP applicant and its affiliates must have "not more than … 500 employees." 15 U.S.C. § 636(a)(36)(D)(i). The PPP application required Defendants to certify that they employ "no more than 500 employees." Ex. 1 at HMC0000008. No amount of tortured misreading of Congress' words or their own certification can alter that Defendants made a false claim. Whether the claim was false by 100 employees, 20 employees, or 1 employee is a question for discovery.

7b(a)(1)-(a)(2)(emphasis added)).[17]

Instead, Relator needs only to allege that Defendants acted "knowingly" as broadly defined in the FCA. The FCA defines "knowingly" to cover: (1) actual knowledge of the information; (2) deliberate ignorance of the truth or falsity of the information; or (3) reckless disregard of the truth or falsity of the information. *See* 31 U.S.C. § 3729(b)(1)(A). Thus, "it is sufficient to plead that the defendant knowingly filed false claims, or that the defendant submitted false claims with reckless disregard or deliberate ignorance as to the truth or falsity of its representations." *Godecke v. Kinetic Concepts, Inc*., 937 F.3d 1201, 1211 (9th Cir. 2019). This is because entities, like Hawthorne, that obtain public funds have "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek." *Id*. at 1211.[18]

Here, the Relator alleges four sets of facts that *each* plausibly supports the inference that Defendants acted "knowingly." <u>*First*</u>, the SAC alleges that Defendants reviewed both "the relevant statutory provisions that imposed the 500-employee restriction" and "the relevant statutory language in the CARES Act concerning waivers." SAC ¶¶ 128, 130. The SAC further specifies that Defendants were "asked by Comerica" to identify all its affiliates without "any qualification"; yet, Defendants "never sought Comerica's view on whether CQ Pacific should be included" or explained any limit as to Hawthorne's disclosure. *Id*. ¶¶ 129, 124. Because the CARES Act's text is clear, and because Defendants had a duty to "act

---

[17]   *See* 2021 WL 5406148, at *3 ("Relator is mistaken in claiming that intent to induce is all the **AKS scienter element** requires.… The scienter element includes both the intent to induce referrals and the knowledge that one's conduct is unlawful") (emphasis added).

[18]   *See also Winter*, 953 F.3d at 1122 ("[T]hose who seek public funds [must] act with scrupulous regard for the requirements of law."); *U.S. ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 668 (N.D. Miss. 2015) (FCA imposes liability on "persons who ignore 'red flags' that the information [they provide to the government] may not be accurate" (quoting H.R. Rep. No. 99-660 (1996))).

with scrupulous regard for the requirements of law," these facts support an inference that they concealed Hawthorne's affiliation with CQ Pacific either with actual knowledge of their non-compliance with the Affiliation Rule or in deliberate ignorance or reckless disregard. *See Winter*, 953 F.3d at 1122.

*Second*, the SAC details other steps Defendants took "to hide and obscure the connection between Hawthorne [] and CQ Pacific." SAC ¶ 125. For example, when CQ applied for a separate PPP loan, it did not list its "address registered with the Hawaii Secretary of State," which also is "the address that Hawthorne[] itself used on its own PPP loan application[,]" and instead listed "one of its retail locations" in Hawaii. *Id*. ¶ 121. CQ "also used a different bank—[*i.e.*,] not Comerica—to further obscure its [affiliation] to Hawthorne[]." *Id*. ¶ 123. Where, as here, FCA defendants "took significant steps to hide" the alleged fraud, these "tend to show that [they] were conscious of their wrongdoing." *United States v. Spectrum Painting Corp*., 2020 WL 5026815, at *9 (S.D.N.Y. Aug. 25, 2020).

*Third*, the SAC describes how Defendants deliberately "altered [] payroll records" so as "to present a credibly eligible [PPP loan] application" by Hawthorne. SAC ¶¶ 85. Headcount changes in the first and second quarters in 2019 that Defendants reported in Hawthorne's PPP loan application, for example, cannot be squared with the "Form 941 quarterly wage filings with the IRS," leaving "a discrepancy of [over $841,000] between the [number of] employees listed and the quarterly payroll." *Id*. ¶¶ 87-89. Further, Hawthorne's internal records and public records "reveal[] that at least eight employees … are missing from the [] payrolls [that Defendants] sent to Comerica." *Id*. ¶¶ 91–93. Such efforts to "manipulate" data or create "phony" data "sufficiently establish[] scienter under the FCA [] at [the pleadings] stage of the proceedings." *U.S. ex rel. Everest Principals v. Abbot Labs., Inc*., 622 F. Supp. 3d 920, 935 (S.D. Cal. 2022); *accord U.S. ex rel. STF, LLC v. Vibrant Am., LLC*, 2020 WL 4818706, at *19 (N.D. Cal. Aug. 19, 2020) (recognizing that allegations of "effort to conceal its [fraud] scheme" are "sufficient

to raise a plausible inference of *scienter*").

