UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ROGER S. CRAIG,<br><br>                              Plaintiff,<br><br>v.<br><br>HAWTHORNE MACHINERY CO., BRIAN VERHOEVEN, TEE NESS, and DAVID NESS,<br><br>                              Defendants. | Case No.:  20-cv-1625-WQH-AHG<br><br>**ORDER** |

HAYES, Judge:

The matter before the Court is the Motion to Dismiss (ECF No. 58) filed by Defendants Hawthorne Machinery Co., Brian Verhoeven, Tee Ness, and David Ness (collectively, "Defendants").

**I.     BACKGROUND**

On August 21, 2020, Plaintiff-Relator Roger S. Craig ("Relator") initiated this action on behalf of the United States of America by filing a Complaint under seal against Defendants Hawthorne Machinery Co. ("Hawthorne Machinery") and Comerica Bank ("Comerica"), alleging violations of the False Claims Act ("FCA"). (ECF No. 1.)

1

On March 11, 2021, Relator filed a First Amended Complaint ("FAC") against Hawthorne Machinery and Comerica, bringing two claims for violations of the FCA. (ECF No. 4.)

On November 16, 2022, the Court issued an Order stating that the United States declined to intervene and ordering that the Complaint, FAC, that Order, and all further matters be unsealed and served on Defendants. (ECF No. 13 at 1–2; *see* ECF No. 15 (Government's Notice of Election to Decline to Intervene).)

On August 17, 2023, the Court granted Relator leave to amend. (ECF No. 49.) On August 21, 2023, Relator filed the Second Amended Complaint ("SAC"), the operative complaint, against Hawthorne Machinery, Brian Verhoeven, Tee Ness, and David Ness. (ECF No. 51, SAC.)

On October 20, 2023, Defendants filed the Motion to Dismiss. (ECF No. 58.) On November 28, 2023, Relator filed a Response in opposition to the Motion to Dismiss. (ECF No. 64.) On December 15, 2023, Defendants filed a Reply in support of the Motion to Dismiss. (ECF No. 66.)

## II.    ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted as emergency legislation that authorized the Paycheck Protection Program ("PPP") in response to the Coronavirus pandemic. (SAC ¶¶ 2–4.) The CARES Act "included clear and unambiguous statutory provisions concerning the application of both program-specific and general [Small Business Administration ('SBA')] requirements for how employees should be counted to determine eligibility for PPP loans." *Id.* ¶ 4. "Among other things, businesses that were not otherwise qualified as 'small business concerns' under the laws and regulations administered by the [SBA] were only eligible to receive PPP loans if they had averaged 500 or fewer employees over the prior year, as calculated under relevant law, or if they met certain other industry-specific criteria, if applicable." *Id.*

On or about April 5, 2020, Hawthorne Machinery, on behalf of itself and two of its affiliates, Hawthorne Pacific Corporation and Hawthorne of Samoa, Inc., submitted a PPP application that "claim[ed] a rolling average 12-month headcount of 489 employees." *Id.* ¶¶ 7, 56. On April 6, 2020, Comerica approved Hawthorne Machinery's loan request. *Id.* ¶ 9.

Defendants Tee Ness and David Ness, as owners and directors of Hawthorne Machinery, and Defendant Brian Verhoeven, as Chief Financial Officer, caused submission of the PPP loan application to Comerica. *Id.* ¶ 57. Hawthorne Machinery did not meet statutory criteria to apply for a PPP loan because it was "a California company with over $200 million in annual revenue … [that] did not qualify as a 'small business concern' or otherwise meet the SBA's industry-specific size requirements for small businesses." *Id.* ¶ 5. "[A]s calculated by longstanding SBA regulations and specific guidance related to the PPP program, Hawthorne Machinery—when counted together with the necessary affiliate entities under applicable federal laws and regulations—had more than 500 employees for the year preceding its submission of a PPP loan application to its commercial bank, Comerica Bank." *Id.* Hawthorne Machinery was not eligible to receive a PPP loan but applied for and received an over $8 million PPP loan. *Id.* ¶ 19.

"[T]hrough two separate means," Defendants "omitted necessary information" from Hawthorne Machinery's PPP application "that caused Comerica to determine Hawthorne Machinery was eligible for its PPP loan when it was not." *Id.* ¶ 14. First, Hawthorne Machinery "inaccurately characterized its employee counts on the PPP application in a manner that was irreconcilable with the very support documents it sent Comerica," "provided incomplete payroll information to Comerica that bears indicia of having been altered to remove a material number of employees," and "claimed employee counts that were irreconcilable with other public disclosures made by Hawthorne Machinery covering the same time period." *Id.* ¶ 62. "Hawthorne Machinery submitted payroll materials in support of its PPP application that were materially altered and/or misrepresented to support its representation that it and two disclosed affiliates, Hawthorne Pacific Corporation

('Hawthorne Pacific'), and Hawthorne of Samoa, Inc. ('Hawthorne Samoa'), had fewer than 500 employees." *Id.* ¶ 7. "Hawthorne Machinery then falsely represented on its PPP loan application that it and these disclosed affiliates had only an annual average of 489 employees, when the correct calculation of its employee size under applicable laws would have been over 500." *Id.*

Second, "[i]n addition to failing to accurately disclose the correct employee count of the entities it disclosed, Hawthorne Machinery also was 'affiliated' with numerous related companies by means of overlapping management and ownership, including at least one other company—CQ Pacific LLC (d/b/a CarQuest) ('CQ Pacific')." *Id.* ¶ 10. "CQ Pacific separately applied for and received a PPP loan in the amount of $564,000." *Id.* ¶ 11. "The SBA and PPP rules require that loan applicants disclose all 'affiliates' and aggregate their employee headcount for purposes of determining eligibility, unless certain tailored and unambiguous exceptions apply." *Id.* Hawthorne Machinery did not disclose its affiliation with CQ Pacific, which allowed it to "present a purported average employee count of under 500." *Id.* ¶ 12. If Hawthorne Machinery had disclosed all affiliated companies and correctly aggregated their employee headcount, Hawthorne Machinery would have been ineligible for the PPP loan and would not have caused "the SBA to guarantee and then ultimately forgive the loan." *Id.* ¶ 14.

