Edward C. Walton (Bar No. 78490)
Email: ed.walton@procopio.com
Sean M. Sullivan (Bar No. 254372)
Email: sean.sullivan@procopio.com
Janine Parchment (Bar No. 352004)
  Email: janine.parchment@procopio.com
PROCOPIO, CORY, HARGREAVES &
    SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Attorneys for Defendants
Hawthorne Machinery Co., Brian Verhoeven, Tee
Ness, and David Ness

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA ex rel. ROGER S. CRAIG,<br><br>Plaintiffs,<br><br>v.<br><br>HAWTHORNE MACHINERY CO., BRIAN VERHOEVEN, TEE NESS, and DAVID NESS,<br><br>Defendants. | Case No. 3:20-cv-01625-WQH-AHG<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56<br><br>NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT.<br><br>Date:      March 9, 2026<br>Dept:      15B (15th Flr)<br>Judge:     Hon. William Q. Hayes |

I. INTRODUCTION ............................................................................................... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 2

III. Legal Standards ............................................................................................... 3

    A.    Summary Judgment ................................................................................ 3

    B.    FCA Elements ........................................................................................ 3

    C.    Scienter ................................................................................................. 4

    D.    Materiality ............................................................................................. 4

IV. ARGUMENT AND AUTHORITIES ........................................................... 4

    A.    Relator Lacks Evidence of a Knowing, Material False Statement or Record .................................................................................................... 4

        1.    Craig Was Not Involved in the Application Process and Admits He Lacks Personal Knowledge of Fabrication or an Undercount. ........................................................................... 5

        2.    Craig Did Not Perform an End-to-End Count and Cannot Identify Any Definitive "Actual" Employee Headcount. ...................... 6

        3.    Craig's "Intent" Narrative Rests on Inference and Cannot Satisfy FCA Scienter. ........................................................... 6

    B.    No Falsity: The Undisputed Record Shows Lender-Directed Reporting and Permissible PPP Methods, Not a False Statement or False Record. ................................................................................................. 8

        1.    Comerica Directed Hawthorne to Provide a 12-Month Average, and Hawthorne Revised the Form 2483 Accordingly. ............. 9

        2.    The Contemporaneous Payroll Support Explained the Relevant Metrics and Does Not Establish Fabrication. ..................... 9

    C.    No Scienter: Craig Cannot Prove Any Defendant Subjectively Believed the PPP Submission Was False. ...................................................... 11

        1.    Lender Direction and Contemporaneous Documentation Undercut Any Inference of Knowing Falsity. ................................... 12

        2.    Relator's "They Must Have Known" Narrative Collapses Under SuperValu and His Own Admissions. ............................... 13

    D.    No Materiality: Relator Cannot Tie His Headcount Dispute to Any Real-World  SBA Decision. ............................................................... 14

        1.    The Undisputed PPP Timeline Highlights the Missing Link in Relator's Proof. ................................................................. 15

        2.    Full Forgiveness After the LNQ Process Underscores the

Lack of Materiality Evidence .................................................................. 16

    3.    SBA Forgave the Loan After DOJ and the SBA Knew of Relator's Allegations, Which Is Strong Evidence of Immateriality. ..... 17

    4.    Craig's Inability to Speak to SBA Materiality Confirms the Disconnect Between His Theory and the Government's Decisions. ..... 18

E.    Count II Also Fails: No Knowing, Material False Record or Statement. ............................................................................................ 19

F.    Independent Ground (and at minimum, Scienter Defeat): The CARES Act Franchise Waiver Bars Relator's Aggregation Theory. .............. 20

    1.    The franchise waiver is real, and it is an express limitation on affiliation-based aggregation as an eligibility rule. ............................... 21

    2.    Relator overstates the waiver if he treats it as a one-way ratchet that automatically forces Hawthorne to aggregate CQ Pacific. ...... 21

    3.    On this record, the waiver and SBA's identifier-code framework at least defeat scienter as a matter of law ............................ 22

    4.    The upshot: Relator cannot premise FCA liability on a purportedly "unambiguous" aggregation obligation that the statutory waiver and rollout framework render, at minimum, debatable. ............. 23

    5.    The Waiver (or, at Minimum, Reasonable Reliance) Defeats the Aggregation Theory. ...................................................................... 23

V. CONCLUSION ..................................................................................... 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................ 3

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................3, 5, 7, 14

*U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*,
    792 F.3d 1121 (9th Cir. 2015) ............................................................ 4

*United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) .......................................................... 3, 4

*United States ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) .......................................................*passim*

*United States ex rel. Kelly v. Serco, Inc.*,
    846 F.3d 325 (9th Cir. 2017) .....................................................4, 15, 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................3, 5, 6, 7

*United States ex rel. Schutte v. SuperValu Inc.*,
    143 S. Ct. 1391 (2023)................................................................*passim*

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
    579 U.S. 176 (2016) .....................................................................*passim*

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002).....................................................3, 5, 6

*United States ex rel. Wang v. FMC Corp.*,
    975 F.2d 1412 (9th Cir. 1992).....................................................*passim*

**Statutes**

15 U.S.C. § 636(a)(36)(D)(iv)(II)....................................................*passim*

CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT,
    PL 116-136, March 27, 2020, 134 Stat 281. ............................7, 10, 20

False Claims Act, Title 31 of the United States Code section 3729-3733 ....... *passim*

Fed. R. Civ. P. 56(a) ............................................................................................3, 6

**Other Authorities**

*Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act*, 86 Fed. Reg. 3,694 (Jan. 14, 2021) ..........................................................................................................21

# I. INTRODUCTION

This case turns on a simple failure of proof. Relator Roger Craig ("Relator" or "Craig") asks the Court to send a False Claims Act ("FCA") case to a jury based on perceived discrepancies in payroll data, inferences construed as fraud, and a hindsight disagreement about how employees should have been counted during the earliest days of the Paycheck Protection Program ("PPP"). The undisputed record does not support those assertions. Defendant Hawthorne Machinery Co. ("Hawthorne") completed its PPP application consistent with lender direction, supported the submission with ordinary-course payroll and headcount records, and received Small Business Administration ("SBA") approval, disbursement, and later full forgiveness of the loan—after the Government knew of Relator's allegations. What Relator offers instead is inference layered on inference, untethered to contemporaneous decision-making or admissible evidence of what Defendants actually believed or what would have mattered to the Government's payment decisions.

