UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. ROGER S. CRAIG,<br><br>                                    Plaintiff,<br><br>v.<br><br>HAWTHORNE MACHINERY CO., BRIAN VERHOEVEN, TEE NESS, and DAVID NESS,<br><br>                                    Defendants. | Case No.:  20-cv-1625-WQH-AHG<br><br>**ORDER** |

HAYES, Judge:

The matter before the Court is the Motion for Summary Judgment (ECF No. 98) filed by Defendants Hawthorne Machinery Co., Brian Verhoeven, Tee Ness, and David Ness.

## I.    PROCEDURAL BACKGROUND

On August 21, 2020, Plaintiff-Relator Roger S. Craig ("Relator") initiated this action on behalf of the United States of America by filing a Complaint under seal against Defendants Hawthorne Machinery Co. ("Hawthorne") and Comerica Bank ("Comerica")

1

asserting violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3279 *et seq.* (ECF No. 1.)

On March 11, 2021, Relator filed a First Amended Complaint ("FAC"). (ECF No. 4.)

On November 16, 2022, the Court issued an Order stating that the United States declined to intervene in this action and ordering that the pleadings be unsealed and served on Defendants. (ECF No. 13 at 1–2; *see* ECF No. 15 (Government's Notice of Election to Decline to Intervene).)

On August 21, 2023, Relator filed the Second Amended Complaint ("SAC") against Defendants Hawthorne, Brian Verhoeven ("Verhoeven"), Tee Ness, and David Ness (collectively, "Defendants"). (ECF No. 51.)

On October 20, 2023, Defendants filed a Motion to Dismiss. (ECF No. 58.) On September 25, 2024, the Court issued an Order denying Defendants' Motion to Dismiss. (ECF No. 68.)

On October 9, 2024, Defendants filed an Answer. (ECF No. 69.)

On January 29, 2026, Defendants filed the pending Motion for Summary Judgment. (ECF No. 98.) On February 23, 2026, Relator filed an Opposition. (ECF No. 99.) On March 2, 2026, Defendants filed a Reply. (ECF No. 100.) On March 9, 2026, Relator filed an additional Response in Opposition. (ECF No. 101.) On May 15, 2026, the Court held a motion hearing. (ECF No. 107.)

## II.    FACTS

### A.    Background

Hawthorne is a seller and lessor of heavy machinery, including Caterpillar brand equipment. (SAC ¶ 26.) Hawthorne owns two related entities: Hawthorne Pacific Corp. and Hawthorne of Samoa, Inc. (*See* ECF No. 98-2, Defendants' Statement of Undisputed Material Facts ("DUF") ¶ 24.)

Verhoeven is the Chief Financial Officer, Treasurer, and Executive Vice President of Hawthorne. (SAC ¶ 27.) Tee Ness is the President, Chief Executive Officer, and

Chairman of the Board of Directors of Hawthorne. *Id.* ¶ 28. David Ness is the Chief Operating Officer and Senior Vice President of Hawthorne. *Id.* ¶ 29.

Relator began working as a Finance Manager for Hawthorne on October 14, 2019. (SAC ¶ 24.) Relator's employment was terminated effective April 3, 2020, as part of a reduction in force related to the COVID-19 pandemic. (DUF ¶ 3; ECF No. 98-8 (Notice to Employee as to Change in Relationship).)

**B.    Paycheck Protection Program**

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub L. No. 116-136, 134 Stat. 281 (2020). The CARES Act created the Paycheck Protection Program ("PPP"), a program administered by the Small Business Association ("SBA") offering loans to specified entities for qualifying purposes, such as payroll expenses. (SAC ¶ 3.)

The CARES Act provides:

> During the covered period [from February 15, 2020 through June 30, 2021], in addition to small business concerns, any business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title shall be eligible to receive a covered loan if the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern employs **not more than the greater of [] 500 employees**; or [] if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern operates.

15 U.S.C. § 636(a)(36)(D)(i) (emphasis added); *id.* § 636(a)(36)(A)(iii). The CARES Act provides that "the term 'employee' includes individuals employed on a full-time, part-time, or other basis." *Id.* § 636(a)(36)(D)(v).