*Fourth*, the SAC alleges that even taking Hawthorne's PPP application at face value, Defendants purposely or recklessly engaged in "systematic undercounting" of employees. SAC ¶ 78. Specifically, a comparison of (A) the payroll spreadsheets that Defendants sent to Comerica ***and*** (B) the monthly headcounts in Hawthorne's application addendum shows that, between "April and December 2019," there are "month-by-month disparities of between 5 and 14 fewer employees … in the PPP application addendum than … in the payroll data[.]" *Id*. ¶¶ 79–80. In April 2019, for example, the payroll data shows that "six additional employees" were added, but the headcount appended to Hawthorne's PPP application had the same number, "483 employees[,] in both March and April 2019." *Id*. ¶ 81; *see also* Ex. 1 at HMC0000012. At a minimum, such obvious discrepancies "should have tipped off" Defendants and gave them "reasons for suspicion" as to the accuracy of the headcounts in Hawthorne's PPP loan application. *Silingo*, 904 F.3d at 680. The SAC, thus, plausibly alleges Defendants "showed reckless disregard or deliberate ignorance" as to the truth or falsity of that application. *Id*.

In addition, in assessing *scienter* on a 12(b)(6) motion, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 326 (2007) (analyzing *scienter* in 10b-5 securities fraud case). Here, the four sets of *scienter* allegations — taken together and with all reasonable inferences drawn in Relator's favor — present a highly plausible basis to infer that Defendants "knowingly" submitted false information in Hawthorne's PPP loan application.

*Finally*, Defendants' erroneous claim that their fraud involved at most "a difference in interpretation," "bad math," or an "honest mistake[]," *see* MTD Br. at 18-21, must be rejected for three independent reasons. First, this presents a disputed question of fact as to knowledge that is inappropriate for a motion to dismiss. As the Supreme Court recently held, "[t]he FCA's *scienter* element refers to [Defendant's]

knowledge and subjective beliefs," *SuperValu*, 598 U.S. at 749, and it can be shown even if Defendants could point to "some other, objective reasonable interpretation" of a statute or regulation. *Id*. at 757. Here, given the extensive *scienter* allegations, it is for a fact-finder, not the Court analyzing a motion to dismiss, to decide whether Defendants knowingly engaged in fraud or merely did "bad math" or made an "honest mistake."[19] *See U.S. ex rel. Hartpence v. Kinetic Concepts, Inc*., 44 F.4th 838, 851–52 (9th Cir. 2022) (reversing summary judgment while recognizing that FCA defendant "certainly has a strong case to make to jurors as to why they should not draw the [*scienter*] inferences" for the relator).

Second, Defendants' brazen request for their fraud to be excused because the Government "did not want [PPP] borrowers second-guessing their interpretation of the law [for fear of FCA liability]," *see* MTD Br. at 20, cannot be squared with the Government's actions. As the *Victory* settlement and other PPP fraud prosecutions make clear, the Government has not endorsed the view espoused by Defendants that the COVID pandemic gave *carte blanche* for the unscrupulous to rob the public fisc.