Relator now brings two claims under the FCA against Defendants. Relator seeks damages, penalties, attorney's fees, and any such relief the Court deems appropriate.

## III.   LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In order to state a claim for relief, a pleading "must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* 8(a)(2). Dismissal under Rule 12(b)(6) "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citation omitted).

Additionally, "[a]s with all fraud allegations, a plaintiff must plead FCA claims 'with particularity' under Federal Rule of Civil Procedure 9(b)." *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1116 (9th Cir. 2020) (quoting *Cafasso ex rel. United States v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011)). Under the heightened pleading requirements of Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly–Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001). Rule 9(b) "requires more specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). "This

5

means the plaintiff must allege 'the who, what, when, where, and how of the misconduct charged,' including what is false or misleading about a statement, and why it is false." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). "Knowledge, however, may be pled generally." *Id.* (citing *United States v. Corinthian Colls.*, 655 F.3d 984, 996 (9th Cir. 2011)).

"When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond." *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citing Fed. R. Civ. P. 12(b)). However, a court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* (citing *Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994)).

Where the documents are not physically attached to the complaint, they may be considered if the documents' "authenticity ... is not contested" and "the plaintiff's complaint necessarily relies" on them. *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998) (quotation omitted); *see also Ritchie*, 342 F.3d at 908 ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("We have extended the 'incorporation by reference' doctrine to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute

the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint.").[1]

## IV.   DISCUSSION

Relator brings two claims against Defendants for violation of the FCA.

In relevant part, the FCA provides for liability for one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States. 31 U.S.C. § 3729(a)(1)(A). To establish a cause of action under § 3729(a)(1)(A), the relator must prove the following elements: (1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent. *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th Cir. 2012).

---

[1] In their Request for Judicial Notice, (ECF No. 58-19), Defendants request, *inter alia*, that the Court take judicial notice of what it asserts is its PPP loan application. (*See generally* ECF No. 58-11.) Notably, while other information concerning Hawthorne Machinery's PPP loan is available on a publicly accessible database, Hawthorne Machinery's PPP loan application is not publicly accessible. Although the SAC "necessarily relies" upon Defendants' PPP loan application, *Parrino*, 146 F.3d at 705, Relator contests the authenticity of Defendant's exhibit. In particular, Relator asserts that Defendants "omitted" an alleged addendum from their exhibit. (ECF No. 64 at 12 n.10.) Relator attaches a document that he asserts is the proper PPP loan application (including the alleged omitted addendum) to his Response. (ECF No. 64-2.) As a result, the authenticity of Defendants' PPP loan application exhibit is in dispute, rendering judicial notice inappropriate. *Parrino*, 146 F.3d at 705. Due to the same authenticity dispute, the Court likewise does not take judicial notice of Relator's exhibit that he asserts contains Hawthorne Machinery's PPP loan application and addendum. Defendants' other requests for judicial notice do not present the same authenticity issues and are, where pertinent to the Court's analysis, addressed elsewhere in this Order.

The Court also declines to consider Relator's Declaration, (ECF No. 64-1), which Relator attached to his Response. In their Objection to Declaration of Roger S. Craig Submitted in Support of Opposition to Defendants' Motion to Dismiss, (ECF No. 66-1), Defendants contend that the Court may not consider Relator's Declaration because it is neither judicially noticeable nor a document attached to or incorporated by reference in the SAC. As Defendants contend, such a document falls outside the bounds of what the Court may properly consider when deciding a motion to dismiss. *See Ritchie*, 342 F.3d at 907. Accordingly, the Court declines to consider Relator's Declaration. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1060 (N.D. Cal. 2012) (striking a declaration plaintiffs attached to their opposition to a motion to dismiss because the declaration "[fell] into none of [the] categories" of evidence that the court may consider outside the pleadings).

The FCA also provides for liability for one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). A "[c]laim" is defined as "any request or demand, whether under a contract or otherwise, for money or property ... presented to an officer, employee, or agent of the United States ...." *Id.* § 3729(b)(2).

Defendants move to dismiss the claims in the SAC on the grounds that Relator's "miscounting theory" lacks merit, the CARES Act's franchise affiliation waiver forecloses the affiliation theory, Relator fails to allege scienter, and Relator's claims fail under the public disclosure bar.

## A.    Relator's "Miscounting Theory"

In March 2020, Congress enacted the CARES Act, which created the PPP to be administered by the SBA. Pub. L. No. 116-136, 134 Stat. 281 (2020). Congress placed the PPP within 15 U.S.C. § 636(a), the codification of § 7(a) of the Small Business Act, which provides the SBA's authority to issue loans to small businesses. The CARES Act modified several requirements under § 636(a) and expanded eligibility for types of entities beyond those that would ordinarily be eligible to receive a small business loan. *See* 15 U.S.C. § 636(a)(36). 15 U.S.C. § 636(a) provides:

> During the covered period,[2] in addition to small business concerns, any business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title shall be eligible to receive a covered loan if the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern employs not more than the greater of—
>
>     (I) 500 employees; or

---

[2] The statute defines the "covered period" as "the period beginning on February 15, 2020 and ending on June 30, 2021 ...." *Id.* § 636(a)(36)(A)(iii). On or about April 5, 2020, Hawthorne Machinery submitted its PPP application, thus falling within the "covered period" according to the allegations in the SAC. (SAC ¶ 56.)

> (II) if applicable, the size standard in number of employees established
> by the Administration for the industry in which the business concern,
> nonprofit organization, housing cooperative, veterans organization, or
> Tribal business concern operates.