The timing and scope of Relator's knowledge underscore the problem. Craig's employment ended on April 3, 2020. Hawthorne submitted its PPP application on April 5, 2020. Craig did not participate in the application process, did not attend relevant meetings, did not engage with the lender, and did not perform an end-to-end reconciliation of source data or systems to verify his accusations pre-filing. He concedes that his allegations rest on comparisons among different payroll reports and on inferences he drew from those comparisons, not on firsthand knowledge of any falsification, directive, or knowing misrepresentation. (*See* SUF ¶¶ 3, 54–62.) The contemporaneous record, by contrast, shows that the lender, Comerica, instructed Hawthorne to report an average headcount, Hawthorne revised its submission accordingly, and Hawthorne explained to Comerica why the "employees paid during 2019" figure differed from a headcount figure. (SUF 10–13.)

The law does not permit FCA liability on this record. Scienter under the Act

turns on what defendants actually believed at the time of submission, not on what a relator later argues they should have concluded. *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391, 1399–1401 (2023). Materiality requires proof that the alleged misstatement was capable of influencing the Government's payment decision in the real world, not that it could be framed as important in the abstract. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192–95 (2016). Here, SBA approved and funded the loan in April 2020, completed the Loan Necessity Questionnaire process for this loan, and issued full forgiveness on October 4, 2021. (SUF 44-51.) The undisputed record also shows that DOJ contacted Hawthorne concerning a potential investigation into its PPP loan, DOJ and the SBA knew of Relator's accusations, and even met with Hawthorne about those claims before the SBA made the forgiveness decision, all in a case in which the United States later declined to intervene. Those undisputed facts are incompatible with Relator's theory of knowing, material fraud.

Independently, Relator's aggregation theory fails as a matter of law. Congress expressly waived SBA affiliation rules for franchise-coded businesses in the PPP, 15 U.S.C. § 636(a)(36)(D)(iv)(II), and the contemporaneous program framework relied on SBA franchise identifier codes and the Franchise Directory. At a minimum, that statutory waiver and implementation scheme foreclose any claim that Defendants knowingly violated a clear eligibility mandate by not aggregating CQ Pacific's employees into Hawthorne's application. On this record, summary judgment is warranted.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants submit a separate Statement of Undisputed Material Facts ("SUF") in compliance with this Court's chambers rules. This memorandum summarizes those facts for context and cites to the SUF for record support, rather than directly to exhibits or testimony excerpts.

# III. LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party, and a fact is material only if it could affect the outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmovant, but the nonmovant must still identify specific facts supported by admissible evidence; argument, conjecture, and mere doubt do not create a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

### B.    FCA Elements

The False Claims Act imposes liability only where a defendant knowingly presents (or causes to be presented) a false or fraudulent claim for payment or approval, or knowingly makes or uses a false record or statement that is material to such a claim. 31 U.S.C. § 3729(a)(1)(A), (B). The required showings are commonly framed as falsity, scienter, and materiality tied to payment. *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171–73 (9th Cir. 2006). The FCA does not convert alleged regulatory or program noncompliance into fraud absent proof of a materially false claim or record. *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996). Because Relator bears the burden of proof at trial on these elements, he must produce sufficient evidence for a reasonable jury on each element to defeat summary judgment. *Celotex*, 477 U.S. at 322–23.

### C.     Scienter

The FCA's scienter requirement is demanding and turns on what the defendant actually believed and understood at the time of the challenged statement. 31 U.S.C. § 3729(b)(1); *SuperValu Inc.*, 143 S. Ct. at 1399–1401. Actual knowledge, deliberate ignorance, or reckless disregard is required; negligence, mistake, and reasonable interpretative disagreement are insufficient. *Hopper*, 91 F.3d at 1266–67; *United States ex rel. Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir. 1992), overruled on other grounds by *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015).

### D.     Materiality

Materiality is likewise rigorous. A misrepresentation is material only if it has a natural tendency to influence, or is capable of influencing, the Government's payment decision. 31 U.S.C. § 3729(b)(4); *Escobar*, 579 U.S. at 192–95. The Government's characterization of a requirement as a condition of payment is relevant but not dispositive, and the inquiry focuses on what matters to payment in the real world on the record developed in discovery. *Escobar*, 579 U.S. at 194–95; *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332–34 (9th Cir. 2017). The question is whether the alleged misrepresentation had "a natural tendency to influence, or [was] capable of influencing," the government's payment decision. *Escobar*, 579 U.S. at 192.

## IV. ARGUMENT AND AUTHORITIES

### A.     Relator Lacks Evidence of a Knowing, Material False Statement or Record

Relator's theory asks the Court to send an FCA case to a jury based on perceived discrepancies, inferences he asserts amount to fraud, and hindsight reconstruction. That is not enough. To survive summary judgment on either FCA count, Relator must produce admissible evidence from which a reasonable jury could find (at minimum) a false claim or false record, made knowingly, and material to the

Government's payment decision. 31 U.S.C. § 3729(a)(1)(A), (B), (b)(1), (b)(4); *Escobar*, 579 U.S. at 192–95; *Hendow*, 461 F.3d at 1171–73. Argument and inference alone are not sufficient evidence; at summary judgment, Relator must identify specific facts supported by competent proof, not speculation about what "must have" occurred and more than metaphysical doubt. *Celotex Corp. v. Catrett*, 477 U.S. at 323–25; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. at 586–87; *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir. 2002).