In a document titled "SBA Pre-PPP Guidance," the SBA instructed applicants that the "method for determining" an applicant's size should be "based upon numbers of employees for each of the pay periods in the preceding completed 12 calendar months." (ECF No. 99-17.)

20-cv-1625-WQH-AHG

**C.      Hawthorne's PPP Loan Application**

On April 2, 2020, a non-party emailed David Ness regarding the CARES Act and the possibility of Hawthorne applying for a PPP loan. (ECF No. 99-41 at 3.) David Ness responded via email:

> We have actively been working with outside [counsel] to analyze the bill. We are about 540-550 [employees]. But we have separate businesses, however the small business bureau is very tough, compared to dept. of labor. We won't be able to benefit from this. Thanks though!

*Id.* at 2. In response to that email, another non-party suggested that David Ness consider "apply[ing] to be added to the 'Franchise Directory' that [the] SBA maintains" because "[t]he legislation allows any business concern operating as a franchise that is assigned a franchise identified code to participate in the Payroll Protection Program." *Id.*

On April 5, 2020, Hawthorne prepared and submitted a PPP loan application through Coamerica in the amount of $8,083,800. (DUF ¶ 6.)

In the morning of April 5, 2020, a representative from Coamerica sent Verhoeven an email with a list of necessary documentation to support Hawthorne's PPP application, including an "SBA Form 2483 Paycheck Protection Program Borrower Application Form" (the "Form 2483"), "Exhibit and Addendum A for SBA Form 2483," and documents that would "establish eligibility such as payroll processor records, payroll tax filings (941 Quarterly forms)." (ECF No. 98-10 at 9–10.)

Hours later, Verhoeven returned the Form 2483 and supporting documentation, including an "Excel file consolidating the Form 941s and reconciling back to payroll detail by person," to Coamerica. *Id.* at 9. Verhoeven provided Coamerica with a payroll report indicating that it had 484 employees during the period from February 12, 2020, through February 14, 2020. (DUF ¶ 7.)

The representative from Coamerica sent the PPP application to its Underwriting center. *Id.* ¶ 8. Another employee responded with a "list of items that we need to process the application." (ECF No. 98-10 at 5.) One of the employee's questions stated: "Employee count on application states 455, but the employee count used to calculate Salaries/Wages

20-cv-1625-WQH-AHG

on the table ($34,952,515.78) is 592 employees. Do we know why it's different?" *Id.* ¶¶ 8, 10; ECF No. 98-10 at 5.

Coamerica forwarded this inquiry and others to Verhoeven, who responded in relevant part: "We currently have 455 employees and had 484 on 2/15/2020. The 592 employees listed in the 2019 report include all employees who received a pay check during 2019. They were not all employed at the same time. We did not exceed 500 employees at any individual point during 2019." (DUF ¶ 11; ECF No. 98-10 at 3.)

Coamerica advised Hawthorne to "fix the employee number on the application to reflect the average employee headcount in the last 12 months." (ECF No. 98-10 at 2.) Coamerica expressed that it was "afraid SBA won't accept the 455 number as that is the current employee headcount of Hawthorne." *Id*.

Verhoeven sent Coamerica a revised Form 2483, which reported a total of 489 Hawthorne employees: 298 employees for Hawthorne Machinery Co., in addition to 184 employees for Hawthorne Pacific Corp. and 7 employees for Hawthorne of Samoa, Inc. (DUF ¶¶ 13–14; ECF No. 98-12.) Hawthorne described these two entities as "qualified affiliates" and "subsidiaries" in its application. (DUF ¶ 25; ECF No. 98-12 at 6.)

Verhoeven testified that he calculated the total employee count of 489 by reviewing Hawthorne's "active employee" reports for the end of each month in 2019. (DUF ¶ 18; *see* ECF No. 98-26 at 14–15.) Verhoeven added the number of active employees at the end of each month in 2019 and divided the sum by 12 to reach the final calculation of 489. (ECF No. 98-26 at 15, 29–31.)

On April 6, 2020, the SBA approved Hawthorne's PPP loan in the amount of $8,083,800. (ECF No. 98-18.)