Lastly, none of the *scienter* cases cited by Defendants are apposite. The plaintiff in *U.S. ex rel. Colucci v. Beth Israel Med. Ctr.*, for example, "concede[d] that no regulations cover[ed]" the situation at issue in that case and could not "identify any regulation violated by defendants." 785 F. Supp. 2d 303, 316 (S.D.N.Y. 2011). In *U.S. ex rel. MC2 Sabtech Holdings v. GET Eng'ring Corp*., neither the parties nor the court "found [any] authority clarifying the correct standard to be applied" to the "women-owned small business" classification at issue in that case. 580 F. Supp. 3d 876, 892 (S.D. Cal. 2022). Here, by contrast, Relator

---

[19]  To succeed on a defense that they "reasonably" held an erroneous interpretation of the Franchise Waiver, Defendants must show that (i) the statute is susceptible to more than one reasonable explanation, (ii) they contemporaneously held their supposedly reasonable interpretation as *post-hoc* views do nothing to excuse their liability, and (iii) the Government did not warn them away from the interpretation. *See Halo Elecs., Inc. v. Pulse Elecs., Inc*., 136 S. Ct. 1923, 1933 (2016).

identified the applicable regulation — the Affiliation Rule — and articulated why it clearly applied to Hawthorne under the CARES Act.[20]

Similarly, insofar as Defendants quote from *Lamers*, *Hopper*, and *Hochman*, to suggest that the FCA cannot apply here because the fraud here only involved "faulty calculations" or "bad math," they take those quotations far beyond their actual contexts. *See* MTD Br. at 21. None of these decisions dealt with a motion to dismiss; instead, all three considered the *state of evidence* at summary judgment.[21] Indeed, in *Hochman*, the Ninth Circuit drew an important insight that is notably missing from Defendants' brief — "[a]s with many [FCA] cases, the resolution of this case is highly dependent on its facts." 145 F.3d 1069, 1073 (9th Cir. 1998). Under the facts here, *scienter* has been plausibly pled.

**D.  Defendants Fail to Identify a Qualifying Public Disclosure or Show That Relator Was Not the Original Source of Such Disclosure.**

Defendants also invoke the FCA's "public disclosure" provision, 31 U.S.C. § 3730(e)(4); *see* MTD Br. at 22-30; but they fail to carry their burden to show this affirmative defense applies here. *See Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017) (recognizing that after 2010 amendments to the FCA, the "public

---

[20]  The same goes for *U.S. ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin. Corp.*, *United States v. Sodexho, Inc.*, and *U.S. ex rel. Englund v. Los Angeles Cnty*. None involved, as here, a clearly incorrect interpretation of a plain statutory or regulatory text. Instead, each involved interpreting sources subject to "conflicting treatments," *Raynor*, 2011 WL 976482, at *9; lack of express regulatory language as to whether "they apply," *Sodexho*, 2009 WL 579380, at *16-17; or "undisputed [evidence] that the Federal government knew what [defendant] was doing and implicitly approved of the [] actions," *Englund*, 2006 WL 3097941, at *12.

[21]  *U.S. ex rel. Lamers v. City of Green Bay* did not address mathematical calculations or headcounts in the context of *scienter*; instead, the Seventh Circuit referenced "faulty calculations" in passing in its falsity discussion. 168 F.3d 1013, 1018-19 (7th Cir. 1999). The same is true with *U.S. ex rel. Hopper v. Anton*, where the Ninth Circuit mentioned "innocent mistakes" in discussing proof of falsity at summary judgment. 91 F.3d 1261, 1267-68 (9th Cir. 1996) (noting that "the record is devoid of" any showing of fraud). *U.S. ex rel. Hochman v. Nackman*, another appeal from summary judgment, is no different.

disclosure bar" is an affirmative defense).

Under § 3730(e)(4), the public disclosure defense involves a two-step inquiry. *See U.S. v. Allergan, Inc.*, 46 F.4th 991, 1000 (9th Cir. 2022). First, this Court must determine "whether there has been a 'public disclosure' of the allegations or transactions underlying the qui tam suit." *U.S. ex rel. Calva v. Impac Secured Assets Corp.*, 2018 WL 6016152, at *3 (C.D. Cal. June 12, 2018). This step itself has three components — whether (1) "the disclosure at issue occurred through one of the channels specified in the statute;" (2) "the disclosure was public;" and (3) "the relator's action is substantially the same as the allegation or transaction publicly disclosed." *Allergan, Inc.*, 46 F.4th at 996. Second, **only if** this Court finds a disclosure with these components will it ask "whether the relator is an 'original source' within the meaning of the statute." *Calva*, 2018 WL 6016152, at *3.