15 U.S.C. § 636(a)(36)(D)(i). On April 6, 2020, the SBA issued the following guidance regarding how PPP loan applicants should calculate their number of employees:

> In general, borrowers can calculate their aggregate payroll costs using data
> either from the previous 12 months or from calendar year 2019. For seasonal
> businesses, the applicant may use average monthly payroll for the period
> between February 15, 2019, or March 1, 2019, and June 30, 2019. An
> applicant that was not in business from February 15, 2019 to June 30, 2019
> may use the average monthly payroll costs for the period January 1, 2020
> through February 29, 2020.
>
> Borrowers may use their average employment over the same time periods to
> determine their number of employees, for the purposes of applying an
> employee-based size standard. Alternatively, borrowers may elect to use
> SBA's usual calculation: the average number of employees per pay period in
> the 12 completed calendar months prior to the date of the loan application (or
> the average number of employees for each of the pay periods that the business
> has been operational, if it has not been operational for 12 months).

(*See* ECF No. 58-4 at 5–6.)[3]

Defendants contend that the SAC must be dismissed because Relator's "miscounting theory lacks merit." (ECF No. 58-1 at 13.) Specifically, Defendants contend that the SAC does not allege facts sufficient to create an inference that the payroll documents Hawthorne Machinery submitted in conjunction with its PPP loan application were fraudulent or that Hawthorne Machinery "altered" its payroll records. *See id.* at 13–18. Defendants also contend that the SAC fails to allege that Hawthorne Machinery's headcount exceeded the

---

[3] Defendants request that the Court take judicial notice of the SBA's guidance document. Because the SBA's guidance document is "official information posted on a governmental website, the accuracy of which [is] undisputed," the Court may properly take judicial notice of it. *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015) (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011)).

500-employee threshold under all three calculation methods that the SBA permitted. *Id.* at 13–14.

Relator contends that the SAC alleges discrepancies between the employee headcount on Hawthorne Machinery's PPP loan application and its employee counts in other documents that "are more than sufficient to support an inference that the employee headcounts submitted by Defendants were false." (ECF No. 64 at 21.) Relator also contends that the SAC "focused on the rolling twelve-month method of calculation because Hawthorne Machinery's PPP loan application appeared to use that method," but regardless of the calculation method, the SAC plausibly alleges that Hawthorne Machinery's true headcount was over 500. *Id.* at 18.

The SAC alleges that "[o]n or about April 5, 2020," Hawthorne Machinery "included an express false statement on its PPP loan application by providing a false number of employees," and that Hawthorne Machinery "falsely certified in its PPP loan application the accuracy of the information it contained and Hawthorne Machinery's compliance with the requirements of the PPP." (SAC ¶¶ 56, 145, 147.) The SAC alleges that Hawthorne Machinery "falsely represented on its PPP loan application that it and [Hawthorne Pacific Corporation and Hawthorne of Samoa, Inc.] had only an annual average of 489 employees, when the correct calculation of its employee size under applicable laws would have been over 500." *Id.* ¶ 7. The SAC alleges that Hawthorne Machinery "provid[ed] a false number of employees" in an effort "to appear eligible for the PPP loan when it was not." *Id.* ¶¶ 78, 145. The SAC alleges that "Defendants' actions constitute the submission (or causing of submission) of false claims and false statements material to such false claims to the United States" and that "Defendants' actions fraudulently induced the United States to guarantee and forgive Hawthorne Machinery's PPP loan, for which it was not eligible under law." *Id.* ¶ 148.

The SAC further alleges that various "documents and other sources" demonstrate that Hawthorne Machinery's average headcount exceeded 500, including that Hawthorne Machinery's "employee counts on the PPP application" are "irreconcilable with the very

support documents [Verhoeven] sent to Comerica," Hawthorne Machinery "provided incomplete payroll information to Comerica that bears indicia of having been altered to remove a material number of employees," and Hawthorne Machinery "claimed employee counts that were irreconcilable with other public disclosures" Hawthorne Machinery made "covering the same time period." *Id.* ¶ 62. Specifically, the SAC alleges that the average employee headcount Hawthorne Machinery disclosed in its PPP loan application is inconsistent with the payroll documentation that Hawthorne Machinery submitted to Comerica to support its application. *See id.* ¶¶ 7, 82. The SAC alleges that while Hawthorne Machinery claimed an employee headcount of 489 employees on its application, the payroll documentation "on its face, showed an average headcount during that period of 497.4." *Id.*[4] Although this number alone does not exceed the 500-employee threshold, the SAC alleges that, in addition, "at least eight employees verifiable at this time (and likely more) [were] missing from the 2019 and/or 2020 payrolls [Hawthorne Machinery] sent to Comerica."[5] *Id.* ¶ 91. The SAC alleges that, after adjusting the monthly headcounts to

---

[4] Defendants assert that Relator's allegation that the "2019 payroll did not reconcile with the PPP application, with month-by-month disparities of between 5 and 14 fewer employees in each month listed in the PPP application addendum than what is in the payroll data between April and December 2019," "does not make sense" because "the 2019 payroll spreadsheet did not list employees on a month-by-month basis." (ECF No. 58-1 at 16 (quoting SAC ¶ 80).) In his Response, Relator asserts that the number of employees can be determined on a month-by-month basis because the 2019 payroll document "provides each person's hire date and (if relevant) termination date." (ECF No. 64 at 10 n.3.) Specifically, Relator determined the number of employees that Hawthorne Machinery and its disclosed affiliates employed as of January 1, 2019, and then "add[ed] and subtract[ed] [employees] based on 'Start Dt' and 'Term Dt' for each month thereafter." *Id.* Defendants' Reply brief does not rebut Relator's explanation of this calculation method for determining the alleged discrepancies between the 2019 payroll document and Hawthorne Machinery's PPP loan application. (*See generally* ECF No. 66.)

[5] Defendants contend that the SAC's allegations are insufficient to support an inference that Hawthorne Machinery "altered" its payroll records in part because Relator makes such allegations "[o]n information and belief," and "[a]llegations of fraud based on information and belief do not satisfy FRCP 9(b) requirements … unless accompanied by a specific statement of facts upon which the belief is founded." *United States ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1407 (C.D. Cal. 2014), *aff'd*, 678 F. App'x 594 (9th Cir. 2017). The Court concludes, however, that the discrepancies Relator identifies—particularly the omission of employees from Hawthorne Machinery's payroll documents and the differing employee numbers when comparing Hawthorne Machinery's PPP loan application to its Form 5500 (filed

accurately reflect the payroll documentation and adding the "missing" eight employees, "the resulting average for Hawthorne Machinery, Hawthorne Pacific, and Hawthorne of Samoa is over 500 employees." *Id.* ¶ 92. Paragraph 92 of the SAC includes a chart demonstrating the alleged "verified" employee numbers on a month-by-month basis. *Id.* The SAC alleges that Relator has "verified" that these eight employees should have been included in the payroll records based on "public records or other Hawthorne documents reflecting their continuing employment at Hawthorne," and alleges that "likely more" were omitted from Hawthorne Machinery's PPP loan application. *Id.* ¶¶ 91–92 & n.8.