The undisputed record leaves Relator without the proof he needs. Craig's employment at Hawthorne ended effective April 3, 2020. (SUF 3.) Hawthorne submitted the PPP application on April 5, 2020. (SUF 4-16.) Craig did not participate in the application process, does not have firsthand knowledge of who created the employee count spreadsheets submitted or how, did not attend any meetings regarding the application, and did not hear any directive by Hawthorne management regarding the application or employee counting related thereto. (SUF 54; 57-62.) That gap is not merely contextual; it is the core evidentiary failure that runs through falsity and scienter. His theory depends on persuading a jury that someone at Hawthorne must have intentionally undercounted employees, but Craig cannot tie any alleged undercount to a particular actor, instruction, document, or specific knowing misrepresentation. He admits his accusations are all based on inference and assumptions.

1. Craig Was Not Involved in the Application Process and Admits He Lacks Personal Knowledge of Fabrication or an Undercount.

Craig's own testimony forecloses the "knowing fraud" element. He testified he has no direct personal knowledge that any particular individual altered payroll records and that his allegations rest on his review of documents and inferences he drew from perceived discrepancies. (SUF 57.) He conceded he did not observe any meeting, directive, or instruction by Hawthorne leadership to undercount employees. (SUF 59.) He also testified that he did not personally see the creation of the

spreadsheet he relies on, does not know who created it, and did not witness any act of fabrication or alteration. (SUF 58.) Those admissions do not create a triable scienter issue; they confirm the absence of evidence of actual knowledge, deliberate ignorance, or reckless disregard. 31 U.S.C. § 3729(b)(1); *United States ex rel. Hopper v. Anton*, 91 F.3d at 1266–67.

2.  Craig Did Not Perform an End-to-End Count and Cannot Identify Any Definitive "Actual" Employee Headcount.

Craig also cannot establish falsity through competent proof of what the employee count "actually" was under any controlling PPP methodology. Craig conceded he did not perform a complete independent headcount calculation from original source systems and did not do his own calculation of the precise number of employees for PPP eligibility purposes. (SUF 60.) He testified that the only single document he viewed as "definitive" was an insurance document listing 717 employees, but he did not recall policy details other than that it covered the Hawthorne family of companies, including affiliates. (SUF 61.) He also testified his view that Hawthorne exceeded 500 employees is based on his personal experience and has become a "moving target" based on an "amalgamation of different data points." (SUF 62.) That leaves the Court with what Rule 56 forbids: a request to infer falsity from generalized discrepancies without foundational proof of the underlying fact. *See Matsushita*, 475 U.S. at 586–87 (nonmovant must do more than show "some metaphysical doubt"); *Villiarimo*, 281 F.3d at 1061 (conclusory allegations and speculation do not create a triable issue).

3.  Craig's "Intent" Narrative Rests on Inference and Cannot Satisfy FCA Scienter.

Craig's "intent" theory is built the same way. He infers intent from "numbers and timing" and from the importance of the PPP threshold, not from firsthand knowledge of any directive or knowing false statement. (SUF 57-62.) He admits he did not witness the creation of the spreadsheet he relies on, does not know who

created it, and did not observe any fabrication or alteration. (SUF 57-58.) He does not claim direct personal knowledge that any individual altered payroll records. (SUF 57.) Under the FCA, that is not enough. The statute requires proof of actual knowledge, deliberate ignorance, or reckless disregard, and the Supreme Court has made clear that scienter turns on what the defendant actually believed at the time, not on post hoc inference from disputed inputs. 31 U.S.C. § 3729(b)(1); *Hopper*, 91 F.3d at 1266–67; *SuperValu*, 143 S. Ct. at 1399–1401.

The contemporaneous record underscores why Craig's inference cannot bridge the gap. Comerica instructed Hawthorne that the "Number of Employees" field should reflect "the average employee headcount in the last 12 months," and Hawthorne revised the Form 2483 accordingly. (SUF 12-13.) Hawthorne supported the submission with payroll documentation and headcount records and expressly distinguished "average headcount" from the larger number of  individuals "paid during 2019," explaining that the latter did not represent employees simultaneously employed at one time. (SUF 13, 16.) Craig was not employed when these communications occurred and offers no firsthand testimony about the submission process. (SUF 3; 54; 57-62.)

This record leaves no triable FCA case. What Craig offers is at most a methodology disagreement and a chain of inferences: he infers an "actual count" from disparate sources he did not reconcile through an end-to-end count (SUF 60-62); he infers falsity because his inferred count differs from the lender-directed average-headcount figure; and he infers intent because the threshold mattered (SUF 59). That is not competent evidence of a knowingly false statement or record. *Celotex*, 477 U.S. at 323–25; *Matsushita*, 475 U.S. at 586–87; *Hopper*, 91 F.3d at 1266–67. Moreover, it sets up the next point. Even putting scienter aside, Craig's theory fails on falsity because the undisputed record shows Hawthorne reported what Comerica told it to report—an average headcount—supported by ordinary-course payroll and headcount records, in a rapidly evolving program environment where the

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

CARES Act did not prescribe a specific employee-counting method and the first IFR did not supply a specific employee-counting methodology, but did delegate eligibility determinations to the lenders. (SUF 17, 21.)

**B.    No Falsity: The Undisputed Record Shows Lender-Directed Reporting and Permissible PPP Methods, Not a False Statement or False Record.**

Craig's pleading uses the rhetoric of "altered" payroll support and "false" headcount reporting. But at summary judgment the inquiry turns on evidence, not adjectives. The question is whether Craig has admissible proof that Defendants submitted a materially false employee count or false payroll support under the standards that governed PPP applications in April 2020. On this record, he does not. What Craig actually offers is a set of comparisons among different sources, coupled with an insistence that one particular employee-counting approach must control. That is a dispute about methodology and inference, and does not establish falsity under the FCA. *See Hopper*, 91 F.3d at 1266–67; *United States ex rel. Wang v. FMC Corp.*, 975 F.2d at 1420–21.