### D.    CQ Pacific's PPP Loan Application

Two days earlier—on April 3, 2020—CQ Pacific LLC ("CQ Pacific"), a company that operates retail locations in Hawaii under the "Carquest" trade name, also applied for a PPP loan. (SAC ¶ 33; DUF ¶ 27.) The parties dispute the relationship between Hawthorne and CQ Pacific; namely, whether CQ Pacific operated as a franchise of Hawthorne. (DUF

¶ 26; ECF No. 99-1 at 26–27.) CQ Pacific sought a loan in the amount of $563,870 and reported that it had 61 employees. (ECF No. 98-4 at 3.)

The CARES Act includes a "Waiver of affiliation rules" for PPP eligibility, which provides that "the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, or any successor regulation, are waived with respect to eligibility for a covered loan for [] any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System code beginning with 72; [] any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; [and] any business concern that receives financial assistance from a company licensed under section 681 of this title." 15 U.S.C. § 636(a)(36)(D)(iv).

The SBA Franchise Directory lists an "SBA Franchise Identifier Code" for Carquest and, separately, for Carquest Auto Parts. (ECF No. 98-14 at 3.)

### E.    Subsequent History

On August 26, 2021, representatives from the Department of Justice ("DOJ") and the SBA met virtually with Verhoeven to discuss an investigation into Hawthorne's PPP loan. (ECF No. 98-4 at 3.)

On October 4, 2021, the SBA forgave Hawthorne's PPP loan in the principal amount of $8,083,800 and $120,583.35 in interest. (ECF No. 98-21 (Notice of Paycheck Protection Program Forgiveness Payment issued by the SBA).)

On January 18, 2022, the DOJ issued a Civil Investigative Demand on Hawthorne "to determine whether there has been a violation of" the FCA. (ECF No. 98-22 at 2.) On May 12, 2022, Hawthorne responded to written interrogatories issued as part of the Civil Investigative Demand. (ECF No. 98-17 at 1–25.)

On November 16, 2022, the United States declined to intervene in this action. (ECF No. 13.)

/ / /

/ / /

6

20-cv-1625-WQH-AHG

## III.    LEGAL STANDARDS

### A.    Summary Judgment

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that is relevant to an element of a claim or defense, and whose existence might affect the outcome of the case." *See United States v. Grayson*, 879 F.2d 620, 622 (9th Cir. 1989) (citation omitted). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). Where the party moving for summary judgment bears the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

If the moving party meets the initial burden, the burden shifts to the opposing party to show that summary judgment is not appropriate. *Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 322, 324. The nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient[.]"). The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (quotations omitted). The nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial,' and summary judgment is appropriate." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

### B.   False Claims Act

The FCA imposes liability on a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). To establish a claim under § 3729(a)(1)(A), a relator must prove each of the following elements: "(1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent." *Hooper v. Lockheed Martin Corp.,* 688 F.3d 1037, 1047 (9th Cir. 2012) (citations omitted). "Likewise, to establish a cause of action under § 3729(a)(1)(B), the United States or a relator must show that defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . that [] is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2).

Under a false certification theory, FCA liability attaches where a party "falsely certifies compliance with a statute or regulation as a condition to payment." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006) (citations omitted). There are two types of false certifications: express and implied. "Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). "Implied false certification

20-cv-1625-WQH-AHG

occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Id.* "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996) (emphasis in original). "Defendants can be liable for violating requirements even if they were not expressly designated as conditions of payment. Conversely, even when a requirement is expressly designated a condition of payment, not every violation of such a requirement gives rise to liability. What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Universal Health Services, Inc. v. United States ex rel. Escobar* (*Escobar*), 579 U.S. 176, 181 (2016).

"To survive summary judgment" on claims brought under the FCA, a "relator must establish *evidence* on which a reasonable jury could find for the plaintiff." *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017) (emphasis in original) (quoting *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)). "If the facts make a claim 'implausible,' the non-movant must present 'more persuasive evidence than would otherwise be necessary' in order to defeat a summary judgment motion." *Id.* (citation and quotation omitted).