Here, under the first step of the § 3730(e)(4) analysis, Defendants fail to meaningfully develop their argument, much less satisfy their burden to identify a "public disclosure." As a starting point, they make no effort to engage with the three discrete channels of qualifying public disclosures delineated by the text of the FCA — "(i) [] a Federal criminal, civil, or administrative hearing in which the Government is an agent or party; (ii) [] a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) [] the news media[.]" 31 U.S.C. § 3730(e)(4)(A).

The sources on which Defendants based this argument fall into four groups:[22]

- *First*, Defendants point to a variety of records derived from state and local government sources. *See* MTD Br. at 25–26. These are inapplicable to the public disclosure bar because the FCA was amended to apply exclusively to federal government sources and to exclude state and local documents like land and corporate records drawn from a Secretary of State's website. *See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812

---

[22] Defendants suggest that anything public is sufficient. But the specificity of the definition in § 3730(e)(4)(A) shows that most things in the public domain are not.

F.3d 294, 302 n.9 (3d Cir. 2016) ("Congress did amend the [second channel in § 3730(e)(4)(A)] so that only 'Federal' reports qualify.").

- *Second*, Defendants point to an online listing of a yacht, which they incorrectly characterize as an "article" to transform a sales listing into supposed "news media." MTD Br. at 24; *see also* Ex. 6. However, as courts have recognized, such online listings are not "news media." *See U.S. ex rel. Hong v. Newport Sensors, Inc.*, 728 F. App'x 660, 662–63 (9th Cir. 2018) (refusing to adopt "district court's broad holding that most public webpages … generally fall within the category of 'news media'"); *U.S. ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 WL 3282619, at *11–16 (C.D. Cal. July 16, 2019) (rejecting overbroad interpretation of "news media" in FCA), *rev'd on other grounds*, 854 F. App'x 840 (9th Cir. 2021).

- *Third*, Defendants point to government press releases and executive social media profiles not even impliedly referenced in the SAC. *See* MTD Br. at 24–27. Even if these sources counted as public disclosures, which Relator does not concede, they do not include "substantially the same allegations or transactions" as the SAC where, as here, their contents are not referenced in the SAC in any way. 31 U.S.C. § 3730(e)(4)(A).

- *Finally*, Defendants point to two federal sources of data concerning Hawthorne: its Form 5500 and the SBA's publicized data concerning its PPP loan (not Hawthorne's application, which is not publicly available). *See* MTD Br. at 25-27.[23] Although these items are from a federal source, they come neither from a hearing in which the government is a party nor from a report, hearing, audit, or investigation. *See MC2 Sabtech*, 580 F. Supp. 3d at 890 (recognizing that information from the online-accessible federal System for Award Management is not a "public disclosure[]").

Further, even if these federal sources — public PPP data about Hawthorne and its Form 5500 — did fall within the ambit of § 3730(e)(4)(A)(ii), they still would not

---

[23] The excerpted information is from a public PPP database, which does not include actual PPP applications. https://www.federalpay.org/paycheck-protection-program/hawthorne-machinery-co-san-diego-ca (last accessed Nov. 27, 2023).

be "public disclosures" for FCA purposes because they do not disclose "substantially the same allegations or transactions" as alleged in the SAC.

The Ninth Circuit has held that there is no public "allegation of fraud [where] the publicly disclosed information does not contain an explicit accusation of wrongdoing." *U.S. ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016) (internal quotation marks omitted). And to decide if "substantially the same ... transactions" have been alleged, the Ninth Circuit has said "[i]f X + Y = Z ... the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." *Id.*

Defendants do not engage with this required inquiry, much less satisfy it. Indeed, neither the public PPP data nor the Form 5500 are a substantially similar allegation or transaction. Neither contains an allegation of fraud or wrongdoing. With respect to a "transaction," neither document has the "X + Y" information necessary to infer that Defendants committed fraud without additional information from other sources. Facing very similar facts, the Ninth Circuit recently reversed a dismissal based on the public disclosure bar.