Additionally, the SAC alleges that, in a separate, unrelated filing submitted by Verhoeven—the same Hawthorne Machinery officer who signed and submitted Hawthorne Machinery's PPP loan application—Hawthorne Machinery disclosed that it had "at least 506 employees in January 2020," despite representing to Comerica in its PPP application that it had only 486 employees in that same month. *Id.* ¶¶ 101–02. Specifically, the SAC contains allegations referencing Hawthorne Machinery's submission of "its Form 5500 for 2020 concerning its 401(k) program to the Department of Labor ['DOL']." *Id.* ¶ 96. The SAC alleges that Hawthorne Machinery's Form 5500 "disclosed the '[t]otal number of active participants at the beginning of the plan year' (i.e., January 2020) as 567 employees, including Hawthorne Machinery, Hawthorne Pacific, Hawthorne of Samoa, and CQ Pacific." *Id.* ¶ 98. The SAC alleges that, after subtracting the 61 employees CQ Pacific disclosed on its own PPP loan application from that amount, the three Hawthorne entities that were included on Hawthorne Machinery's PPP loan application "had about 506

---

with the Department of Labor)—constitute "a specific statement of facts upon which" Relator has founded the allegations in the SAC. *Id.* Defendants contend that the discrepancies upon which Relator relies are insufficient to support an inference of fraud because they are "easily explainable." (ECF No. 58-1 at 7.) However, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Here, drawing every reasonable inference in favor of Relator, the Court concludes that Relator's explanation—that Defendants omitted employees from their payroll records in order to fall below the 500-employee threshold and secure "an over $8 million loan" (SAC ¶ 19)—is plausible and thus sufficient to survive a motion to dismiss.

employees in January 2020," as opposed to the 486 employees Hawthorne Machinery disclosed for that month on its PPP loan application. *Id.* ¶¶ 101–02. The Court concludes that the SAC's allegations regarding these alleged discrepancies and omissions are sufficiently plausible to support an inference that the employee headcount submitted by Defendants in Hawthorne Machinery's PPP loan application was false.

The SAC also identifies the "who" responsible for Defendants' alleged false statement material to their alleged false claim with sufficient particularity. *See Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 890 (E.D. Cal. 2019) (explaining that in order to plead a fraud claim against a corporation with particularity, the plaintiff "must allege the names of the employees or agents who purportedly made the fraudulent representations or omissions, or at a minimum identify them by their titles and/or job responsibilities" (quoting *UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1108 (C.D. Cal. 2015))). The SAC satisfies this particularity requirement by alleging that "[a]ll of Hawthorne Machinery's application and supporting materials were submitted to Comerica by Verhoeven with the approval of Tee Ness and David Ness," and that "Verhoeven signed all versions of the PPP application that were submitted by Hawthorne Machinery to Comerica for the PPP loan, including certifying that all information in the application was 'true and accurate in all material respects.'" (SAC ¶¶ 77, 59.) In sum, the SAC alleges facts that, when viewed in the light most favorable to Relator, plausibly support an inference that Defendants knowingly[6] made a false statement material to a false claim that was presented to the federal government for payment when they submitted a false employee headcount that excluded a material number of employees on Hawthorne Machinery's PPP loan application. *Id.* ¶¶ 7, 82, 91–92, 101–102.

---

[6] Defendants separately challenge the SAC's allegations regarding scienter. The Court addresses this contention below.

Nevertheless, Defendants contend that the SAC is "deficien[t]" and "requires dismissal" because it incorrectly alleges the method of calculation that Hawthorne Machinery used to determine its employee headcount and fails to allege that Hawthorne Machinery exceeded the 500-employee threshold under every calculation method available to it.[7] (ECF No. 58-1 at 7.) The parties dispute which calculation method Hawthorne Machinery utilized in its PPP loan application. Defendants assert that "Hawthorne utilized the calendar year 2019 method, not the rolling 12-month method." *Id.* Relator contends that the SAC "focused on the rolling twelve-month method of calculation because Hawthorne's PPP loan application appeared to use that method to derive 489 as the 'Reported' number of employees." (ECF No. 64 at 18.) Although Defendants point to email exchanges between Verhoeven and Comerica as evidence that Hawthorne Machinery relied upon the "calendar year" calculation method, these emails do not contain Hawthorne Machinery's actual PPP loan application or verify which calculation method Defendants ultimately used to arrive at the headcount submitted in Hawthorne Machinery's application.[8]

Resolving all disputes in the light most favorable to Relator, as the Court must at this stage of the proceedings, the SAC plausibly alleges that Hawthorne Machinery utilized the "rolling average 12-month headcount" or "rolling month-by-month basis" and that, had Hawthorne Machinery performed an accurate calculation using that method and not

---

[7] The parties dispute whether the SBA's guidance presented two or three alternative calculation methods available to Hawthorne Machinery. (The parties agree that the calculation method for "seasonal businesses" was inapplicable to Hawthorne Machinery.) In any event, because the Court concludes that the SAC plausibly alleges Hawthorne Machinery utilized the "rolling month-by-month basis" calculation method, the Court need not address this dispute at this stage of the proceedings.

[8] The Court may take judicial notice of these email exchanges because they are "incorporated by reference in the complaint." *Ritchie*, 342 F.3d at 907; *see* SAC ¶¶ 69, 83, 127.