The undisputed application process is the proper starting point. During the April 5, 2020 submission window, Comerica told Hawthorne that the "Number of Employees" field should reflect "the average employee headcount in the last 12 months," and so Hawthorne revised the Form 2483 accordingly. (SUF 12, 13, 20.) Hawthorne supported the submission with ordinary-course payroll and headcount reports, including contemporaneous explanations distinguishing "average headcount" from other payroll-related figures that measure different concepts. (SUF 11, 16, 19, 20.) Relator's attempt to reframe those materials as "false" depends on treating his preferred counting construct as the only permissible one and asking the Court to infer fabrication from discrepancies he did not reconcile through an end-to-end count. The FCA does not permit a case to proceed to trial on that foundation.

1.    Comerica Directed Hawthorne to Provide a 12-Month Average, and Hawthorne Revised the Form 2483 Accordingly.

The undisputed evidence shows how the headcount entry was reported and why Craig cannot prove it was intentionally false. On April 5, 2020—during the earliest PPP application window—Comerica instructed Hawthorne that the "Number of Employees" field should reflect "the average employee headcount in the last 12 months." (SUF 12.) Hawthorne revised the Form 2483 in response and returned a signed, initialed, dated revision reflecting a total headcount of 489 employees across Hawthorne Machinery Co., Hawthorne Pacific Corp., and Hawthorne of Samoa, Inc., with a 298/184/7 breakdown. (SUF 13-16, 19, 20.) That lender-directed framing is central to the falsity analysis. A headcount reported as a last-twelve-month average in the manner the lender instructed is not shown to be "false" merely because Relator would prefer a different metric, such as a point-in-time maximum or another proxy.

Relator's problem is not just that he advances a different methodology. He cannot supply competent proof that Hawthorne's lender-directed figure was wrong under the governing standard. Craig admits he did not perform a complete end-to-end headcount calculation from original source systems and did not do his own calculation of the precise number of employees for PPP eligibility purposes. (SUF 60.) He also testified he cannot identify a single definitive document that conclusively establishes an "actual" employee count on the relevant date and that his conclusions are based on his experience and an "amalgamation" of sources. (SUF 61, 62.) On that record, Relator cannot convert a disagreement over metrics into proof of falsity.

2.    The Contemporaneous Payroll Support Explained the Relevant Metrics and Does Not Establish Fabrication.

The payroll support Hawthorne provided to Comerica confirms that the reported headcount was derived from ordinary-course payroll and headcount records and was consistent with the "average headcount" concept Comerica directed. As part

of the April 5 submission package, Hawthorne transmitted payroll support reflecting a February 2020 headcount in the mid-480s and separately identified a larger figure reflecting "employees paid during 2019." (SUF 11, 13, 16, 20.) Hawthorne expressly distinguished between those concepts, explaining that the larger number reflected employees who received a paycheck at some point during the year, not an average headcount and not the number of employees simultaneously employed at one time. (*Id*.) That contemporaneous explanation matters. It shows Hawthorne was not attempting to pass off a larger "paid during the year" figure as an average headcount; it was doing the opposite by explaining why those figures do not measure the same thing.

Craig tries to recharacterize differences among payroll-related sources as "alteration" and "under-counting." But Craig's own admissions highlight why this remains inference rather than proof. He testified he does not have direct personal knowledge that any particular individual altered payroll records and that his allegations are based on his review of documents and inferences he drew from perceived discrepancies. (SUF 57, 59.) He testified he did not personally see creation of the spreadsheet he relies on, does not know who created it, and did not witness any act of fabrication or alteration. (SUF 58.) And he conceded he did not do an independent headcount calculation from original source systems prior to filing his lawsuit. (SUF 60.) Those evidentiary gaps matter because falsity under the FCA requires proof the statement or record was false, not a theory that it "must have been" false because some other document reflects a different number. *See Wang*, 975 F.2d at 1420–21 (affirming summary judgment; evidence of mistakes or negligence is not proof of fraud; FCA targets "a lie," not technical error); *Hopper*, 91 F.3d at 1266–67 (affirming summary judgment; regulatory noncompliance and disputes over interpretation do not establish an actionable false claim absent a false certification or other false statement within the meaning of the FCA).

The undisputed state of PPP guidance regarding employee counting under the

CARES Act in April 2020 reinforces the point. The CARES Act did not identify a specific statutory counting methodology when it was initially signed into law. (SUF 2, 17.) Even the SBA's First Interim Final Rule, published April 15, 2020, did not provide specific guidance on the methodology for counting employees, but rather focused primarily on payroll cost calculations rather than employee counting methods. (SUF 21.) Those interim rules delegated eligibility determinations to the lenders. (SUF 22.)

In that setting, differences among payroll-related figures (for example, "employees paid during the year" versus "average headcount") do not themselves demonstrate intentional falsity. They often reflect the reality that distinct measures answer distinct questions. Without competent evidence that Hawthorne's reported figure was knowingly wrong under the applicable PPP approach—and without evidence of a fabricated document attributable to Defendants—Craig cannot establish actionable falsity. Here, he cannot make that showing on the undisputed record in light of the evidence showing Hawthorne's efforts to comply with lender guidance in computing employee headcount for itself and its qualified affiliates—a lender delegated with determining eligibility. (SUF 12-16; 18-25.)

For these reasons, Relator cannot establish falsity as required for either Count I (§ 3729(a)(1)(A)) or Count II (§ 3729(a)(1)(B)).

### C.    No Scienter: Craig Cannot Prove Any Defendant Subjectively Believed the PPP Submission Was False.

Scienter is the fulcrum of this case, and it is where Relator's proof fails most cleanly. Even if Relator could persuade a factfinder that a different headcount methodology should have been used, that would not establish FCA knowledge. The question under the statute and *SuperValu* is what Defendants actually believed and understood at the time of submission: did they know the reported information was false, or did they act in deliberate ignorance or reckless disregard of a substantial risk of falsity at the time the PPP application was submitted? 31 U.S.C. § 3729(b)(1);

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*SuperValu Inc.*, 143 S. Ct. at 1399–1401. Craig has no competent evidence on that point. He offers inference, not proof, and he tries to replace state-of-mind evidence with the proposition that "they must have known" because the 500-employee threshold mattered. That is not enough to survive summary judgment.