## IV. DISCUSSION

Relator brings two causes of action under the FCA based on allegations that Defendants knowingly submitted false information about the number of Hawthorne employees in their PPP loan application. (*See* SAC at ¶¶ 150–55 (asserting claims under 31 U.S.C. § 3729(a)(1)(A) and (B)).) Relator raises two theories in support of his position that the actual number of Hawthorne employees exceeded 500 during the relevant period: (1) Hawthorne knew that it averaged, "at minimum, 503 employees during calendar year

2019," but knowingly devised a counting methodology that excluded some of those employees; and (2) Hawthorne knew that it should have included the 61 employees working at its "affiliate/subsidiary CQ Pacific" because CQ Pacific did not qualify as an "franchise" within the meaning of the CARES Act. (ECF No. 99 at 16–17; ECF No. 51 at 4, 23, 26; *see* 31 U.S.C. §§ 3729(a)(1)(A), (B).)

As to the former theory, Relator contends that Defendants "counted only those [Hawthorne] employees that were 'active employees' on the final day of each month in calendar year 2019." (ECF No. 99 at 8.) Relator contends that this methodology fails to fully account for the 103 Hawthorne employees terminated throughout the year because, if their employment concluded before the final day of the month, these employees would not have been included in the "active employees" count for the month in which they were terminated. *Id.*

As to the latter theory, Relator contends that all CQ Pacific employees should have been included in Hawthorne's total number of employees because CQ Pacific was not operating as a "franchise" in a manner that would permit Hawthorne to exclude its employees. *Id.* at 12; *see* ECF No. 99-15 at 8 (Relator's expert concluding that "CQ Pacific should not be treated as a franchise. . .").

Defendants contend that each of Relator's theories of liability represents only "a hindsight disagreement about how employees should have been counted during the earliest days of the" PPP program. (ECF No. 98-1 at 6.) Defendants contend that they submitted the Form 2483 and supporting documentation based on good-faith calculations, including adherence to Coamerica's instruction that that their count should reflect "the average employee headcount in the last 12 months." *Id.* at 12.

In their Motion for Summary Judgment, Defendants contend that the undisputed facts in the record do not plausibly establish materiality, scienter, or falsity as to either of Relator's claims under the FCA, and that summary judgment on each claim is appropriate. *Id.* at 29.

/ / /

20-cv-1625-WQH-AHG

### A.   Request for Judicial Notice and Evidentiary Objections

As a preliminary matter, the Court considers Defendants' Request for Judicial Notice filed in support of their Motion for Summary Judgment. (ECF No. 98-3.) Defendants request that the Court notice the "SBA Franchise Directory," which is accessible from the SBA's website at the following URL: https://www.sba.gov/document/support-sba-franchise-directory. *Id.* at 3.

"Judicial notice under [Federal Rule of Evidence] 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). "Under Rule 201, the court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (quotation omitted); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (taking notice of a list of vendors displayed publicly on school districts' websites). The SBA Franchise Directory is displayed publicly on a federal government website whose reliability cannot reasonably be questioned. Accordingly, Defendants' Request for Judicial Notice (ECF No. 98-3) is granted.

In their Reply in Support of the Motion for Summary Judgment, Defendants object to certain documents filed by Relator in support of his Opposition to the Motion for Summary Judgment. (ECF No. 100 at 6.) Defendants "object under Rule 56(c)(2) and Rule 56(c)(4) to Relator's counsel's declaration and 'spreadsheet' exhibits," which are "described as edited, with data inserted, 'filled-in,' or otherwise manipulated." *Id.* Defendants contend that these materials "lack foundation, are hearsay, [and] are not business records." *Id.* Relator responds that the spreadsheets are business records created during Hawthorne's normal course of business and were submitted in support of its PPP

20-cv-1625-WQH-AHG

loan application. (ECF No. 101 at 2.) Relator contends that the challenged exhibits are merely versions of documents produced by Defendants during discovery that have been sorted or edited to "show the relevant information to the Court." *Id.* at 4.

Upon review, the challenged exhibits reflect various alterations to two payroll-related spreadsheets: (1) the Hawthorne Machinery Co. & Subsidiaries Employee Analysis – Paid Hours (Including Reg., Sick, Vacation & Overtime), (ECF No. 99-9), and (2) the Hawthorne Machinery Payroll Calendar Year 2019, (ECF No. 99-21). Relator submits edited versions of these spreadsheets, including filters and highlights, to further explain his contentions regarding the accurate number of Hawthorne employees. The Court does not rely upon the altered versions of these documents filed by Relator because the original, unedited copies are adequate to inform its analysis of the Motion for Summary Judgment. Accordingly, Defendants' objections to the altered spreadsheets are denied as moot.