In *Silbersher*, the Ninth Circuit found that a handful of sources referenced by that relator were potentially public and within one of the three statutory channels. Nonetheless, applying the *Mateski* "X + Y = Z" formula, the *Silbersher* court concluded that none of these revealed the "combination" of allegations necessary for an inference of an FCA violation. 76 F.4th at 857. Specifically, the court explained "the scattered qualifying public disclosures each contain a piece of the puzzle, but none shows the full picture. In his qui tam action, Silbersher filled the gaps by putting together the material elements of the allegedly fraudulent scheme." *Id.*

Relator has done the same as the *Silbersher* relator. The two theories of liability alleged in the SAC — the omission of CQ Pacific and "systematic undercounting" of employees — rely substantially on information other than the public PPP data and the Form 5500, and indeed rely on a variety of sources entirely

outside the ambit of the three channels specified in § 3730(e)(4)(A). *See, e.g.*, SAC ¶¶ 56–58 (board meeting at which Verhoeven, Tee Ness, and David Ness authorized and approved the PPP application), 61–93 (Verhoeven's misrepresentations to Comerica, non-public misrepresentations in Hawthorne's PPP loan application, and the corresponding information in payroll documents), 105–126 (CQ Pacific's PPP application and Hawthorne's material omission of CQ Pacific from its PPP application). Defendants' failure to show the existence of any qualifying "public disclosure" thus ends the inquiry. *See U.S. ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1520 (9th Cir. 1995) (explaining because certain public disclosure elements were not satisfied, the court "need not address" the other elements or "whether Schumer was an 'original source' of the allegations").

But even if the Court disagreed and found that the federal sources or any others were covered public disclosures discussing substantially similar allegations or transactions, that would still not warrant dismissal because Relator is an original source within the meaning of the FCA. Among other things, the FCA defines an original source as one "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B)(2). Despite Defendants' insinuations to the contrary, the relator does not need to have been directly involved in the PPP application, or directly access other evidence, to qualify as an original source because the FCA was amended to remove the word "direct" from the original source definition. *See, e.g.*, *U.S. v. Kiewit Pacific Co.*, 41 F. Supp. 3d 796, 807 (N.D. Cal. 2014) ("[T]he removal of the word 'direct' appears to broaden the exception and permit a relator to qualify as an 'original source' of information even if that information was obtained indirectly."); *U.S. ex rel. Booker v. Pfizer, Inc.*, 2014 WL 1271766, at *8 (D. Mass Mar. 26, 2014) (same); *U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 842 (E.D. Va. 2013) (same). Thus, the facts

in the SAC "independent of" anything Defendants wrongly claim violates the public disclosure bar would satisfy the original source inquiry.

Furthermore, even if a "direct" source of information that materially adds to the SAC were necessary — which it isn't — Relator had direct knowledge from his employment at Hawthorne about CQ Pacific's affiliation with Hawthorne and the number of employees at the three Hawthorne Entities and CQ Pacific, which materially adds to the allegations in the SAC. *See* Craig Decl. ¶¶ 2–13. Among other things, it would have been difficult to connect CQ Pacific to Hawthorne without such knowledge. *Id.* ¶¶ 7–8. In short, Defendants' attempt to invoke the public disclosure bar fails at every turn, and the Court should reject it.

**E.      Any Dismissal Should Be with Leave to Replead**

For the reasons above, the Court should deny Defendants' motion in its entirety. However, should the Court find any pleading defect, it should grant Relator leave to replead. Rule 15 requires that leave to amend "shall be freely given," and the Ninth Circuit has emphasized that this must be applied "with extreme liberality" towards amendment. *Eminence Cap., LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (reversing denial of leave to replead, even after "three bites at the apple"). Further, "prejudice is the touchstone of the inquiry under rule 15(a)," *id*. at 1052, and Defendants make no such showing in their motion.

## V.      CONCLUSION

For these reasons, Defendants' motion should be denied in its entirety.

Dated: November 28, 2023
New York, NY

Respectfully submitted,

By:   */s/ Max Rodriguez*
_____

Max Rodriguez (admitted *pro hac vice*)
Adam Pollock (admitted *pro hac vice*)
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
Tel: (212) 337-5361
Email: max@pollockcohen.com

Liana R. Vitale (SBN 348772)
201 Spear Street, Suite 1100
San Francisco, CA 94105
Tel: (646) 415-9001
Email: liana@pollockcohen.com


By:   */s/ Li Yu*
_____

Li Yu (*pro hac vice* motion pending)
Molly Knobler (admission pending)
DiCELLO LEVITT LLP
485 Lexington Ave., Suite 1001
New York, NY 10017
Tel: (212) 337-5361
Email: lyu@dicellolevitt.com

*Counsel for Plaintiff-Relator*
*Roger S. Craig*