14

omitted employees, its headcount would have exceeded 500.[9] (SAC ¶¶ 56, 63, 92.) Indeed, Defendants acknowledge that, taking Relator's allegations as true, the sum of the "verified" monthly employee counts alleged in paragraph 92 of the SAC is 6,001 employees, which results in an average monthly employee count of 500.083—a figure that exceeds 500. (*See* ECF No. 58-1 at 20–21 (citing SAC ¶ 92).)

Defendants contend that it is "not even clear as a matter of law that exceeding the monthly limit by a fraction of an employee renders the borrower ineligible." (ECF No. 58-1 at 21.) Defendants cite no authority to support this contention. The text of the CARES Act specifies that it applies to businesses that "employ[] not more than the greater of … 500 employees …." 15 U.S.C. § 636(a)(36)(D)(i)(I). As discussed above, the SAC alleges that the additional "eight employees verifiable at this time" and the corrected employee headcounts as "reflected in the payroll documents" comprise the chart at issue, which results in an average monthly employee count of 500.083. (SAC ¶ 92.) The SAC additionally alleges that other forms submitted by Defendants to the DOL indicate that Hawthorne Machinery had 506 employees in January 2020, which is seven more than the "verified headcount" in the SAC's chart for January 2020. *Id.* ¶¶ 96–104. Viewing the reasonable inferences from these allegations in Relator's favor, the SAC alleges that Hawthorne Machinery exceeded the 500-employee threshold by more than one-twelfth of an employee. The Court accordingly declines to decide, at this stage of the proceedings, the issue of whether "exceeding the monthly limit by a fraction of an employee renders the borrower ineligible." (ECF No. 58-1 at 21.)

Additionally, Defendants identify no authority requiring Relator to specifically plead that the employee headcount exceeded 500 under every available calculation method, especially given that the SAC sufficiently alleges that Hawthorne Machinery's actual

---

[9] Defendants seem to suggest that Hawthorne Machinery's average employee headcount would not exceed 500 under an alternative calculation method. Such contentions introduce a factual dispute that is inappropriate at this stage of the proceedings.

headcount surpassed the 500-employee threshold under the calculation method the SAC alleges that Hawthorne Machinery utilized. Therefore, the SAC alleges plausible facts describing Defendants' alleged undercounting of employees and alteration of supporting documents with particularity sufficient to withstand Defendants' motion to dismiss as to both of Relator's FCA claims.[10]

## B.    Scienter

Under the FCA, "[t]he scienter requirement is critical to the operation." *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998). To establish FCA claims under both § 3729(a)(1)(A) and § 3729(a)(1)(B), the relator must establish that the defendant acted "knowingly." 31 U.S.C. § 3729(a)(1)(A)–(B). The FCA defines "knowingly" as having "actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). "Congress specifically amended the FCA to include this definition of scienter, to make 'firm ... its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" *Hochman*, 145 F.3d at 1073 (quoting S. Rep. No. 99-345, at 7 (1986)). Notably, however, the FCA "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). The Court of Appeals for the Ninth Circuit "has further explained that the requisite scienter is the knowing presentation of what is known to be false, and that known to be false does not mean scientifically untrue; it means a lie." *Hochman*, 145 F.3d at 1073 (citations and quotations omitted).

---

[10] The SAC alleges that Defendants violated the FCA by making false claims and making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim under two independent theories—misrepresenting its employee headcount and failing to disclose Hawthorne Machinery's affiliation with CQ Pacific. (*See* SAC ¶ 14 (alleging that, "*through two separate means*, Defendants omitted necessary information that caused Comerica to determine Hawthorne Machinery was eligible for its PPP loan when it was not" (emphasis added))); *see also id.* ¶ 144 ("Defendants have violated the [FCA] in multiple ways ...."). Because the Court concludes that the SAC sufficiently alleges Relator's FCA claims under the "miscounting theory," the Court declines to consider Relator's alternative franchise affiliation theory at this stage of the proceedings.

16

"Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679 (9th Cir. 2018) (citing Fed. R. Civ. P. 9(b); *Corinthian Colls.*, 655 F.3d at 996). An FCA complaint "therefore must set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." *Id.* (citing *Iqbal*, 556 U.S. at 678).

Defendants contend that "the totality of circumstances does not show fraud with scienter," and that "innocent mistakes are not actionable fraud under the FCA." (ECF No. 58-1 at 7–8.) Relator responds that "[t]he SAC plausibly alleges that Defendants 'knowingly' made false statements in their PPP loan application … by understating headcounts." (ECF No. 64 at 21.) Relator further contends that Defendants' contentions regarding "'bad math,' or an 'honest mistake[]'" involve "a disputed question of fact as to knowledge that is inappropriate for a motion to dismiss." *Id.* at 24.

Here, the SAC first alleges that Defendants "were aware of the legal requirements for PPP loans," in part because "Hawthorne Machinery reviewed the relevant statutory language in preparing its PPP application." (SAC ¶ 68.) The SAC supports this assertion by alleging that, in order to submit its PPP loan application, Hawthorne Machinery made certain "certifications" that were "incorporated into the form itself." *Id.* ¶ 67. In particular, the SAC alleges that Hawthorne Machinery certified that it and the affiliates disclosed on its application "employ[ed] no more than the greater of 500 employees" and that "the information provided in [its] application and the information provided in all supporting documents and forms [was] true and accurate in all material respects." *Id.* ¶ 67(b), (e).