The undisputed evidence shows compliance-oriented conduct in a rapidly evolving program: Hawthorne sought and followed lender direction on how to complete the headcount field, supported the submission with ordinary-course payroll and headcount materials, and documented distinctions among different payroll-related metrics. That record is inconsistent with a subjective belief in falsity. Relator's own testimony underscores that his scienter theory is built from "numbers and timing," not from firsthand proof of a directive to undercount, a decision to falsify, or an internal admission that the reported figure was wrong. On this record, no reasonable jury could find FCA scienter.

          1.   <u>Lender Direction and Contemporaneous Documentation Undercut Any Inference of Knowing Falsity.</u>

The core contemporaneous facts point away from knowledge. During the April 5, 2020 application process, Comerica instructed Hawthorne that the "Number of Employees" field should reflect "the average employee headcount in the last 12 months," and Hawthorne revised and resubmitted its signed Form 2483 consistent with that direction. (SUF 12, 13.) Hawthorne did not submit an unexplained number. It provided payroll and internal headcount/payroll reports maintained in the ordinary course of business and, critically, it identified and explained why a larger "employees paid during 2019," figure did not represent average headcount or the number of employees employed at a single point in time. (SUF 11, 13-16, 20.) That is not what "reckless disregard" looks like. It is affirmative effort to apply the lender's framing and to explain the meaning of the supporting data.

The record also reflects Hawthorne following lender guidance regarding eligibility requirements and compliance during the initial rollout, in a landscape that

was changing quickly, and the SBA delegated eligibility determinations to the

lenders. (SUF 12-13, 22, 41-42.) Those undisputed facts matter under *SuperValu*

because they bear directly on what Defendants believed. A borrower that seeks

lender input, follows the lender's directives on how to report a key field, and

supports the submission with ordinary-course records is not acting as if it believes it

is lying to the Government. If anything, that conduct is the opposite of deliberate

ignorance. *See Wang*, 975 F.2d at 1420–21 (affirming summary judgment; FCA

targets "a lie," not technical error or negligence); *United States ex rel. Hopper v.

Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996) (affirming summary judgment;

innocent mistakes and differences in interpretation do not establish FCA liability).

Relator emphasizes motive—the loan amount was large and the application

window compressed—but motive is not scienter. (*See*, e.g., SUF 59.) The FCA

requires <u>evidence</u> that Defendants did not believe their reported figure was true, or

that they consciously avoided learning the truth while suspecting falsity, or

recklessly disregarded it. *Schutte*, 143 S. Ct. at 1399–1401. The undisputed evidence

points the other way.

### 2.   Relator's "They Must Have Known" Narrative Collapses Under <u>SuperValu</u> and His Own Admissions.

Relator's scienter theory is not tied to any admissible evidence that a

decisionmaker at Hawthorne believed the headcount was false. There are no internal

admissions. There is no contemporaneous warning ignored. There is no testimony

identifying who purportedly fabricated a document, when, and for what purpose.

Instead, Relator invites the Court to infer intent from alleged discrepancies between

sources and from the importance of the 500-employee threshold. (SUF 54-62.) That

is precisely the kind of speculation based on Relator's hindsight reconstruction that

does not satisfy § 3729(b)(1), particularly after *SuperValu*'s clarification that the

inquiry is subjective. 31 U.S.C. § 3729(b)(1); *SuperValu*, 143 S. Ct. at 1399–1401.

Craig's own testimony underscores the gap. He was terminated effective April

3, 2020 and was not employed when Hawthorne submitted its PPP application on April 5, 2020. (SUF 3, 54.) He lacks personal knowledge of the preparation of the application, the lender communications, and Hawthorne's internal decision-making during the submission window. (SUF 57-58.) His admissions go further. He testified he does not have direct personal knowledge that any particular individual altered payroll records and that his allegations are based on his review of documents and inferences from perceived discrepancies. (SUF 57, 62.) He testified he did not witness creation of the spreadsheet he relies on, does not know who created it, and did not observe any act of fabrication or alteration. (SUF 57.) He testified his belief in intentional undercounting is inference from "numbers and timing," not firsthand knowledge of any meeting, directive, or instruction by Hawthorne leadership to undercount. (SUF 59.) Those admissions are fatal to scienter at summary judgment because they confirm Relator cannot connect any purported "falsification" to any Defendant's state of mind.

To be clear, this argument does not assume away Relator's pleadings about "altered" documents. It addresses the dispositive point at this stage: there is no competent evidence that any Defendant actually believed the submission was false, or that anyone acted with deliberate ignorance or reckless disregard as to falsity. Without that proof, Relator cannot carry his burden on an essential FCA element, and summary judgment is warranted on scienter alone. *Celotex Corp. v. Catrett*, 477 U.S. at 322–23 (nonmovant must present evidence on an essential element; failure of proof warrants judgment as a matter of law).

### D. No Materiality: Relator Cannot Tie His Headcount Dispute to Any Real-World SBA Decision.

Materiality is a demanding element that requires proof the alleged misstatement actually mattered to the Government's payment decision in the real world. *Escobar* makes materiality "demanding" and directs courts to focus on what is "capable of influencing" the Government's payment decision in the real world, not

on abstract importance to a relator's post hoc view of what "should" have mattered. *Escobar*, 579 U.S. at 192–95. On this record, Relator cannot satisfy that standard. He has no competent evidence that SBA (or Comerica acting within the PPP framework) would have denied guarantee or disbursement in April 2020, or denied forgiveness in October 2021, based on the particular headcount dispute he now advances. Instead, he offers the premise that "eligibility must matter," which is not proof of materiality under *Escobar* and *Kelly*.