### B.  Materiality

Defendants contend that summary judgment is appropriate on the basis that Relator fails to identify adequate evidence to establish materiality because the record does not indicate that the SBA "would have denied guarantee or disbursement in April 2020, or denied forgiveness in October 2021, based on the particular headcount dispute he now advances." (ECF No. 98-1 at 20.) Defendants also contend that the SBA knew of Relator's allegations at the time that it chose to forgive Defendants' loan in full. *Id.* at 22.

Relator responds that materiality is a "fact-specific question that is typically an appropriate question for the jury." (ECF No. 99 at 26.) Relator contends that PPP loans were meant "to assist small businesses," and that the limitation on employees for applicant businesses was an integral aspect of the program. *Id.* at 26–27. Relator contends that the United States's decision not to intervene in this case and the SBA's forgiveness of its loan to Defendants are not decisive as to materiality at the summary judgment stage. *Id.* at 28.

Under the False Claims Act, a falsehood is material if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Escobar*, the Supreme Court stated that "[t]he materiality standard

is demanding." 579 U.S. at 194. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 194–95.

In *United States ex rel. Kelly v. Serco, Inc.*, the Ninth Circuit affirmed a grant of summary judgment on the issue of materiality for a defendant corporation that performed project management services for the United States. 846 F.3d 325, 328 (9th Cir. 2017). Under the terms of the contract, the defendant company was required to "implement a cost and progress tracking system" to record its work. *Id.* The relator in that action, who had been hired by the defendant company to monitor its performance on the project, determined that the defendant company's cost reports were unreliable because they "tracked costs manually and with a single charge code in violation of" third-party, standardized guidelines that had not been expressly identified in the contract. *Id.* at 329. The Ninth Circuit affirmed summary judgment for the defendant on the issue of materiality, stating: "Given the demanding standard required for materiality under the FCA, the government's acceptance of [the defendant company's] reports despite their non-compliance with [the standardized guidelines]," and the government's payment in fulfillment of the contract to the defendant company, "no reasonable jury could return a verdict for [the relator] on his implied false certification claim." *Id.* at 335.

In *Stephens Institute*, conversely, the Ninth Circuit affirmed a district court's denial of summary judgment for claims against a defendant school alleged to have offered financial incentives to admissions officers in violation of eligibility requirements for federal funding. *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1016 (9th Cir.

20-cv-1625-WQH-AHG

2018). The Ninth Circuit wrote that, in light of the Supreme Court's holding in *Escobar*, "it is clear that noncompliance with the incentive compensation ban is not material per se." *Id.* at 1020. The appellate court discussed the circumstances to assess whether the alleged violations were material: the federal government had conditioned payment of educational funding on the "incentive compensation ban through statute, regulation, and contract" (in other words, "triple-conditioning" the disbursement of funds) and the Department of Education's conduct in similar situations demonstrated a pattern of enforcement of the incentive policy, which suggested that it "*did* care about violations of the incentive compensation ban and did not allow schools simply to continue violating the ban while receiving Title IV funds." *Id.* at 1020–22. The appellate court also emphasized the magnitude of the violation: admissions officers saw their salaries adjusted by "as much as $23,000" and could win "a trip to Hawaii." *Id.* at 1022 ("[T]hose awards are precisely the kind of substantial incentive that Congress sought to prevent in enacting the ban on incentive compensation."). The Ninth Circuit concluded that, viewing the evidence in the light most favorable to the relators, a reasonable factfinder could determine that the violations of the prohibition on incentive programs were material. *Id.*

Here, there is no dispute that the PPP loan program to which Defendants applied had a statutory eligibility threshold of 500 employees. Materiality, however, is not satisfied merely by a violation of that threshold. *Escobar*, 579 U.S. at 194 ("In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive."); *see also Stephens Institute*, 909 F.3d at 1020. The issue of materiality is not resolved merely by determining whether Hawthorne employed more than 500 employees in the relevant time period under either of Relator's theories of liability.