The SAC also plausibly alleges that Defendants knew the employee headcount submitted in the PPP loan application was false and did not comply with the statutory requirements, specifically alleging that Defendants "altered [their] payroll records in a further attempt to present a credibly eligible application for the PPP loan" and that their supporting documents "show systematic undercounting and misrepresentation." *Id.* ¶¶ 85, 78. The SAC alleges specific facts that support the "knowing" nature of these

misrepresentations, alleging that "month-by-month disparities" existed between Hawthorne Machinery's 2019 payroll and its PPP loan application and that "a review of several documents … reveals that at least eight employees verifiable at this time (and likely more) are missing from the 2019 and/or 2020 payrolls [Verhoeven] sent to Comerica." *Id.* ¶¶ 80, 91. Additionally, the SAC alleges that "the disclosure of at least 506 employees in January 2020 in the Form 5500," a separate document Hawthorne Machinery filed with the DOL and "signed by Brian Verhoeven"—the same Hawthorne officer who signed and submitted Hawthorne Machinery's PPP loan application—"shows that the companies' true collective headcount was known and readily available to Hawthorne Machinery and its principals, including Verhoeven, Tee Ness, and David Ness." *Id.* ¶¶ 104, 77, 59. Taking these allegations as true, the Court concludes that the SAC pleads sufficient facts from which Defendants' knowledge of their allegedly fraudulent statements and false or fraudulent claims regarding Hawthorne Machinery's employee headcount can reasonably be inferred.[11]

Defendants contend that exceeding the 500-employee threshold "by one-twelfth of one employee in the midst of a calamitous global pandemic do[es] not plausibly support an inference of knowing fraud." (ECF No. 58-1 at 21.) Defendants rely upon Ninth Circuit authority to contend that "errors" resulting from "faulty calculations," "flawed reasoning," "innocent mistakes" and "negligent misrepresentations" are not false under the FCA. (ECF No. 58-1 at 21); *see United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) ("Innocent mistakes, mere negligent misrepresentations and differences in interpretations are not false certification under the [FCA]." (citing *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1478 (9th Cir. 1991))); *Wang v. FMC Corp.*, 975 F.2d 1412, 1420 (9th Cir. 1992) ("Bad math is no[t] fraud."), *overruled*

---

[11] Because both counts of the SAC survive Defendants' motion to dismiss under the "miscounting theory," at this stage, the Court does not consider Defendants' contention that the SAC fails to sufficiently allege scienter as to Relator's alternative franchise affiliation theory.

1  *on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d

2  1121 (9th Cir. 2015).[12]

3      Relator responds that Defendants' assertions "present[] a disputed question of fact

4  as to knowledge that is inappropriate for a motion to dismiss." (ECF No. 64 at 24.) The

5  court agrees that Defendants' assertions are unavailing at this juncture. *See City of San*

6  *Diego v. Invitation Homes, Inc.*, No. 22-cv-260-L-MDD, 2023 WL 35217, at *6 (S.D. Cal.

7  Jan. 3, 2023) (rejecting defendant's argument that the relator had not sufficiently pleaded

8  scienter under California's analogue to the FCA because "[w]hether Defendant knew the

9  laws existed and reasonably believed it was in compliance is a factual dispute not ripe for

10  resolution on a motion to dismiss"). Both *Hopper* and *Wang*, upon which Defendants rely,

11  discuss the scienter requirement of an FCA claim in the context of appeals from motions

12  for summary judgment, not motions to dismiss. *See Hopper*, 91 F.3d at 1267–68

13  (considering "the undisputed evidence" and noting that "the record [was] devoid of any

14  such showing" of "knowing fraud"); *Wang*, 975 F.2d at 1420 (concluding that the relator

15  "ha[d] no evidence that [the defendant] committed anything more than 'innocent mistakes'

16  or 'negligence,' if that"). Because the SAC sufficiently alleges that Defendants

17  "knowingly" made their false claim and false statements material to their false claim

18  regarding Hawthorne Machinery's employee headcount and its eligibility for a PPP loan,

19  the Court declines to consider, at this juncture, Defendants' contrary assertion that they

20  were merely mistaken or made incorrect calculations.

21      At this stage in the proceedings, the Court similarly declines to adopt Defendants'

22  contention that the SBA's forgiveness of Hawthorne Machinery's loan, while possessing

23  the same payroll records upon which Relator relies, creates a strong inference against the

---

26  [12] In support of their contention that the SAC does not adequately plead scienter, Defendants again assert

27  that Hawthorne Machinery utilized an alternative calculation method that resulted in an employee headcount below the 500-employee threshold. (ECF No. 58-1 at 21.) As stated above, however, the Court concludes that, at this stage of the proceedings, the SAC sufficiently alleges that Hawthorne Machinery

28  utilized the "rolling month-by-month" calculation method.

materiality or scienter of Relator's claims. Defendants rely upon *Universal Health Services, Inc. v. United States* for the proposition that "if the Government pays a particular claim in full despite its *actual knowledge* that certain requirements were violated, that is very strong evidence that those requirements are not material." 579 U.S. 176, 195 (2016) (emphasis added). However, the SAC does not allege that the SBA had "actual knowledge" that Hawthorne Machinery had "violated" the 500-employee limit at the time that it forgave Hawthorne Machinery's PPP loan.[13] The SAC alleges that Hawthorne Machinery engaged in "deceitful actions," including "submitt[ing] payroll materials in support of its PPP application that were materially altered and/or misrepresented to support its representation that it and two disclosed affiliates … had fewer than 500 employees." (SAC ¶¶ 7-8.) The SAC further alleges that Hawthorne Machinery "applied for and obtained forgiveness of its PPP loan based on the same lies and omissions." *Id.* ¶ 19. The allegations in the SAC are sufficient at this stage for the SBA's forgiveness of the loan to not be dispositive of materiality or scienter. Additionally, Defendants raised this particular argument for the first time in their Reply brief. *See United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (noting that courts generally decline to consider arguments raised for the first time in a reply brief); *United States v. Boyce*, 148 F. Supp. 2d 1069, 1085 (S.D. Cal. 2001) ("This argument was not presented in their moving papers and therefore should not be considered now, as it is improper for a party to raise a new argument in a reply brief.").

Accordingly, Defendants' motion to dismiss the SAC on the basis that Relator fails to allege scienter is denied.

---

[13] Defendants assert that the SBA "had been on notice of Relator's lawsuit for approximately 14 months" and was "aware of Relator's allegations" when it forgave Hawthorne Machinery's loan. (ECF No. 58-1 at 7, 15.) Relator responds that Defendants' assertion "introduces a factual dispute." The Court agrees that the SBA's awareness of Relator's lawsuit and his allegations against Defendants is a disputed fact issue, and the Court must resolve such disputes in the light most favorable to Relator at this stage of the proceedings.