Relator's problem is structural. His theory is a methodology dispute over employee counting and affiliation. Materiality requires evidence that the Government treated the disputed requirement as consequential in payment decisions in circumstances like these, or that the alleged misstatement would have predictably altered SBA's actions as a matter of practice. Relator has produced no testimony from any SBA official who participated in approving, reviewing, or forgiving Hawthorne's loan, nor any lender testimony tying the particular headcount dispute here to an actual decision to deny, recoup, or withhold forgiveness; Relator also offers no SBA documentary adjudication showing that the specific discrepancy he presses would have changed guarantee, disbursement, or forgiveness.

Relator's retained expert, William Manger, is a former SBA official at the programmatic level, but he does not testify that he adjudicated Hawthorne's loan, reviewed Hawthorne's loan file, or that the SBA would have denied, recouped, or withheld forgiveness on these facts. (SUF 33-34.) Without that proof, the claim cannot reach a jury. *See United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d at 332–34.

1. The Undisputed PPP Timeline Highlights the Missing Link in Relator's Proof.

The undisputed sequence matters because it frames the "payment decision" that *Escobar* asks the Court to examine. Hawthorne submitted its first-draw PPP application on April 5, 2020, SBA approved the loan on April 6, 2020 in the

principal amount of $8,083,800, and funding followed on April 16, 2020. (SUF 20, 44, 45.) For loans over $2 million, Hawthorne then completed the SBA's Loan Necessity Questionnaire process in early 2021, providing information and documentation through Comerica as part of that review. (SUF 46-50.) These events are not window dressing. They show the SBA and the lender actually engaged with this loan through the program's established review pathways, yet Relator still cannot connect his headcount theory to any evidence that SBA would have acted differently at approval, disbursement, or forgiveness. *Escobar*, 579 U.S. at 192–95.

## 2. Full Forgiveness After the LNQ Process Underscores the Lack of Materiality Evidence.

SBA ultimately remitted full forgiveness of the loan and paid interest as well. (SUF 50.) SBA's Notice of Paycheck Protection Program Forgiveness Payment is dated October 4, 2021 and reflects forgiveness of the full principal amount of $8,083,800.00 plus $120,583.35 in interest. (SUF 50.) The notice also imposed a six-year record-retention obligation. (SUF 51.) Relator's burden is not satisfied by asserting that employee-count issues are "important" in theory. He must show that the particular alleged misrepresentation he claims was capable of influencing SBA's actual payment decisions in this case and on this record. *Escobar*, 579 U.S. at 192–95.

Relator bears the burden to prove that the alleged headcount discrepancy had a natural tendency to influence, or was capable of influencing, SBA's approval, disbursement, or forgiveness decisions in this case. *Escobar*, 579 U.S. at 192–95; 31 U.S.C. § 3729(b)(4). Yet Relator offers no competent evidence about how SBA evaluated employee-count issues in practice, what information SBA considered determinative here, or whether SBA would have denied or recouped forgiveness had Hawthorne reported a different number. On this record, the only concrete payment-decision evidence is that SBA approved the loan, disbursed it, and later granted full forgiveness. Without evidence tying Relator's methodology dispute to SBA's actual

decision making, Relator cannot carry his burden on materiality at summary judgment.

### 3. SBA Forgave the Loan After DOJ and the SBA Knew of Relator's Allegations, Which Is Strong Evidence of Immateriality.

This case presents the circumstance *Escobar* identified as "very strong evidence" of immateriality: continued payment after the Government becomes aware of the alleged violation. 579 U.S. at 195.

Relator filed his qui tam complaint in August 2020. (SUF 55.) Although the action remained under seal, DOJ/AUSA contacted Hawthorne regarding the Government's investigation into its PPP loan before the SBA issued its Notice of Paycheck Protection Program Forgiveness Payment dated October 4, 2021. (SUF 66.) On August 26, 2021, representatives of the DOJ and SBA met with and interviewed Hawthorne representatives via Zoom, including Brian Verhoeven, to discuss the matter of Hawthorne's PPP loan. (SUF 67.) Thus, the Government— including the SBA itself— expressly knew of Relator's allegations prior to making the forgiveness decision..

Notwithstanding that awareness, SBA elected to forgive the loan in full, remitting the entire principal amount of $8,083,800 plus interest. (SUF 50, 51.) The forgiveness notice did not condition forgiveness on further review, reserve a clawback right, or suggest that SBA viewed the alleged eligibility issues as material to payment. (*Id.*) That decision occurred before the Government issued a Civil Investigation Demand ("CID") in January 2022. (SUF 63.) Ultimately, the United States declined to intervene in this action in October 2022. (SUF 64-65.)

While declination is not dispositive, it underscores the evidentiary gap on materiality. It is a record-based point about what is missing: despite a loan-necessity review process, pre-forgiveness DOJ and SBA contact, a CID, and the Government's evaluation of whether to take over the case, Relator still cannot tie his methodology dispute and inferences to evidence that SBA would have denied

guarantee/disbursement or would have withheld forgiveness (or sought recoupment) had Hawthorne counted differently.

Under *Escobar*, the Government's decision to pay—or here, to forgive—after learning of the alleged violation is powerful evidence that the requirement at issue was not material to the payment decision. *Escobar*, 579 U.S. at 195; *see also Kelly*, 846 F.3d 325 (affirming judgment where relator failed to satisfy *Escobar*'s rigorous materiality requirement on the developed record). Relator offers no evidence that SBA treated the alleged headcount dispute as disqualifying in practice, and the Government's actions affirmatively point the other way.

### 4.    Craig's Inability to Speak to SBA Materiality Confirms the Disconnect Between His Theory and the Government's Decisions.

Craig concedes he does not know how the SBA evaluates materiality in deciding whether to approve, pay, or forgive PPP loans, and his opinions reflect his personal interpretations rather than knowledge of SBA decision making. (SUF 57-62.) That matters because the relevant decision maker is the Government—and the Government, including SBA specifically, had notice of Relator's allegations, proceeded to forgive the loan.