The parties do not identify, as contemplated by the Supreme Court in *Escobar*, a pattern of conduct in which the SBA declined or chose to issue loans to companies that marginally exceeded the employee headcount threshold. *Escobar*, 579 U.S. at 195. The record does provide support, however, for a finding similar to the third form of proof

contemplated in *Escobar* that provides insight into materiality: circumstances in which "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Id.*

Defendants provide adequate evidence to establish that the SBA forgave Hawthorne's PPP loan in full on October 4, 2021. (ECF No. 98-21.) Defendants also provide adequate evidence to establish that the SBA's forgiveness of the loan occurred after the initiation of this action on August 21, 2020, and after a meeting between the DOJ, SBA, and Verhoeven to discuss an investigation into Hawthorne's PPP loan. (ECF No. 1; ECF No. 98-4 at 3.) This sequence of events supports an inference that the SBA knew of Relator's allegations regarding the accurate number of Hawthorne employees, and that knowledge of those allegations was insufficient for the SBA to decline forgiveness of the PPP loan. The SBA's decision to forgive Hawthorne's PPP loan—although it does not indicate that the agency determined that the eligibility requirements had, in fact, been violated—weighs heavily towards a finding that the alleged violation was immaterial to the SBA's original decision to issue the loan. Accordingly, Defendants satisfy their burden of demonstrating that the evidence supports summary judgment in their favor on materiality. The burden shifts to Relator to show that summary judgment is not appropriate.

Relator cites *Gilead Sciences*, in which the Ninth Circuit held that the relators sufficiently pled materiality despite "continued FDA approval" of pharmaceutical products after the government learned that the drugs had been produced at unregistered facilities in violation of federal requirements. *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 896, 906 (9th Cir. 2017). In that case, the Ninth Circuit reasoned that continued approval did not indicate that the violation was immaterial because "there are many reasons the FDA may choose not to withdraw a drug approval" and, moreover, the defendant company ceased using materials from the noncompliant facility during its continuing relationship with the government. *Id.* at 906. The SBA's forgiveness of Defendants' loan is more persuasive on the question of materiality than the continued approval in *Gilead Sciences* because the alleged violation and the government's later conduct are related to a

20-cv-1625-WQH-AHG

single event: the issuance of the PPP loan to Hawthorne, rather than the broader relationship between a pharmaceutical developer and the federal government. The SBA's forgiveness of Hawthorne's PPP loan constitutes an affirmative act—rather than the maintenance of an existing relationship—that strongly suggests the alleged violation did not materially affect the government's determination of whether Hawthorne was eligible for the PPP program.

Relator raises a range of purportedly accurate calculations of Hawthorne employees. (*See* ECF No. 99 at 16 (arguing that Hawthorne "had, at minimum, an average of 503 employees" in 2019); *id.* at 21 (identifying the 561 participants, per Form 5500, on Hawthorne's employee benefit plan at the beginning of 2019); *id.* at 22 (contending that Hawthorne should have included the "61 employees that worked at CQ Pacific" in the total headcount).) Even drawing all reasonable inferences in Relator's favor, the alleged magnitude of Defendants' false representation does not constitute a substantial deviation from the 500-employee threshold in the CARES Act. Assuming that Relator can establish falsity on any or all of his theories, the alleged deviation from the statutory threshold for PPP eligibility remains "minor or insubstantial." *Escobar*, 579 U.S. at 194.

Relator has not satisfied his burden to show that summary judgment on the issue of materiality is inappropriate. Based on the record, no reasonable juror could conclude that Defendants' alleged violation of the statutory threshold for PPP eligibility was material to the SBA. Accordingly, summary judgment for Defendants on the issue of materiality is appropriate as to all claims. *See United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 44 F.4th 838, 850 n.7 (9th Cir. 2022) (explaining that the materiality analyses under 31 U.S.C. § 3729(a)(1)(A) and (B) are equivalent at the summary judgment stage).

### C.  Scienter

Defendants also contend that Relator fails to establish scienter because they "sought and followed lender direction on how to complete the headcount field, supported the submission with ordinary-course payroll and headcount materials, and documented distinctions among different payroll-related metrics," which is "inconsistent with a

subjective belief in falsity." (ECF No. 98-1 at 17.) Defendants contend that, even if Relator's calculations of Hawthorne's employee headcount are more accurate than their own, there is inadequate evidence in the record to support a finding that Defendants knew that they exceeded the employee count threshold for PPP eligibility. *Id.* at 16–17.