20-cv-1625-WQH-AHG

### C.   Public Disclosure Bar

The FCA contains a "public disclosure bar" to the *qui tam* provisions that operates as an affirmative defense to an FCA claim. *See United States ex rel. Hoggett v. Univ. of Phx.*, 863 F.3d 1105, 1107 n.2 (9th Cir. 2017) (recognizing that the Ninth Circuit "recently held that the 2010 amendments [to the FCA] transformed the public disclosure bar from a jurisdictional bar into an affirmative defense" (citing *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1103 (9th Cir. 2017))). Because the public disclosure bar is an affirmative defense, a court may consider it on a motion to dismiss only "where the 'allegations in the complaint suffice to establish' the defense." *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

The public disclosure bar provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

The public disclosure bar "involves a two-step inquiry." *United States ex rel. Calva v. Impac Secured Assets Corp.*, No. SACV 16-1983 JVS(JCGx), 2018 WL 6016152, at *3 (C.D. Cal. June 12, 2018). At step one, "the Court must determine whether there was a prior 'public disclosure' of the allegations or transactions underlying the *qui tam* suit through one of the enumerated sources." *Id.* (citing 31 U.S.C. § 3730(e)(4)(B)). "The public disclosure bar is triggered if three things are true: (1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was 'public'; and (3)

the relator's action is 'based upon' the allegations or transactions publicly disclosed." *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016) (citations omitted). At step two, if the court concludes that a public disclosure has occurred, it must then "determine whether the relator is an 'original source' within the meaning of the statute." *Calva*, 2018 WL 6016152, at *3 (citing 31 U.S.C. § 3730(e)(4)(B)). "Original Source" is defined under the statute as "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(d)(4)(B).

Defendants contend that Relator's claims should be dismissed under the public disclosure bar because "Relator's judicially noticeable social media posts show that after his termination, he became enraged, scoured the internet for publicly available tidbits of information, then assembled them into a series of unhinged, abusive, and inflammatory LinkedIn posts." (ECF No. 58-1 at 23.)[14] Defendants contend that "[t]hese posts, based entirely on public sources, laid out the exact theories Relator now alleges in his SAC." *Id.* Defendants contend that these posts contain screenshots or links to publicly available documents, including publicly available loan information from the SBA's website, an internet article about a yacht, real estate records, PPP loan records, Hawaii property records, United States Attorney salary information, land records from the internet, UCC records, corporate filings with the State of Hawaii, publicly available Secretary of State Filings with the State of California, internet articles, real estate transactions, social media posts, images, and Hawthorne Machinery's Form 5500 filed with the DOL for 2020, in

---

[14] District courts within the Ninth Circuit have held that "[c]ourts can take judicial notice of publicly accessible social media posts." *Monster Energy Co. v. Vital Pharms., Inc.*, No. EDCV 18-1882 JGB (SHKx), 2023 WL 2918724, at *4 n.2 (C.D. Cal. Apr. 12, 2023) (citing *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 868–69 (N.D. Cal. 2022)).

addition to other publicly available sources. Defendants contend that "the entirety of his fraud theory originated from publicly available governmental records and internet articles Relator sought out long after he had already been terminated." *Id.* at 31. Relator responds that Defendants fail to identify a qualifying public disclosure or show that Relator was not the original source.

Although Defendants reference multiple public documents and public sources, they do not appear to identify, at this juncture, a "public disclosure" that "occurred through one of the channels specified in [§ 3730(e)(4)(A)]" and that Relator's action is "based upon." *Mateski*, 816 F.3d at 570. First, Defendants do not explain how any of the sources correspond to the federal sources listed in channels (i) and (ii). *See* 31 U.S.C. § 3730(d)(4)(B)(i), (ii). Many of the sources Defendants identify are state and local government records, including property listings and real estate records, a California Labor Commission hearing, and corporate filings with the State of Hawaii and the State of California. The public disclosure bar, however, specifies that only federal government sources fall within channels (i) and (ii). *See Silbersher v. Valeant Pharm. Int'l, Inc.*, 89 F.4th 1154, 1160 (9th Cir. 2024) (noting that "[t]he 2010 amendments narrowed the requirements for triggering the public disclosure bar in several important respects," including that "[n]ow, only a '*Federal* criminal, civil, or administrative hearing' qualifies as a specified channel (i) disclosure," and "for a 'report, hearing, audit, or investigation' to trigger the public disclosure bar under channel (ii), it must now be 'Federal'" (quoting 31 U.S.C. § 3730(e)(4)(A)(i), (ii))).

Defendants also rely upon an online listing of a yacht that Defendants refer to as an "internet article," social media profiles for Verhoeven and Hawthorne Machinery's in-house counsel, and images of certain public figures. Defendants do not contend, however, that any of these sources are federal in nature, and thus they do not appear to fall within channels (i) or (ii) of the statute.

Defendants similarly fail to demonstrate that the remaining public sources fall into channels (i) or (ii). Despite referencing multiple documents associated with or accessible

through federal sources, including the Form 5500 that Hawthorne Machinery filed with the DOL, publicly available data on the SBA's website regarding Hawthorne Machinery's PPP loan, and certain Department of Justice ("DOJ") press releases, Defendants do not explain how these documents fit within any of the statute's channels. Defendants do not establish that these documents are derived from "hearing[s]" or that they constitute "report[s]," "audit[s]," or "investigation[s]." 31 U.S.C. § 3730(e)(4)(A)(i), (ii). While multiple allegations in the SAC reference Hawthorne Machinery's Form 5500, Defendants contend only that it "is plainly a public source of information available to anyone on the internet" and do not specify which of the channels they contend it corresponds to. (ECF No. 58-1 at 29.) The same is true for the information on the SBA's website and the DOJ press releases. Thus, at this stage, none of the sources Defendants reference appear to fall within channels (i) or (ii) of the public disclosure bar.