Materiality under the FCA turns on whether the alleged misrepresentation was capable of influencing the Government's payment decision in context. *Escobar*, 579 U.S. at 192–95. On this record, the only evidence of how the Government actually treated the alleged discrepancy is that it approved, disbursed, and then forgave the loan after it knew of the accusations. Craig's disagreement with methodology cannot overcome that reality. Relator has no competent evidence—no testimony from an SBA decisionmaker involved with Hawthorne's loan, no lender testimony tied to denial or forgiveness on the facts here, and no relevant documentary evidence from the SBA—showing that the alleged headcount dispute (as opposed to an abstract eligibility concept or his inferences) would have changed approval, disbursement, or forgiveness. Without that proof, Relator cannot carry his burden on an essential

element, and summary judgment should be granted on materiality.

**E.    Count II Also Fails: No Knowing, Material False Record or Statement.**

Count II under 31 U.S.C. § 3729(a)(1)(B) does not lower Relator's burden or provide an alternate path to trial. It requires proof that Defendants knowingly made or used a false record or statement, and that the identified record or statement was material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B), (b)(1), (b)(4) . Thus, the same failures of proof that defeat Count I defeat Count II: Relator must still prove a materially false record, knowing falsity under *SuperValu*'s subjective scienter standard, and *Escobar* materiality tied to SBA's real-world approval, disbursement, or forgiveness decisions. *Escobar*, 579 U.S. at 192–95; *United States ex rel. Schutte v. SuperValu Inc*., 143 S. Ct. 1391, 1399–1401 (2023).

Relator's Count II theory effectively alternates between two purported categories of "false records": the PPP application package itself (Form 2483 and Addendum A) and the payroll/headcount materials transmitted to Comerica as support. Neither category can sustain liability under § 3729(a)(1)(B).

First, if the supposed "false record" is the PPP application itself, Count II rises or falls with the same element showings addressed under Count I. Relator must prove that the employee-count and eligibility representations were false under a controlling PPP standard, that Defendants subjectively believed they were false (or acted in deliberate ignorance or reckless disregard), and that the particular representation was capable of influencing SBA's payment decisions. 31 U.S.C. § 3729(a)(1)(B), (b)(1), (b)(4); *Escobar*, 579 U.S. at 192–95; *SuperValu*, 143 S. Ct. at 1399–1401. On this record, he cannot. The undisputed evidence shows the employee-count entry was made in response to lender direction and supported by ordinary-course payroll/headcount materials reflecting an averaging approach permitted during the initial PPP rollout. Relator's contrary view amounts to a post hoc methodology dispute, and his own testimony confirms he did not perform an

end-to-end count from source systems or identify any definitive "actual" headcount under a controlling standard. *See Wang*, 975 F.2d at 1420–21; *Hopper*, 91 F.3d at 1266–67. And materiality fails for the same reasons already addressed, including SBA's approval, disbursement, and later full forgiveness in the real world. *Escobar*, 579 U.S. at 192–95.

Second, if the supposed "false record" is the payroll/headcount support, Count II fails even more directly because Relator cannot meet § 3729(a)(1)(B)'s attribution and knowing-use requirement. The Second Amended Complaint alleges "altered" or "selectively omitted" payroll information, but Count II demands evidence—not rhetoric—of a specific false record knowingly made or used. 31 U.S.C. § 3729(a)(1)(B), (b)(1). Craig's employment ended before the PPP submission, and he admits he lacks personal knowledge that anyone fabricated or altered payroll records, cannot identify who purportedly did so, and did not observe any act of falsification. Those admissions preclude a finding that any Defendant knowingly made or used a false payroll record within the meaning of § 3729(a)(1)(B). *Wang*, 975 F.2d at 1420–21; *Hopper*, 91 F.3d at 1266–67. And even setting attribution aside, Relator still cannot tie the alleged payroll-support dispute to *Escobar* materiality, particularly in light of SBA's actual payment decisions culminating in full forgiveness. *Escobar*, 579 U.S. at 192–95.

In short, Count II adds a different statutory label, not missing proof. Whether Relator points to the Form 2483 package, Addendum A, or payroll support, he cannot produce admissible evidence of a knowingly false record that was material to payment. 31 U.S.C. § 3729(a)(1)(B), (b)(1), (b)(4). Summary judgment should be granted on Count II.

**F.    Independent Ground (and at minimum, Scienter Defeat): The CARES Act Franchise Waiver Bars Relator's Aggregation Theory.**

Relator's CQ Pacific theory depends on treating the affiliation rules as a rigid aggregation mandate applicable to Hawthorne's PPP eligibility in April 2020. The

problem is that Congress carved out an express waiver of SBA affiliation rules "with respect to eligibility for a covered loan for … any business concern operating as a franchise that is assigned a franchise identifier code." 15 U.S.C. § 636(a)(36)(D)(iv)(II). That waiver does not automatically resolve every affiliation question in this case, but it materially changes what Relator must prove. At a minimum, it forecloses any argument that the law clearly compelled Hawthorne—on pain of FCA liability—to aggregate CQ Pacific's headcount into Hawthorne's application in the manner Relator now insists.

       1.   <u>The franchise waiver is real, and it is an express limitation on affiliation-based aggregation as an eligibility rule.</u>

Congress did not merely delegate discretion to SBA; it mandated that the affiliation provisions "are waived" for the franchise-coded category. 15 U.S.C. § 636(a)(36)(D)(iv)(II) (SUF 23). Treasury's PPP interim final rule materials likewise recognize that the statute "waives SBA's affiliation rules" for, among other categories, "any business concern operating as a franchise that is assigned a franchise identifier code by the Administration." U.S. Dep't of the Treasury, *Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act*, 86 Fed. Reg. 3,694 (Jan. 14, 2021). That statutory structure means the parties cannot treat the affiliation rules as an automatically applicable aggregation mandate without first confronting the carve-out and the Directory-based implementation mechanics.