Relator responds that Verhoeven "purposely ignored [Hawthorne's] actual payroll numbers" when submitting the PPP application to Coamerica. (ECF No. 99 at 25.) Relator contends that Hawthorne's internal payroll and health insurance documents indicated a higher number of employees than reported and that Defendants deliberately ignored this information when preparing their loan application. (*See* ECF No. 99-54 at 3 (Form 5500 for the "Hawthorne CAT 401(k) Retirement Plan" from 2019 reporting 561 "active participants at the beginning of the year" and 548 "active participants at the end of the year").) Relator also identifies the email from David Ness on April 2, 2020, indicating that he believed Hawthorne "won't be able to benefit from" the PPP loan program because the company employed "about 540–550" employees. (ECF No. 99 at 19; ECF No. 99-41 at 2.)

Scienter requires that the defendant acted "knowingly" in providing false information to the government. 31 U.S.C. §§ 3729(a)(1)(A)–(B). The FCA defines "knowingly" as having "actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). "Congress specifically amended the [FCA] to include this definition of scienter, to make 'firm . . . its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S. Rep. No. 99-345, at 7 (1986)). The Supreme Court has stated that "[t]he FCA's scienter element refers to [a defendant's] knowledge and subjective beliefs" at the time that the allegedly false claim is submitted. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749, 752 (2023).

Innocent mistakes and negligent conduct do not establish scienter. In a case concerning a mechanical engineer's qui tam suit against a former employer, the Ninth

Circuit affirmed a district court's grant of summary judgment in favor of the defendant corporation on the issue of scienter. *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015). The Ninth Circuit stated that the relator failed to establish that the defendant corporation had "committed anything more than 'innocent mistakes' or 'negligence'" and that "[v]irtually all of [his] evidence consists of his own affidavit, which assesses and condemns [the defendant corporation's] performance on various defense projects." *Id.* at 1420. With respect to one project, the relator's "entire claim [was] based on allegedly faulty calculation by another" employee of the defendant corporation. *Id.* The Ninth Circuit held that the relator's criticism, "even if accurate, proves no more than an 'innocent mistake.'" *Id.*

Here, the record indicates that Verhoeven and Coamerica communicated repeatedly about Defendants' PPP loan application on April 5, 2020. (ECF No. 98-10.) During that day, Verhoeven shared a series of documents, including a "Signed 2483 Application" and payroll documentation. *Id.* at 8–9. In response to an inquiry from Coamerica about a discrepancy between a payroll figure indicating more than 500 employees and the calculation of total employees in Hawthorne's application, Verhoeven stated that the "592 employees listed in the 2019 report include[s] all employees who received a pay check during 2019. They were not all employed at the same time. We did not exceed 500 employees at any individual point during 2019." *Id.* at 3.

In response, Coamerica advised Verhoeven to "fix the employee number on the application to reflect the average employee headcount in the last 12 months." (ECF No. 98-10 at 2.) Coamerica's response did not appear to suggest that Hawthorne should conceal information about the number of its employees; instead, the advisal was based on concern that the "SBA won't accept the . . . *current* employee headcount of Hawthorne" and that historical information from 2019 was more appropriate. *Id.* (emphasis added). The Active Employee Report subsequently generated by Defendants indicated a "2019 Average Active Headcount" of 486 employees and listed, at bottom, the number of reported Hawthorne

18

employees as 489. (ECF No. 98-24 at 2.) In the finalized Form 2483 conveyed to Coamerica for submission in its PPP loan application, Hawthorne listed 489 as the total "# of Jobs" in connection with its application. (ECF No. 98-12 at 6.)

During his deposition, Verhoeven testified about the methodology used to determine the number of Hawthorne employees in 2019:

> Well, when the law was originally passed, the information provided about how to go about counting employees was not laid out. So we were left with trying to come up with a reasonable approach to counting employees. And so in the instructions to the form, which are not on this one, but different—on the other application, it made reference to most applicants will use the 2019 payroll.
>
> So seeing that, and not having any other guidance at the time, I went about preparing the application. Most of the time was spent in getting the dollars, the analysis done for the dollars. . . .
>
> I followed the same approach using the 2019 calendar year, and I used our month-end active employee report in our financial system to determine how many employees we had that were active at the end of each calendar month.