Defendants contend that the Court should interpret the third channel of the statute—"(iii) news media"—as encompassing the publicly available information and sources upon which Relator relies. (ECF No. 66 at 10–11.) Defendants contend that there is a split of authority on this issue. *Id.* Some courts broadly construe the phrase "news media" to encompass "information publicly available on the internet," while other courts interpret the phrase more narrowly and consider various factors like the newsworthiness of the information, the "intent to disseminate information widely," the extent to which "an online source functions like" a "traditional news outlet[]," and "whether [the source] could reasonably be described as 'news media' as at least some people would [use] that term in everyday speech." *Compare United States ex rel. Hong v. Newport Sensors, Inc.*, No. SACV 13-1164-JLS (JPRx), 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016) ("Information publicly available on the internet generally qualifies as 'news media.'") (collecting cases), *aff'd*, 728 F. App'x 660, 662–63 (9th Cir. 2018), *with United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, No. CV 17-1694 PSG (SSx), 2019 WL 3282619, at *12, *14–15 (C.D. Cal. July 16, 2019) ("[A]pplying the news media provision to anything ever published publicly on the internet is contrary to the

ordinary meaning of the term 'news media' and has the potential to eviscerate the balance Congress struck between encouraging private parties to bring forth evidence of fraud and preventing parasitic suits."), *rev'd on other grounds*, 854 F. App'x 840 (9th Cir. 2021). The Ninth Circuit has not addressed this issue. *See Hong*, 728 F. App'x at 662–63 (explaining that because the relator "[did] not independently challenge the district court's broad holding that most public webpages … generally fall within the category of 'news media,'" the appellate court declined to "address that argument"). Defendants contend that the Court should adopt the broader interpretation,[15] while Relator contends that the Court should apply the narrower interpretation. The Court need not resolve this issue at this stage in the proceedings because Defendants have not shown that any of the sources disclosed "substantially the same allegations or transactions" as the allegations in the SAC. 31 U.S.C. § 3730(e)(4)(A); *see Silbersher*, 89 F.4th at 1166 (declining to resolve whether a *Law360* article and certain scientific studies qualified as "news media" because none of the sources in question "disclose[d] 'substantially the same … allegations or transactions' as [the relator's] claims"); *Mateski*, 816 F.3d at 570–71 (defining an "allegation" as a "direct claim of fraud" and defining "transactions" as "facts from which fraud can be inferred").

Relator asserts that several allegations in the SAC demonstrate that he relied upon "a variety of sources entirely outside the ambit of the three channels specified in § 3730(e)(4)(A)," (ECF No. 64 at 29–30), including Hawthorne Machinery's PPP loan application itself, which is non-public,[16] as well as non-public emails between Verhoeven

---

[15] It is unclear precisely which sources Defendants contend fall within the "news media" channel of the statute. (*See* ECF No. 66 at 10–11.) The Court assumes, for purposes of this Order, that Defendants contend all the public sources and documents they identify fall within the "news media" channel.

[16] Defendants assert that in a LinkedIn post, Relator "cit[ed] Hawthorne's PPP loan application that he pulled from publicly available online sources." (ECF No. 58-1 at 25 (citing ECF No. 58-13 at 5).) A review of the LinkedIn post in question reveals that the document Relator attached to his post is illegible. (*See* ECF No. 58-13 at 5.) However, even if the Court were to assume that this illegible document was Hawthorne Machinery's PPP loan application, Defendants do not explain how Relator's attachment of Hawthorne Machinery's application to his LinkedIn post demonstrates that the application was publicly accessible. Relator asserts in his Response that while a public database contains certain PPP loan

and Comerica and Hawthorne Machinery's non-public payroll information. Additionally, Defendants do not explain how Relator deduced from public sources that Defendants misrepresented Hawthorne Machinery's employee headcount or altered Hawthorne Machinery's payroll documents. Although the SAC contains allegations regarding Hawthorne Machinery's publicly available Form 5500 to support Relator's claim that Hawthorne Machinery misrepresented its employee headcount on its PPP loan application, (SAC ¶¶ 96–104), there is no indication from the allegations in the SAC that the Form 5500's listing of "active participants" constituted either "a direct claim of fraud" or "facts from which fraud can be inferred." *Mateski*, 816 F.3d at 570–71. The Ninth Circuit has explained:

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

*Id.* at 571 (quoting *U.S. ex rel. Found. Aiding the Elderly v. Horizon W.*, 265 F.3d 1011, 1015 (9th Cir. 2001)). It is not clear, at this stage, that the information in the Form 5500 (or any other public source) "revealed" the "combination" of the "essential elements" of Defendants' alleged fraud. *Id.* The SAC compares the "active participants" in the Form 5500—a public document—to the employee headcount listed in Hawthorne Machinery's PPP loan application—a non-public document—to allege that Hawthorne Machinery misrepresented its headcount in the application. (*See* SAC ¶¶ 96–104.)

Similarly, while Defendants assert that Relator's social media posts demonstrate that he relied upon publicly available information regarding Hawthorne Machinery's PPP loan, this information appears to reveal only the amount of Hawthorne Machinery's PPP loan, the number of jobs retained, the date the loan was approved, the loan status, and the issuing lender. (*See, e.g.*, ECF No. 58-15 at 10.) Thus, it is not clear that this publicly available

---

information, it does not include entities' "actual PPP applications." (ECF No. 64 at 28 n.3.) Defendants do not dispute this assertion in their Reply. (*See generally* ECF No. 66.)

data, which does not seem to provide any information regarding Hawthorne Machinery's employee headcount (as submitted in its PPP loan application or otherwise), "revealed" the "essential elements" of Defendants' alleged misrepresentations. *Mateski*, 816 F.3d at 571. The Court accordingly concludes that Defendants have not established, at this stage of the proceedings, that the public disclosure bar requires dismissal of the SAC.[17] Defendants' motion to dismiss the SAC on the basis that it violates the public disclosure bar is denied.

## V.   CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss the Second Amended Complaint is DENIED. (ECF No. 58.)

Dated:  September 25, 2024

_William Q. Hayes_
Hon. William Q. Hayes
United States District Court

---

[17] While Defendants assert that "Relator had no job responsibilities or training related to Hawthorne's payroll or employee records, the methods of calculation of those records, or the purposes of the various types of employee records Hawthorne prepared and maintained," (ECF No. 58-1 at 14), this assertion introduces a factual dispute that is not ripe for resolution at this stage of the proceedings.