       2.   <u>Relator overstates the waiver if he treats it as a one-way ratchet that automatically forces Hawthorne to aggregate CQ Pacific.</u>

The statutory phrasing matters. The waiver is keyed to "eligibility for a covered loan for … [a] business concern operating as a franchise" with an SBA franchise identifier code. 15 U.S.C. § 636(a)(36)(D)(iv)(II). Read naturally, that language is most directly about how *the franchise-coded borrower's* eligibility is evaluated, not about imposing a separate affirmative duty on every non-franchise

affiliate to aggregate the franchise's employees into its own application. Relator wants the Court to treat affiliation aggregation as "unambiguous" and mandatory against Hawthorne in April 2020 even though Congress simultaneously told the administering agency that affiliation rules were "waived" for a defined class of PPP participants. That is not a clean statutory fit for an FCA theory that requires a provably false eligibility statement under a clear governing rule.

3. On this record, the waiver and SBA's identifier-code framework at least defeat scienter as a matter of law

Even if the Court ultimately concludes that Hawthorne still should have aggregated CQ Pacific notwithstanding CQ Pacific's franchise-coded status, Relator must still prove subjective scienter under the FCA: what Defendants actually believed at the time, not what Relator now says they should have concluded after years of litigation. 31 U.S.C. § 3729(b)(1); *SuperValu Inc.*, 143 S. Ct. at 1399–1401. Here, the program's contemporaneous implementation mechanics cut directly against any inference that Hawthorne knowingly violated a clear aggregation mandate. The record reflects written Carquest dealer/program agreements for CQ Pacific during the relevant period (SUF 26), a Franchise Directory excerpt identifying the Carquest-branded program with an SBA franchise identifier code effective before April 2020 (SUF 30), and testimony from Relator's own SBA expert that lenders/applicants could rely on the SBA Franchise Directory in assessing franchise identifier codes in the PPP context (SUF 31). When Congress has enacted an express waiver tied to a public identifier-code mechanism, and the implementation framework tells participants they may rely on the Directory, Relator cannot plausibly convert a disputed and highly technical affiliation/waiver interaction into "knowing" fraud, especially when Relator's own SBA expert confirmed the Directory could be relied upon for this purpose.

4.    <u>The upshot: Relator cannot premise FCA liability on a purportedly "unambiguous" aggregation obligation that the statutory waiver and rollout framework render, at minimum, debatable.</u>

Relator's aggregation theory requires the Court to accept that Hawthorne violated a clear eligibility rule by not rolling CQ Pacific's headcount into Hawthorne's application. But the CARES Act's franchise waiver, the SBA's identifier-code framework, and the Directory-reliance evidence collectively preclude that "clear rule + knowing violation" narrative. That defeats scienter under *SuperValu*, and it also undermines falsity and materiality because the record does not support treating Relator's preferred aggregation construct as the single controlling PPP standard that would have predictably altered SBA's guarantee, disbursement, or forgiveness decisions on these facts. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192–95 (2016).

5.    <u>The Waiver (or, at Minimum, Reasonable Reliance) Defeats the Aggregation Theory.</u>

This motion does not require the Court to decide every nuance of franchise program taxonomy to grant judgment. The point is narrower: Relator's aggregation-based ineligibility theory depends on treating affiliation aggregation as an enforceable PPP eligibility obligation in the face of an express statutory waiver and a contemporaneous implementation framework that relied on SBA identifier codes and the Franchise Directory. 15 U.S.C. § 636(a)(36)(D)(iv)(II); (SUF 26-39). At minimum, the undisputed record forecloses any claim that Defendants knowingly violated a clear eligibility rule by not aggregating CQ Pacific's employees into Hawthorne's headcount when the waiver concept existed in public law, "operating as a franchise" was not publicly defined in the initial window, and lenders/applicants could rely on the SBA Franchise Directory for identifier codes. (*Id*.)

Once the aggregation premise fails, so do Relator's FCA elements. Without a false statement of eligibility predicated on aggregation, there is no actionable falsity. Without a published controlling standard and with lender-directed, compliance-

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

23

oriented conduct, there is no scienter. And without proof the supposed aggregation dispute would have influenced, or minimally had a natural tendency to influence or was capable of influencing, approval, disbursement, or forgiveness decisions on this record, there is no materiality. *Escobar*, 579 U.S. at 192–95.

## V. CONCLUSION

This record does not present a triable False Claims Act case. Relator has not produced admissible evidence from which a reasonable jury could find that Defendants made a false claim or false record, acted with the requisite scienter, or submitted anything material to the Government's real-world payment decisions. The undisputed evidence instead shows lender-directed reporting, reliance on ordinary-course payroll records in an evolving regulatory environment, and SBA's approval, disbursement, and ultimate forgiveness of the loan—after it was aware of Relator's allegations. Under controlling law, that is not fraud. It is a failure of proof by Relator. *See* 31 U.S.C. §§ 3729(a)(1)(A), (B); *Escobar*, 579 U.S. 176; *SuperValu Inc.*, 143 S. Ct. 1391.

Independently, Relator's aggregation theory cannot sustain FCA liability. Congress expressly waived SBA affiliation rules for franchise-coded businesses in the PPP, and the statutory waiver—together with the contemporaneous identifier-code framework—forecloses any claim that Defendants knowingly violated a clear eligibility mandate by not aggregating CQ Pacific's employees into Hawthorne's application. 15 U.S.C. § 636(a)(36)(D)(iv)(II).

For these reasons, Defendants respectfully request that the Court grant summary judgment on both counts.

/ / /

/ / /

/ / /

/ / /

/ / /

1   DATED: January 29, 2026          PROCOPIO, CORY, HARGREAVES &
2                                    SAVITCH LLP

3
4                                    By: */s/ Edward C. Walton*
                                         Edward C. Walton
5                                        Sean M. Sullivan
                                         Janine Parchment
6                                        Attorneys for Defendants
                                         Hawthorne Machinery Co., Brian
7                                        Verhoeven, Tee Ness, and David Ness

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28