(ECF No. 98-26 at 14–15.)

The record indicates that Verhoeven adopted a methodology for determining the total number of Hawthorne employees in 2019 by averaging the number of employees at the end of each month in that year. The guidance available to Defendants at the time of submitting their PPP loan did not indicate that this methodology was impermissible. The statutory definition of "employees," which included full-time and part-time employees, did not explain how those employees should be counted for the purpose of the PPP application, including in the case of termination during a pay period. 15 U.S.C. § 636(a)(36)(D)(v). Likewise, the provision that "part-time" employees must be included did not explain how the termination of an employee during the year should affect their mathematical contribution towards the company's total headcount. Defendants satisfy their burden to show that summary judgment is appropriate on the issue of scienter, and the burden shifts

20-cv-1625-WQH-AHG

to Relator to present "persuasive evidence" that summary judgment is not appropriate. *Kelly*, 846 F.3d at 330.

Even drawing all reasonable inferences in favor of Relator, the email sent by David Ness three days prior to Hawthorne's PPP loan application is inadequate to create a triable issue of fact regarding scienter. The email states that David Ness has been "working with outside council [*sic*] to analyze the [CARES Act]" and estimates that Hawthorne is ineligible for a PPP loan because it maintains "about 540–550 employees." During his deposition, however, David Ness testified that he was not involved in Hawthorne's loan application process and did not know how the total number of employees was calculated for the purpose of the application. (ECF No. 99-42 at 14, 16.) The record reflects, instead, that Verhoeven prepared the loan application based on his communications with Coamerica. (ECF No. 98-26 at 14–16.) David Ness's estimate of Hawthorne's employee headcount, which exceeded the statutory threshold for PPP eligibility, does not indicate that Verhoeven later acted knowingly or with deliberate indifference in contributing false information to Hawthorne's loan application.

With respect to Relator's theory of falsity related to the affiliate/franchise status of CQ Pacific, the statutory guidance contained a "[w]aiver of affiliation rules." *Id.* § 636(a)(36(D)(iv). Defendants contend that, at the time of the loan application, they understood CQ Pacific to qualify as a franchise whose employees were excluded from its total count. (DUF ¶ 28.) Verhoeven testified, in relevant part:

> Well, when the law came out, it didn't define franchise, as I recall. It – it used fairly plain language about the term "franchise," in the context of whether or not a company is listed on the SBA's franchise agreement. You know, the law was put together very quickly, and they used a lot of general terms. It was intended to be broad, from our understanding.
>
> And so, in reviewing it, we concluded that the term "franchise" relates to the franchise list that the SBA issued.

(ECF No. 98-26 at 11.)

Even if Defendants should have employed an alternative methodology that would have yielded a number of Hawthorne employees greater than the statutory limit for PPP eligibility or included CQ Pacific employees, the record does not indicate that Defendants acted knowingly or in reckless disregard of the truth when preparing the Form 2483 and other supporting materials for the PPP loan application. Communications between Verhoeven and Coamerica indicate a mutual effort to provide the required documentation to the SBA. Relator's contentions are related mostly to the question of whether Defendants' methodology was correct; however, the fact that Hawthorne should have counted its employees in a manner that resulted in a higher total does not establish that Defendants knowingly submitted a false headcount in their PPP application. At this stage in the proceedings, Defendants adequately point to an absence of evidence that could support a finding of scienter. Relator does not identify adequate evidence in response to support the conclusion that a reasonable factfinder could find in his favor on scienter.

Accordingly, summary judgment in favor of Defendants is warranted on the elements of materiality and scienter as to both of Relator's claims under the FCA. The Court does not reach the question of whether summary judgment is appropriate on the issue of falsity with respect to either of Relator's theories of liability because, even if a rational factfinder could find for Relator of the issue of falsity, each of the foregoing grounds provides an independent basis to issue judgment on all claims for Defendants.

## V.    CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 98) is granted. The Clerk of Court shall enter judgment in favor of Defendants and against Relator as to all claims.

Dated:  June 8, 2026

Hon. William Q. Hayes
United States District Court

20-cv-1625-WQH-AHG